IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

**FILED**

SEP 30 1999

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| GARY LEON BROWN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) |
| | ) |
| WILLIE JOHNSON, | ) |
| Warden, Holman Unit; | ) |
| and JEFF SESSIONS[1], | ) |
| Attorney General of the | ) |
| State of Alabama, | ) |
| | ) |
| Respondents. | ) |

Case No. CV-95-C-1792-S

**ENTERED**

OCT 0 1 1999

## MEMORANDUM OPINION

In this death penalty habeas corpus action under 28 U.S.C. § 2254, based on the discussion which follows, the Court finds and concludes that most of the federal constitutional claims raised by Gary Lee Brown ("Petitioner") are procedurally barred, and that he has failed to establish his claim of ineffective assistance of counsel.[2] The petition for a writ of habeas corpus must therefore be denied.

---

[1]Bill Pryor has now succeeded Jeff Sessions as the Attorney General of the State of Alabama.

[2]In a separate opinion issued contemporaneously, the Court has found that Petitioner is entitled to an evidentiary hearing. The record of the state court proceeding is adequate for resolution of the issues raised by Petitioner.

Because of its length, a Table of Contents precedes the opinion.

**TABLE OF CONTENTS**

I.      **FACTUAL AND PROCEDURAL BACKGROUND** . . . . . . . 8

II.     **THE SPECIFIC CLAIMS OF PETITIONER** . . . . . . 16

III.    **APPLICABLE LEGAL PRINCIPLES** . . . . . . . . . . 19

IV.     **PROCEDURALLY DEFAULTED CLAIMS** . . . . . . . . . 38

   **Claim A.** Petitioner's death sentence violates his rights under the Eighth and Fourteenth Amendments because prosecution witness Jimmy Davenport's testimony was procured through coercive prosecutorial interrogation tactics. . . . 38

   **Claim B.** The playing of the tape of the interrogation of prosecution witness Jimmy Davenport deprived Petitioner of his rights of confrontation and to due process of the law guaranteed him under the Sixth and Fourteenth Amendments and to protection from cruel and unusual punishment under the Eighth Amendment. . . . . . . . . 48

   **Claim C.** Alabama's application of the "especially heinous, atrocious and cruel" aggravating circumstance is unconstitutionally vague and, as applied to Petitioner's case, violates due process and the prohibition of cruel and unusual punishment. . . . . . . . . . . . . 49

   **Claim D.** Petitioner was deprived of his rights under the Eighth and Fourteenth Amendments due to a false

impression created by a prosecution witness as
to pain felt by the deceased. . . . . . . . 49

Claim E. The   trial   court's   instructions limiting
consideration of mitigating evidence violated
Petitioner's   rights   to   a   constitutional
sentencing hearing. . . . . . . . . . . . . 56

Claim F. The trial court's directive to the jury that it
exclude from consideration during its penalty
phase   deliberations   any   and   all   passion
violated Petitioner's rights under the Eighth
and Fourteenth Amendments.   . . . . . . . . 56

Claim G. The trial court erred in its instruction to the
jury on reasonable doubt and thereby violate
Petitioner's rights under the Sixth, Eighth and
Fourteenth Amendments . . . . . . . . . . . 58

Claim H. Petitioner's   conviction   was   obtained in
violation of his right to due process of law
under the Fourteenth Amendment because of a
jury instruction that impermissibly shifted the
burden of proof.   . . . . . . . . . . . . . 59

Claim I. The   prosecution's   misconduct   and arguments
during the guilt/innocence phase of the trial
were improper and violated Petitioner's rights
under the Fifth, Sixth, Eighth and Fourteenth
Amendments. . . . . . . . . . . . . . . . . 60

Claim J. The prosecution's misconduct and arguments at
the penalty phase of the trial were improper
and deprived Petitioner of a fundamentally fair
hearing and due process.   . . . . . . . . . 60

Claim K.  The state's use of prejudicial and inflammatory photographs and slide shows at Petitioner's trial violated the petitioner's rights. . . 60

Claim L.  Petitioner's death sentence violates the Eighth and Fourteenth Amendments because of the failure of the trial court to properly consider mitigating evidence.  . . . . . . . . . . . 61

Claim M.  The trial court's denial of Petitioner's request for a continuance violated his rights under the Sixth, Eighth and Fourteenth Amendments. . . . . . . . . . . . . . . . . 61

Claim N.  Petitioner's statements to deputies of the Jefferson County Sheriff's Department were not voluntary and therefore inadmissible under the Fifth and Fourteenth Amendments . . . . . . 62

Claim O.  Petitioner's third statement to law enforcement officials was obtained in violation of his rights under the Sixth and Fourteenth Amendments. . . . . . . . . . . . . . . . . 78

V.       CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL . . 81

Claim P.  Petitioner did not receive effective assistance of counsel at trial in violation of his rights under the Sixth, Eighth and Fourteenth Amendments. . . . . . . . . . . . . . . . . 81

         1.  Counsel failed to adequately investigate, develop and present evidence as to the Petitioner's background, drug and alcohol abuse and its effects upon his mental state relevant

to pretrial, guilt/innocence and life/death issues; counsel failed to adequately develop and present a viable defense strategy or defense at either stage of trial. . . . . . 81

    a.   Trial Counsel's Performance.   . . 93

    b.   Prejudice.   . . . . . . . . . 100

2.   Counsel failed to ask during voir dire whether venire members would automatically vote to impose the death penalty if Petitioner were convicted of capital murder.   . . . . . . 104

3.   Counsel failed to adequately present a defense strategy at the hearing to suppress statements Petitioner gave to Jefferson County law enforcement officers, or to otherwise effectively seek suppression of evidence.   107

4.   Counsel failed to object to certain prosecution jury arguments at the trial.   . . . . . . 113

    a.   Guilt/innocence phase arguments   . . 114

    b.   Penalty phase arguments   . . . . . 122

5.   Counsel failed to object to the trial court's directive that the jury exclude from its consideration in its penalty phase deliberations any and all passion.   . . . 127

6.   Counsel failed to object to a jury instruction that shifted the burden of proof on reasonable doubt.   . . . . . . . . . . . . . . . 128

7.   Counsel failed to adequately investigate the

*State's penalty phase forensic evidence presented through Dr. Robert Brissie on the issue of the victim's degree of suffering, or to adequately cross-examine Dr. Brissie in this regard, for the purpose of dispelling a false impression regarding the victim's pain.* .   135

8.   *Counsel failed to object to the trial court's instruction improperly limiting the jury's consideration of mitigating evidence in the case.*   .  .  .  .  .  .  .  .  .  .  .  .  .  .  .   136

9.   *Counsel failed to challenge the application of the Ala. Code (1975) § 13A-5-49(8) aggravating circumstance ("heinous, atrocious and cruel") to his case.*   .  .  .  .  .  .  .  .  .  .  .  .  .  .   143

10.   *Counsel failed to object to the trial court's jury instructions on reasonable doubt.*   .   150

11.   *Counsel failed to specify all the possible constitutional grounds for objecting to Davenport's testimony and the playing of his recorded statement.*   .  .  .  .  .  .  .  .  .  .   154

**Claim Q. Petitioner's conviction and sentence of death violate the Sixth and Fourteenth Amendments because he did not receive effective assistance of counsel on appeal.**   .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .   156

1.   *Ineffective assistance claim regarding the trial court's consideration of mitigating evidence.*   .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .   161

2.   *Ineffective assistance for failure to raise a claim regarding the trial court's denial of a continuance.*   .  .  .  .  .  .  .  .  .  .  .  .  .  .   169

3.   *Ineffective assistance for failing to raise a claim regarding admission of certain photographs and slides at trial.* . . . . 176

4.   *The playing of the tape of the interrogation of Jimmy Davenport.* . . . . . . . . . . . . 181

VI.   **CONCLUSION** . . . . . . . . . . . . . . . . **184**

## I.   FACTUAL AND PROCEDURAL BACKGROUND

On May 26, 1986, Gary Leon Brown ("Brown") and three acquaintances, Archie Bankhead, James Bynum and Jimmy Davenport, went fishing near Locust Fork, Alabama, about thirty miles north of Birmingham.[3]  (R. 563, 777-79; Rule 20 Tr. 785)[4].  The men drank alcohol as they fished.  (R. 564-65).  When they finished fishing, they went to Chuck and Willie's Lounge in Birmingham, where they continued to drink and played pool.  (R. 565).  While at the Lounge, Brown, Bankhead and Bynum discussed the possibility of going to the Pinson, Alabama home of the victim, Jack McGraw, to obtain money.   (R. 565, Rule 20 Tr. 790).   Brown and Bynum were familiar with McGraw, as he had paid them for sexual relations on several previous occasions in the months before the murder.

---

[3]The victim and each of the men lived in or near Birmingham.

[4]In citing the trial record, the Court will use the abbreviation "R.", except that the first 39 pages of that record, which contain transcripts of the November 6, 1986 and December 17, 1986 pretrial hearings, are paginated separately from the rest of the trial record, and shall be cited as "Supp. R.". The Rule 20 record will be cited as "Rule 20 R."; the transcript of the Rule 20 hearing will be cited as "Rule 20 Tr."; the Rule 20 Supplemental Record will be cited as "Rule 20 Supp. R."; and the Supplemental Record on Appeal will be cited as "Supp. R.".

Brown had once spent the night at McGraw's house.[5]  (Rule 20
Tr. 735, 741-44, 776-77).

The group then left the lounge and headed to McGraw's
residence with Davenport driving and Bynum giving directions.
(R. 566-70).  On the way, Davenport heard the others discuss
"something about going and killing a queer, or something like
that."  (R. 567).

When they arrived at McGraw's that night, Davenport
remained in the car while Bankhead, Bynum and Brown went to
McGraw's door and knocked.  (R. 571).  McGraw let them in and
said he could not "party" that evening as he had to go to work
the next morning.  (Rule 20 Tr. 796-97).  The three men began
to leave, and as McGraw walked outside with them, Bankhead
grabbed McGraw in a headlock, and Bynum and Brown began
hitting McGraw.  (R. 571).  Davenport also saw Brown make a
"slashing" movement at McGraw's neck.  (R. 574).  McGraw and
Bankhead fell to the ground and struggled, then the three men

---

[5]On one of their previous contacts with McGraw, Bynum and
Brown stole McGraw's check-cashing card and his checks, some
of which they passed at a grocery store.  (R. 776-78).  They
later threw the checks out of their car when they had a wreck
near Brown's house.  (R. 779-80).  These checks and an
informant helped lead police to question Brown in McGraw's
murder.

picked McGraw up and carried him inside.  (R. 571-72, 574, Rule 20 Tr. 798-99).

Brown recalls Bankhead saying that they would have to kill McGraw, as McGraw had seen Bankhead.  (Rule 20 Tr. 801-02).  Brown admits that he repeatedly stabbed McGraw in the back with a small pocket knife.  (Rule 20 Tr. 807-08).  He claimed that either Bankhead or Bynum delivered the mortal wounds to McGraw's neck area.[6]

After killing McGraw, the blood-smeared Bankhead, Bynum and Brown gathered McGraw's possessions, loaded them into Davenport's car, and left the murder scene.  (Rule 20 R. 809; R. 576-79).  They then proceeded to Bankhead's house, where

---

[6]   Dr. Robert Brissie, Chief Medical Examiner for Jefferson County, testified that McGraw had suffered at least fifteen or sixteen cuts to his neck, including several deep cuts striking the carotid artery and jugular venous complex that could have, by themselves, caused McGraw's death. (R. 522-23, 533).  McGraw suffered fifty-nine stab wounds to his back, the deepest of which were two-inches deep.  (R. 528). Many of these back wounds had the appearance of having been made with a knife that had been twisted around or altered in position while penetrating the skin.  (R. 528).    In combination, Brissie testified, these back wounds would have been potentially fatal, but not rapidly so.   (R. 529-30). Brissie testified that McGraw's stab wounds were consistent with wounds made by a knife with a relatively small blade with one sharp margin and one blunt margin, such as the blades on the pocket knife found by Blanche Bankhead at her residence after the murder.  (R. 539-40, 542-44).

they unloaded the stolen property, divided up the money in McGraw's wallet, and burned their bloody clothes. (R. 577-84). According to Bankhead's wife, Blanche, the men joked about the murder.   She overheard Brown relating to Bankhead that he "kept stabbing and stabbing and stabbing and stabbing" McGraw. (R. 652).   She also heard Bankhead and Bynum stating that they cut McGraw in his neck.   (R. 652, 657-58).

The next afternoon, McGraw's lifeless body was discovered by Chris Mitchell, a neighborhood child. (R. 417-18).   He and two of his playmates notified neighborhood adults, who contacted the Jefferson County Sheriff's Department. (R. 420-24).

A few days after the murder, Jefferson County deputy sheriffs found Brown at Bankhead's house and asked him to accompany them to the Center Point substation.   At the substation, he gave a statement that he and the three other men had gone fishing, then to the bar, then home.   (R. 747-48, 777-79).   After giving his statement, he rode with the officers to Bynum's house, where the officers questioned Bynum while Petitioner waited in a squad car with one of the officers.   (R. 803-06).

Bynum told the officers that Brown inflicted all the stab

11

wounds on McGraw and struck his head with a skillet. (Rule 20 Supp. R. 26-28). Brown claims that the officers returned to the squad car, arrested him and told him that Bynum's statement reflected that Bankhead stabbed McGraw and was the ringleader. (R. 843). Brown then gave a second statement to the effect that Bankhead, who was not in custody, had inflicted all the wounds on McGraw. (R. 841-42).

Later, after Brown learned that Bankhead had been found and arrested, Brown gave a third statement. (R. 856-57). In his third statement Brown admitted that he stabbed McGraw in the back repeatedly with a pocket knife and participated in the attack and robbery along with Bynum and Bankhead. (App. Supp. R. 37-38).

Brown, Bynum and Bankhead were subsequently indicted. Russell T. McDonald represented Brown at trial. McDonald was appointed to represent him. Brown's trial was held in February of 1987. He did not testify at trial. The jury deliberated and unanimously found Brown guilty of capital murder. (R. 942).

At the penalty phase of the trial, the State presented several photographs of the crime scene and McGraw to prove aggravating circumstances. The State also called Dr. Brissie

12

to testify about McGraw's wounds and explain photographs of his body.

Brown's trial counsel called several witnesses including his parents, siblings, family, friends, acquaintances, church members, a basketball coach, and an English teacher. A GED instructor for jail inmates was also called to testify for Brown at the penalty phase.

At the conclusion of the penalty phase, the jury voted ten to two in favor of a recommendation that Brown be sentenced to death. (R. 1073-74).

On March 27, 1987, the trial court conducted a sentencing hearing. Again, Brown's counsel called several of the witnesses, who had testified to the jury at the penalty phase, and others. After hearing the evidence, the trial court accepted the jury's recommendation and sentenced Brown to death. (R. 1161).

On direct appeal, Brown was represented by William J. Wynn. He raised the following issues:

    1.    Whether the trial court erred in denying Petitioner's motion to suppress statements made by him.

    2.    Whether the court erred in denying Petitioner's motion for mistrial based upon admission of Petitioner's statement which contained evidence of other crimes.

3.  Whether the court erred in admitting a taped statement by Davenport which was not shown to be voluntary.

4.  Whether the court erred in refusing to allow the defense to play the entire taped statement by Davenport, once the statement had been admitted.

5.  Whether the court erred in refusing to grant Petitioner's motion for mistrial or continuance based upon prosecutorial misconduct in not informing the defense that Davenport had changed his story.

6.  Whether the court erred in allowing the prosecution to impeach its own witness.

(Brief of Appellant, Tab # 37, at 4-5, 10, 13, 17, 20, 22, 26). Brown's direct appeal was denied on February 18, 1988, and his application for rehearing was denied on March 22, 1988. Brown v. State, 545 So. 2d 106 (Ala. Crim. App. 1988). His subsequent petition for certiorari was denied by the Alabama Supreme Court on March 10, 1989. Ex Parte Brown, 545 So. 2d 122 (Ala. 1989). The United States Supreme Court denied Brown's petition for certiorari on October 10, 1989. Brown v. Alabama, 493 U.S. 900, 100 S. Ct. 257, 107 L. Ed. 2d 206 (1989).

On February 16, 1990, Brown filed a Rule 20 petition in state court, represented by his current counsel, Thomas M. Goggans. (Rule 20 R. 22-68). On the same date, he filed a

14

motion to disqualify the trial judge and to assign the action
to a circuit judge from another judicial circuit.[7]   (Rule 20
R. 18).  The court denied the disqualification motion.  (Rule
20 R. 183).   The motion for reconsideration and mandamus
petition   on   the   disqualification   issue   were   likewise
unsuccessful.   (Rule 20 R. 181-84; 257, 283).

The circuit court held a Rule 20 hearing on September 5-
7, 1990, and heard further testimony on October 26, 1990.
Brown   presented   numerous   witnesses   as   well   as   expert
testimony.

The circuit court denied the Rule 20 petition on January
21, 1992.   (Rule 20 R. 429).   On February 10, 1992, Brown
filed with the Alabama Court of Criminal Appeals, a notice of
appeal from the denial of his Rule 20 motion.   He raised 19
issues on this appeal.

The Court of Criminal Appeals found that 16 of the issues
raised by Brown were procedurally barred "either because they

---

[7]   This motion was based upon two claims.  First, Judge
Hard  judge  would  be  required  to  determine  whether  he
improperly failed to consider certain factors at Brown's
sentencing.   Second, the trial judge would have to consider
when  Brown received ineffective assistance of counsel from
William J. Wynn, who had become by the time of the Rule 20
proceedings, Judge Hard's fellow circuit judge in Jefferson
County.   (Rule 20 R. 19).

could have been raised at trial and on direct appeal but were not, because they were raised at trial but not on appeal, or because they were raised and addressed on direct appeal." Brown v. State, 663 So. 2d 1028, 1030. The court addressed only the issues of: (1) whether the trial judge should have disqualified himself from the Rule 20 proceeding; (2) whether Brown received ineffective assistance of counsel at trial and; (3) whether he received ineffective assistance of counsel on direct appeal.

The Court of Criminal Appeals affirmed the denial of Brown's Rule 20 relief on January 13, 1995. It overruled his application for rehearing on March 3, 1995. Id. at 1028.

Brown then filed a petition for writ of certiorari with the Alabama Supreme Court. It was denied on May 26, 1995. Id.

Brown then filed this petition for writ of habeas corpus on July 14, 1995, challenging his conviction and death sentence in state court.

## II. THE SPECIFIC CLAIMS OF Petitioner

In his petition for writ of habeas corpus, Brown sets forth the following claims:

16

A.   Petitioner's death sentence violates his rights under the Eighth and Fourteenth Amendments because prosecution witness Jimmy Davenport's testimony was procured through coercive prosecutorial interrogation tactics.

B.   The playing of the tape of the interrogation of prosecution witness Jimmy Davenport deprived Petitioner of his rights of confrontation and to due process of the law guaranteed him under the Sixth and Fourteenth Amendments and to protection from cruel and unusual punishment under the Eighth Amendment.

C.   Alabama's application of the "especially heinous, atrocious and cruel" aggravating circumstance is unconstitutionally vague and, as applied to Petitioner's case, violates due process and the prohibition of cruel and unusual punishment.

D.   Petitioner was deprived of his rights under the Eighth and Fourteenth Amendments due to a false impression created by a prosecution witness as to pain felt by the deceased.

E.   The trial court's instructions limiting consideration of mitigating evidence violated Petitioner's rights to a constitutional sentencing hearing.

F.   The trial court's directive to the jury that it exclude from consideration during its penalty phase deliberations any and all passion violated Petitioner's rights under the Eighth and Fourteenth Amendment.

G.   The trial court erred in its instruction to the jury on reasonable doubt and thereby violated Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments.

H.   Petitioner's conviction was obtained in violation of his right to due process of law

17

under the Fourteenth Amendment because of a
jury instruction that impermissibly shifted the
burden of proof.

I.    The prosecution's misconduct and arguments
      during the guilt/innocence phase of the trial
      were improper and violated Petitioner's rights
      under the Fifth, Sixth, Eighth and Fourteenth
      Amendments.

J.    The prosecution's misconduct and arguments at
      the penalty phase of the trial were improper
      and deprived Petitioner of a fundamentally fair
      hearing and due process.

K.    The State's use of prejudicial and inflammatory
      photographs and slide shows at Petitioner's
      trial violated Petitioner's rights.

L.    Petitioner's death sentence violates the Eighth
      and Fourteenth Amendments because of the
      failure to properly consider mitigating
      evidence.

M.    The trial court's denial of Petitioner's
      request for a continuance violated his rights
      under the Sixth, Eighth and Fourteenth
      Amendments.

N.    Petitioner's statements to deputies of the
      Jefferson County Sheriff's Department were not
      voluntary and therefore inadmissible under the
      Fifth and Fourteenth Amendments.

O.    Petitioner's third statement to law enforcement
      officials was obtained in violation of his
      rights under the Sixth and Fourteenth
      Amendments.

P.    Petitioner did not receive effective assistance
      of counsel at trial in violation of his rights
      under the Sixth, Eighth and Fourteenth
      Amendments.

18

Q.   Petitioner's conviction and sentence of death
violate the Sixth and Fourteenth Amendments
because he did not receive effective assistance
of counsel on appeal.

Respondents assert that nineteen of these claims are

procedurally barred from consideration on the merits, and that

the remaining two (i.e., ineffective assistance of counsel)

claims are without merit.

### III.  APPLICABLE LEGAL PRINCIPLES

Based on Supreme Court precedents, the Eleventh Circuit

has set forth the parameters of a district court's review of

habeas claims:

> [T]he federal courts' authority to review state
> court criminal convictions pursuant to writs of
> habeas corpus is severely restricted when a
> petitioner has failed to follow applicable state
> procedural rules in raising a claim, that is, where
> the claim is procedurally defaulted. Federal review
> of a petitioner's claim is barred by the procedural
> default doctrine if the last state court to review
> the claim states clearly and expressly that its
> judgment rests on a procedural bar, Harris v. Reed, 489
> U.S. 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308
> (1989), and that bar provides an adequate and independent
> state ground for denying relief.  See id. at 262, 109 S.
> Ct. at 1042-43; Johnson v. Mississippi, 486 U.S. 578,
> 587, 108 S. Ct. 1981, 1987, 100 L. Ed. 2d 575 (1988).
> The doctrine serves to ensure petitioners will first seek
> relief in accordance with state procedures, see Presnell
> v. Kemp, 835 F.2d 1567, 1578-79 (11th Cir. 1988), cert.
> denied, 488 U.S. 1050, 109 S. Ct. 882, 102 L. Ed. 2d 1004
> (1989), and to "lessen the injury to a State that results
> through reexamination of a state conviction on a ground

that a State did not have the opportunity to address at
a prior, appropriate time." McCleskey v. Zant, 499 U.S.
467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

Johnson v. Singletary, 938 F.2d 1166, 1173 (11th Cir. 1991),

cert. denied, 506 U.S. 930, 113 S. Ct. 361, 121 L. Ed. 2d 274

(1992). Thus, if a claim has been presented in some form to

a state court, a federal habeas court may refuse to hear the

claim only if the last state court rendering the judgment

"'clearly and expressly' states that its judgment rests on a

state procedural bar." Harris, 489 U.S. at 263.

The last state court to review the claims here asserted

was the Alabama Court of Criminal Appeals, which affirmed the

trial court's denial of Petitioner's request for post-

conviction relief under Rule 20 of the Alabama Rules of

Criminal Procedure (Temporary).[8]  The Court of Criminal

Appeals "clearly and expressly" stated that sixteen of

Petitioner's claims were procedurally barred because they (1)

could have been raised at trial and on direct appeal but were

not, (2) were raised at trial but not on direct appeal, or (3)

were raised and addressed on direct appeal and, therefore,

---

[8]Rule 20 of the Alabama Rules of Criminal Procedure (Temporary)
was enacted as a temporary rule effective April 1, 1987, but was
later recodified as Ala. R. Crim. P. 32.

cannot be reviewed again in a collateral proceeding.[9]  <u>Brown</u>,

663 So. 2d at 1030.  The rules providing for the first two of

these bars to state relief are found in Rules 20.2(a)(3)&(5)

of the Alabama Rules of Criminal Procedure (Temporary) (now

codified as Rules 32.2(a)(3) & (5)), which state that

> [a] petitioner will not be given relief under this
> rule based upon any ground:
>> (3) [w]hich could have been but was not
>> raised at trial . . . ; or
>> (5) [w]hich could have been but was not
>> raised on appeal . . . .

A.R.Crim.P. (Temporary) Rules 20.2(a)(3)&(5).  Since such

rules are adequate and independent state grounds for denying

relief, any claim by Petitioner barred under these rules

is procedurally defaulted in this federal habeas proceeding as

well.  <u>See</u> <u>Waldrop v. Jones</u>, 77 F.3d 1308, 1314-15 (11th

Cir.), <u>cert. denied sub nom</u> <u>Waldrop v. Hopper</u>, 519 U.S. 898,

117 S. Ct. 247, 136 L. Ed. 2d 175 (1996)(Rule 32.2(a)(5) is

"adequate and independent" state ground for denial of relief);

<u>Hill v. Jones</u>, 81 F.3d 1015, 1023 (1996), <u>cert. denied</u>, 519

U.S. 1119, 117 S. Ct. 967, 136 L. Ed. 2d 851 (1997)("firmly

established and regularly followed" state procedural

---

[9]Of course, claims that were raised and considered on the
merits on direct appeal were exhausted and, therefore, not
procedurally defaulted for federal habeas purposes.

rules may bar federal habeas claims)(quoting <u>Ford v. Georgia</u>, 498 U.S. 411, 423-24, 111 S. Ct. 850, 857, 112 L. Ed. 2d 935 (1991)).

A habeas petitioner who has procedurally defaulted on a constitutional claim is barred from litigating that claim in a federal habeas corpus proceeding unless he can show adequate "cause" for and "actual prejudice" from the default.[10] <u>Engle v. Issac</u>, 456 U.S. 107, 128 102 S.Ct. 1558, 71 L.Ed. 2d 783, 801 (1982); <u>Wainwright v. Sykes</u>, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); <u>Wilson v. Jones</u>, 902 F.2d 923, 925 (11th Cir. 1990).

The "fundamental miscarriage of justice" exception, permits a federal habeas court to consider a procedurally defaulted claim in the absence of cause and prejudice if a

---

[10]  "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." <u>Murray v. Carrier</u>, 477 U.S. 478, 106 S. Ct. 2639, 91 L. Ed. 397 (1986).  <u>See also</u> <u>Amadeo v. Zant</u>, 486 U.S. 214, 221-22, 108 S. Ct. 1771, 100 L. Ed. 2d 249 (1988).  Petitioner must also demonstrate that he was prejudiced; he must show "not merely that the errors . . . created a <u>possibility</u> of prejudice, but that they worked to his <u>actual</u> and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." <u>United States v. Frady</u>, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982) (emphasis in original).

"fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," or where Petitioner shows "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found Petitioner eligible for the death penalty." Petitioner has not made a showing of "actual innocence" necessary to circumvent his procedural default of any claim in his habeas corpus petition.[11]

In <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the court formulated the two-prong test for assessing whether the representation provided by an attorney during a criminal trial constitutes "ineffective" representation under the Sixth Amendment. The court wrote

---

[11] Petitioner must show "actual innocence" either as to the crime or his eligibility for the death penalty. As to his guilt, such a showing requires Petitioner "to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence – that was not presented at trial." <u>Schlup v. Delo</u>, 115 S.Ct. at 865. Petitioner has not made such a showing. As to his eligibility for the death penalty, he would be required to show by clear and convincing evidence that, but for a constitutional error at trial, no reasonable juror would have found him eligible for the death penalty under state law. <u>Schlup, supra</u>; <u>Sawyer, supra</u>. Given the brutality of McGraw's murder, the evidence that it was committed in the course of a robbery, and the weakness of mitigation evidence, Petitioner was clearly eligible for the death penalty under state law.

that:

> [A] convicted defendant's claim that
> counsel's assistance was so defective as to
> require a reversal of a conviction or death
> sentence has two components.  First, the
> defendant must show that counsel's
> performance was deficient.  This requires
> showing that counsel made errors so serious
> that counsel was not functioning as the
> "counsel" guaranteed that defendant by the
> Sixth Amendment.  Second, the defendant
> must show that the deficient performance
> prejudiced the defense.  This requires
> showing that counsel's errors were so
> serious as to deprive the defendant of a
> fair trial, a trial whose result is
> reliable.  Unless a defendant makes both
> showings, it cannot be said that the
> conviction or death sentence resulted in a
> breakdown of the adversary process that
> renders the result unreliable.

Strickland, 466 U.S. at 687 (1984).  To prove his ineffective

assistance claims, Petitioner is thus required to meet both

the performance and prejudice prongs of the Strickland

test, which is difficult.  As the Eleventh Circuit has noted,

"the cases in which habeas petitioners can properly prevail on

the ground of ineffective assistance of counsel are few and

far between."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir.),

cert. denied, 513 U.S. 899, 115 S.Ct. 255, 130 L.Ed.2d 175

(1994).

Meeting the first prong is difficult because "[j]udicial

24

scrutiny of counsel's performance must be highly deferential,"
and courts must "indulge a strong presumption that counsel's
conduct falls within the wide range of reasonable professional
assistance; that is, the defendant must overcome the
presumption that, under the circumstances, the challenged
action "might be considered sound trial strategy."
Strickland, 466 U.S. at 689.  In discussing the first prong of
Strickland, the Eleventh Circuit stated as follows:

> The Supreme Court has mandated a highly
> deferential review of counsel's conduct,
> especially where strategy is involved.
> Strickland v. Washington, 466 U.S. 668, 689-90,
> 104 S.Ct. 2052, 2065-66, 80 L.Ed.2d 674 (1984).
> Intensive scrutiny and second-guessing of
> attorney performance are not permitted.  Id.;
> accord, e.g.., Atkins v. Singletary, 965 F.2d
> 952, 958 (11th cir. 1992)("Most important, we
> must avoid second-guessing counsel's
> performance."); White v. Singletary, 972 1218,
> 1220 (11th Cir. 1992) ("courts also should at
> the start presume effectiveness and should
> always avoid second-guessing with the benefit
> of hindsight.").  Because it is a "wide range"
> of performance that is constitutionally
> acceptable, "the cases in which habeas
> petitioners can properly prevail on the ground
> of ineffective assistance of counsel are few
> and far between." Rogers v. Zant, 13 F.3d 384,
> 386 (11th Cir. 19940.  Cases in which
> deliberate strategic decisions have been found
> to constitute ineffective assistance are even
> fewer and farther between.

Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994),
cert. denied, 513 U.S. 1115, 115 S.Ct. 911, 130 L.Ed.2d 793

(1995).

To meet the second prong, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.[12] A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.

Brown points out that in affirming his conviction on direct review, the Court of Criminal Appeals stated:

> This court has reviewed the entire record in this cause as required by § 13A-5-53(a), Code of Alabama (1981), and we have found no error adversely affecting the substantial rights of this appellant. Beck v. State, 396 So.2d 645 (Ala.1980); A.R.A.P. 45.
>
> The trial court found the existence of two aggravating circumstances:
>
>> (1) "The capital offense was committed while the defendant was engaged ... in the commission of ... robbery." (§ 13A-5-49(4)).
>>
>> (2) "The capital offense was especially heinous, atrocious or cruel compared to other capital offenses." (§ 13A-5-49(8)) (R. 1184)--See Appendix A, hereto attached.
>
> The first aggravating circumstance is fully supported by this record.

_____

[12]    In certain limited circumstances, prejudice is presumed. Strickland, 466 U.S. at 692.

26

We are convinced that this capital offense was especially heinous, atrocious and cruel. <u>Hubbard v. State</u>, 500 So.2d 1204 (Ala.Cr.App.), <u>aff'd</u>, 500 So.2d 1231 (Ala.1986), <u>cert. denied</u>, <u>Hubbard v. Alabama</u>, 480 U.S. 940, 107 S. Ct. 1591, 94 L. Ed. 2d 780 (1987). . . . The victim was 59 years old at the time of his death, lived alone, was unsuspecting and unarmed when overpowered by his three assailants. There was a total of 78 stab wounds to the body, with 16 to the neck, 59 in the back and three to the face. A contusion to the back of the victim's head and several areas of abrasion were found on the victim's body. The most extensive injuries were to the neck where the carotid artery and jugular vein were severed. Dr. Brissie's opinion was that "all the wounds depicted were ante-mortem or prior to the decedent's death." (R. 1184) These facts support and sustain the finding of the second aggravating circumstance. [Citations omitted].

The trial court found no statutory mitigating circumstances. The trial judge went through each mitigating circumstance as listed in § 13A-5-51, Code of Alabama (1981).

The trial court considered the fine family of this appellant and the appellant's background and character. The trial judge's findings regarding the mitigating circumstances are supported by the record. See Appendix A [setting forth the sentencing order of the Circuit Court of Jefferson County].

We find no evidence in this record that the sentence was imposed under the influence of passion, prejudice or any other arbitrary fact. <u>Hubbard</u>, <u>supra</u>.

Our independent weighing of the mitigating circumstances and the aggravating circumstances convinces us that death was the proper sentence to be imposed in this cause.

27

* * *

> We have carefully searched the record for plain
> error and found none.

Brown, 545 So. 2d at 115-16.   Further, he also points out

that, in affirming the judgment of the Alabama Court of

Criminal Appeals on direct appeal, the Alabama Supreme Court

stated that "[a]lthough Petitioner raises several issues on

appeal, a thorough review of the record, arguments, and briefs

of counsel reveals no error adversely affecting his rights."

Ex parte Brown, 545 So. 2d 122.

Petitioner further asserts that the Alabama Court of

Criminal Appeals, in affirming the denial of Rule 20 relief,

reiterated that it had reviewed for plain error those jury

instructions as to which trial and appellate counsel allegedly

rendered ineffective assistance by failing to object, but that

it had found none, Brown, 663 So. 2d at 1034.   In addition,

Petitioner states that on direct appeal, the court had

reviewed the record in the case and found that issues

regarding the constitutionality of a witness' testimony or the

playing of a tape of that witness' interrogation did not rise

to the level of plain error. (Petitioner's Reply Brief at 7-

8).

Citing these examples as well as the rule that, in

28

capital cases, state appellate courts "may notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of Petitioner," Alabama Rule of Appellate Procedure 39(k), Petitioner claims that the merits of all matters of record are routinely reviewed by the Alabama appellate courts on direct appeal in death penalty cases and were reviewed in this case.

Petitioner also acknowledges, however, that in <u>Julius v. Johnson</u>, 840 F.2d 1533 (11th Cir. 1988), <u>opinion modified on rehearing</u>, 854 F.2d 400, <u>cert. denied</u>, 488 U.S. 960, 109 S. Ct. 404, 102 L. Ed. 2d 932 (1988), the Eleventh Circuit Court of Appeals held that the mere existence of a plain error rule did not preclude a finding of procedural default and that an Alabama appellate court's assertion that it did not find errors upon its independent review of the record did not constitute a ruling on the merits of claims not raised in that court. (Petitioner's Reply Brief at 4-5). Petitioner argues that the <u>Julius</u> court limited its holding to the facts of the case and did not decide the effect of such a statement when

the allegedly barred issue was raised by the defendant but was not discussed in the state court's opinion. Neither did the court decide whether such language permits federal review where a defendant raised the claim at trial, making it more likely that the state appellate court came across the claim during its review of the record. <u>Julius</u>, 840 F.2d at 1546, n. 10. (Petitioner's Reply Brief at 4-5).

Despite the limitations in the <u>Julius</u> holding, the Court is not inclined to hold that the Alabama appellate courts reviewed the merits of claims Petitioner did not raise on appeal, unless there is some evidence in the opinion or judgment of the appellate court indicating that, in fact, it did consider the merits of particular issues or errors under the plain error rule. When a state appellate opinion is totally devoid of any mention of a particular claim or issue, this Court has no reason to believe that the state appellate court actually considered the merits of the issue under the plain error rule. On the other hand, when the appellate opinion explicitly deals with an issue not raised in the appellate brief of Petitioner, there is every reason to believe that the court recognized the possibility of error and resolved it on its merits. Thus, absent some affirmative

30

indication in the appellate record that issues not raised by Petitioner were, in fact, considered by the appellate court, the mere existence of a plain error rule does not lead to the conclusion that <u>all</u> issues petitioner <u>could</u> have raised (but did not) were addressed on the merits.

Although it appears that, at trial, Petitioner raised in part two of the allegedly defaulted claims, there is no indication that the appellate courts particularly considered these claims or intended to address them in the course of their plain error review. Nor does it appear that the state appellate courts ignored a claim actually raised by Petitioner. Contrary to Petitioner's arguments, the state appellate courts did not consider the merits of those claims they found to be procedurally defaulted, so those defaults rested on a state procedural bar.

While it is true that the Alabama Court of Criminal Appeals considered on its own whether the evidence offered at trial was sufficient to meet the "especially heinous, atrocious, and cruel" aggravating factor, it did not, however, address Petitioner's present contention that the factor is unconstitutionally vague. The appellate court's discussion of the factor started with the assumption that it is

+

constitutional and considered only whether the evidence was sufficient to establish it.    Thus, the appellate court's discussion of the "especially heinous, atrocious, and cruel" aggravating factor, apparently under its plain error review, did <u>not</u> avoid the procedural default of Petitioner's present claim that the factor is unconstitutionally vague.

Second, Petitioner argues that it is not clear that the procedural bar asserted against him rests upon independent and adequate state law grounds.  He specifically complains that, on appeal from the denial of Rule 20 relief, the Alabama Court of Criminal Appeals stated only that certain claims raised on appeal were barred on one of three grounds:    (1) the claims could have been raised at trial and on direct appeal but were not, (2) the claims were raised at trial but not on direct appeal, or (3) the claims were raised and addressed on direct appeal.    <u>Brown v. State</u>, 663 So. 2d at 1030.    According to Petitioner's argument, it is thus unclear whether the state bar actually rested on the first two grounds, which are adequate and independent state grounds or the third ground, which is not.[13]    (Petitioner's Reply Brief at 9-10).

---

[13]Of course, insofar as a claim was raised on direct appeal, Petitioner exhausted his state remedies on that claim for federal habeas purposes even though Rule 32 of the

The grounds upon which the Alabama Court of Criminal
Appeals barred certain claims on appeal from denial of Rule 20
relief are apparent from the trial court's Rule 20 opinion,
which categorizes the defaulted claims according to the
grounds upon which they are barred, and from materials in the
record, which reveal the grounds upon which each claim is
barred.   There is no essential uncertainty over which state
law ground barred Petitioner's claims on appeal from the
denial of Rule 20 relief that would prevent assertion of the
procedural bar in this proceeding.   Those claims rejected in
the Rule 20 proceedings because they could have been raised at
trial or on appeal but were not, are clearly identified in the
record so that Court is able to determine whether the state
law ground is, in fact, an independent and adequate one.

Third, Petitioner argues that the state law rules barring
his claims on post-conviction appeal are not "strictly and
regularly followed," meaning that they are not "adequate"

---

Ala.R.Crim.P. would preclude the state courts from reconsidering
the claim under Rule 32 (or its precursor, Rule 20).   If raised on
direct appeal the claim was not procedurally defaulted despite the
inability of the state courts to hear the claim a second time in
collateral proceedings.

state grounds that would prevent this court from considering
the merits.    (Petitioner's Reply Brief at 10-11).    See
Johnson v. Mississippi, 486 U.S. 578, 587, 108 S. Ct. 1981,
1987, 100 L. Ed. 575, 585-86 (1988)(citations omitted).
Petitioner states no basis for this assertion, other than his
statement that "the opinion of the Alabama Court of Criminal
Appeals on post conviction review in this case indicates that
the Alabama procedural rules are not 'strictly and regularly'
followed." (Petitioner's Reply Brief at 11).    He does not
state, and the Court has been unable to independently
determine, how Johnson supports his contention.  On the other
hand, the Eleventh Circuit recently held that Rule 32.2(a)(5),
one of the rules barring Petitioner's claims, was an adequate
and independent state ground because Petitioner in that case
"cite[d] no Alabama authority supporting his argument that
Alabama does not regularly and strictly apply its rule that
challenges to jury instructions must be raised on direct
appeal" and "cite[d] no cases to support his argument that
exceptions to this rule under Alabama law are not strictly and
regularly applied." Waldrop, 77 F.3d at 1315-16.  In view of
such authority and the scant support presented by Petitioner,
the court is unwilling to hold that Alabama does not strictly

34

and regularly follow its procedural default rules. Petitioner has not offered adequate support for such a contention.

Fourth, Petitioner argues that this Court must consider the merits of his habeas claims because he falls within the "cause and prejudice" exception to the procedural default rule.

Petitioner argues that he falls within the cause and prejudice exception because he allegedly received ineffective assistance of counsel. Attorney performance cannot serve as cause unless the performance is shown to have constituted ineffective assistance violative of Petitioner's Sixth Amendment rights. See Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. at 2639, 2645, 100 L. Ed. 2d 249 (1988) (defendant represented by counsel whose performance is not constitutionally ineffective under Strickland must bear the risk of attorney error that results in a procedural default). As is set forth below in the Court's discussion of petitioner's claims of ineffective assistance by his trial and appellate counsel, the Court has considered and rejected Petitioner's claims of ineffective assistance of counsel in

violation of his Sixth Amendment rights.[14]  Because Petitioner

suffered no ineffective assistance in the ways argued here, he

has not shown "cause" to excuse the procedural default of

these claims due to the alleged shortcomings of his attorneys.

Petitioner has not made a showing of "actual innocence"

necessary to circumvent his procedural default of any claim in

his habeas corpus petition.[15]

Respondents assert that claims A (in part), B, C, F, G,

H, I (in part), K (in part), and L are procedurally defaulted

due to Petitioner's failure to raise them at trial or on

---

[14]Petitioner argues in his separate Motion for an Evidentiary
Hearing that a hearing is required to determine whether he is
entitled to circumvent the procedural bar. As is set forth in this
court's Memorandum Opinion and Order denying Petitioner's Motion
for Evidentiary Hearing, issued concurrently herewith, Petitioner
is not entitled to an evidentiary hearing as to any cause and
prejudice that would excuse the default of these claims.

[15]Petitioner must show "actual innocence" either as to the
crime or his eligibility for the death penalty. As to his guilt,
such a showing requires Petitioner "to support his allegations of
constitutional error with new reliable evidence--whether it be
exculpatory scientific evidence, trustworthy eyewitness accounts or
critical physical evidence--that was not presented at trial."
Schlup v. Delo, 115 S. Ct. at 865.  Petitioner has not made such a
showing. As to his eligibility for the death penalty, he would be
required to show by clear and convincing evidence that, but for a
constitutional error at trial, no reasonable juror would have found
him eligible for the death penalty under state law.  Schlup, supra;
Sawyer, supra.  Given the brutality of McGraw's murder, the
evidence that it was committed in the course of a robbery, and the
weakness of mitigation evidence, Petitioner was clearly eligible
for the death penalty under state law.

direct appeal.   (Respondent's Brief on the Merits at 8-9).
They also assert that claims K and M are procedurally
defaulted in part because Petitioner failed to raise them on
direct appeal after raising them at trial.   (Id. At 9-10).
The Rule 20 court found that these claims were defaulted.
(Rule 20 R. at 391-94).   On appeal from the denial of the Rule
20 petition, the Alabama Court of Criminal Appeals found that
all but three of the nineteen claims raised by Petitioner in
the Rule 20 petition were procedurally defaulted for one of
the three reasons stated above.   Brown, 663 So.2d at 1030.
The status of each of these claims will be discussed
separately below.

    Respondents also assert that claims E, F (in part), I (in
part), J (in part), L (in part) and M (in part) are
procedurally defaulted because Petitioner has not raised them
before any state court on direct appeal or in the Rule 20
proceedings.   (Respondent's Brief on the Merits at 10-11).   As
is explained below, it appears that Petitioner did raise each
one of these claims in state court, and the Court has been
unable to discern new challenges or contentions in connection
with these claims raised by petitioner for the first time
here.   Any such new challenges or contentions would be barred

37

as procedurally defaulted.   _Teague v. Lane_, 489 U.S. 288, 109
S.Ct. 1060, 103 L.Ed.2d 334 (1989).

In opposition to Respondents' assertion of procedural
default defenses, Petitioner makes four arguments, which are
discussed in turn below.  First, he suggests that none of the
claims are barred under independent and adequate state ground
principles.   He argues that, by conducting a plain error
review allowed by state rules of appellate procedure, the
state appellate courts have in fact, albeit implicitly,
reviewed the merits of each of his claims.  Because they have
been reviewed on the merits, the judgments of those courts
therefore, do not rest upon a state procedural bar.

### IV.   PROCEDURALLY DEFAULTED CLAIMS

**Claim A.  Petitioner's death sentence violates his rights
under the Eighth and Fourteenth Amendments because
prosecution witness Jimmy Davenport's testimony was
procured through coercive prosecutorial
interrogation tactics.**

Respondents argue that this claim is procedurally
defaulted in part due to Brown's failure to raise it at trial
and then on direct appeal.  (Respondent's Brief on the Merits
at 7-8).  Respondents do not explain what part of this claim
is defaulted, arguing that it is no more than an impermissible

38

attempt to assert Davenport's Fifth Amendment and <u>Miranda</u>
rights.[16]    (Respondent's Brief on the Merits at 11-13).
Because Respondents address this claim without explaining
which portion of it is procedurally defaulted and because it
appears from the record  that Petitioner preserved this issue
for habeas review, at least insofar as Davenport's taped
testimony    is    concerned[17],    the    Court    will

---

[16] See <u>Miranda v. Arizona</u>, 384 U.S. 436, 476-77, 86 S. Ct.
1602, 16 L. Ed. 2d 694 (1966).

[17] At trial, Petitioner moved for a continuance or mistrial
due to Davenport's changed testimony, and then for a mistrial
due to prosecutorial misconduct in procuring the testimony.
(R. 552-58, 620). The trial court acknowledged that
Petitioner raised "a very real issue. . . of just how the so-
called truth was finally elicited by the state attorneys." (R.
597-604, 609-13, 634-38, 731-32).
    On direct appeal, Petitioner argued that Davenport's
taped testimony was coerced by prosecutors and should have
been excluded because it implicated Petitioner and "supplied
the evidence of intent necessary for a finding of capital
murder." (Brief and Argument of Appellant, Tab # 37 at 17-
19). In its direct appeal opinion, the Alabama Court of
Criminal Appeals stated that:

    The appellant's counsel argues that the trial court
    erred in admitting a taped interview of Davenport
    which was not shown to be voluntary.

    In essence, the appellant is trying to assert
    Davenport's Fifth Amendment and <u>Miranda</u> rights.

        "[T]he Fifth Amendment privilege against
        compulsory    self-incrimination,    being
        personal to the defendant, does not extend
        to the testimony or statements of third

> parties called as witnesses at trial.
> <u>United States v. Nobles</u>, 422 U.S. 225, 234,
> 95 S. Ct. 2160, 2168, 45 L. Ed. 2d 141
> (1975).   The Fifth Amendment privilege is
> a personal privilege: it adheres basically
> to the person, not to information that may
> incriminate him.   <u>Nobles</u>, 422 U.S. at 233,
> 95 S. Ct. at 2167.  In any event, the Fifth
> Amendment privilege against compulsory
> self-incrimination provides no protection
> for the commission of perjury.   <u>United
> States v. Apfelbaum</u>, 445 U.S. 115, 100 S.
> Ct. 948, 63 L. Ed. 2d 250 (1980)."
> <u>Moulds v. State</u>, 426 So. 2d 942, 948 (Ala. Cr. App.
> 1982).
>
> This argument fails due to the fact that the
> appellant has no standing to assert a third party's
> rights.
>
> Hence, the trial court did not err in admitting the
> taped interview of Davenport as to its
> voluntariness.

<u>Brown</u>, 545 So.2d at 113-14.

In his Rule 20 petition, Petitioner argued that because
his death sentence was supported by coerced testimony, it
offended the heightened need for reliability in sentencing
under the Eighth and Fourteenth Amendments and the need to
avoid unwarranted convictions under the Fourteenth Amendment.
(Rule 20 R. 24-28).   The Rule 20 court found this claim
procedurally defaulted "at least in part" due to Petitioner's
failure to raise the claim at trial and on direct appeal and
due to his assertion of the claim on direct appeal.  The Rule
20 court did not explain which part of the claim was why it
was not addressed.

At least insofar as Davenport's taped testimony is
concerned, it thus appears that Petitioner exhausted this
claim on direct appeal by "fairly presenting" it to the state
courts.  See exhaustion discussion in § F below.  <u>See also</u>

40

address the merits of the claim.

Petitioner argues that on the eve of trial Davenport was interviewed alone for two hours by both prosecutors at their offices, during which they used profanity and professed disbelief in his previous story. (Petitioner's Reply Brief at 19-22). He also points out that Davenport changed his story during this interview and that the prosecutors threatened him with the possibility of perjury charges if his trial testimony was inconsistent with his new story.[18] (Id.). Davenport's subsequent trial testimony agreed with his interview testimony in that he said Bankhead, Bynum and Brown discussed killing McGraw while on the way to McGraw's house on the night of the murder. (R. 567). Petitioner argues that this new testimony, which provided evidence of the intent element of his capital

---

Waldrop v. Thigpen, 857 F. Supp. 872, 897 (N.D. Ala. 1994)(citations omitted), aff'd sub nom Waldrop v. Jones, 77 F.3d 1308, 1315-16 (11th Cir.), cert. denied sub nom Waldrop v. Hopper, 519 U.S. 898, 117 S. Ct. 247, 136 L. Ed. 2d 175 (1996)). There is no indication that the claim was withheld for federal habeas review in order to "sandbag" the state courts. Magill v. Dugger, 824 F.2d 879, 891 (11th Cir. 1987).

[18]A tape of the prosecutors' interview with Davenport was played for the jury during his testimony. The court later charged the jury that the taped interview was to be used only to illustrate the circumstances of the interview, and that the substance of the comments on the tape were not to be considered as evidence. (R. 725-26, 859-63).

41

murder charge, was involuntary and thus possibly false.  The
possibility that the jury may have relied on false testimony
in finding Petitioner guilty of capital murder means, he
argues, that his death sentence is inconsistent with the
"heightened need under the Eighth and Fourteenth Amendments
for reliability in the determination that death is the
appropriate sentence in a particular case," and with the
Fourteenth Amendment's admonition to avoid the risk of an
unwarranted conviction.   (Id. at 17-18, 22-23).   He argues
that the trial court should have excluded Davenport as a
witness or that it should have at least excluded that part of
his testimony that was "tainted" by coercion.  (Id. at 23).

      Petitioner does not cite, and the Court has not found,
any cases where similar facts have been addressed in the
context of either the "heightened need for reliability" in
sentencing    or    the    admonition    against    "unwarranted
convictions."   Even so, courts have held that defendants may,
in   some   cases,   have   standing   to   argue   that   their
constitutional rights were violated by the admission of
testimony coerced from a non-defendant prosecution witness.
The Seventh Circuit explained as follows:

        Generally, a defendant does not have standing to
        complain about violations of the rights of third

42

parties.  <u>United States v. Chiavola</u>, 744 F.2d 1271,
1273 (7th Cir. 1984); <u>United States ex rel.
Cunningham v. DeRobertis</u>, 719 F.2d 892, 895 (7th
Cir. 1983).  A violation of a non-defendant's Fifth
Amendment rights may constitute a violation of the
defendant's right to a fair trial, however, "when
the government seeks a conviction through use of
evidence obtained by extreme coercion or torture."
<u>Chiavola</u>, 744 F.2d at 1273; <u>see also United States
v. Merkt</u>, 794 F.2d 950, 961-62 (5th Cir. 1986),
<u>cert. denied</u>, 480 U.S. 946 (1987); <u>LaFrance v.
Bohlinger</u>, 499 F.2d 29, 34 (1st Cir. 1974); <u>Bradford
v. Johnson</u>, 476 F.2d 66 (6th Cir. 1973)(per curiam),
<u>aff'g</u> 354 F. Supp. 1331 (E.D. Mich. 1972).[19]

<u>United States v. Hurt</u>, 92 F.2d 1188 (table), 1996 WL 414180

(7th Cir. 1996) (unpublished disposition).

In <u>Bradford v. Johnson</u>, 354 F. Supp. 1331 (E.D. Mich.

1972), <u>aff'd</u>, 476 F.2d 66 (1973), Petitioner actually

prevailed on such a claim.  In that case, state authorities

brutally and repeatedly tortured LeRoy Payne to secure a

confession implicating Petitioner.  Payne was later the star

witness at Petitioner's trial, during which he was still under

the custody and control of his torturers.  <u>Bradford</u>, 354 F.

Supp. at 1333-34.  The court granted habeas relief on due

process grounds, finding the state's knowing use of testimony

---

[19]<u>See also United States v. Merkt</u>, 764 F.2d 266 (5th Cir.
1985)(petitioner had standing to assert that admission of
coerced non-defendant statements violated her due process
right to a fair trial, but claim failed as state conduct was
not so egregious as to require exclusion of the evidence).

procured by torture to be "analogous to the knowing use of perjured testimony or testimony purchased by a litigant." Id. at 1338.   The court did note, however, that "[u]nder normal circumstances, the issue of credibility is one which the jury can weigh as a question of fact" and that its conclusion did not "mean that incriminations of others coerced by torture necessarily poison all future in-court testimony."   Id. at 1337.

Where the authorities' conduct is less egregious, such claims are less likely to succeed.   In United States v. Fredericks, 586 F.2d 470 (5th Cir. 1978), cert. denied, 440 U.S. 962, 99 S. Ct. 1507, 59 L. Ed. 2d 776 (1979)[20], the court refused to exclude the testimony of an unindicted co-defendant that had been procured in violation of her Miranda rights and only after a threatening and heavy-handed interrogation by the authorities.   The court held that the authorities' conduct, "even if viewed in the worst possible light, were a far cry from the sort of third-degree physical or psychological coercion that might prompt us to disregard altogether the

---

[20]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the newly-created Eleventh Circuit adopted as binding precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

societal interest in law enforcement by excluding the highly probative testimony of a non-defendant." Fredericks, 586 F.2d at 481.

The Eleventh Circuit has recognized that "the admission at trial of improperly obtained statements which results in a fundamentally unfair trial violates a defendant's Fifth Amendment right to a fair trial." Wilcox v. Ford, 813 F.2d 1140, 1148 (11th Cir.)(citations omitted), cert. denied, 484 U.S. 925, 108 S. Ct. 287, 98 L. Ed. 2d 247 (1987). In Wilcox, however, the Eleventh Circuit found that the admission of allegedly coerced testimony (one witness's out-of court statement and another witness's trial testimony) did not render Petitioner's trial fundamentally unfair. The police had used oppressive intimidation tactics, including lengthy questioning, verbal abuse, vivid threats, and the denial of food and water, to secure out-of-court statements from the witnesses, one of whom was an elderly, illiterate black man. Wilcox, 813 F.2d at 1147-48. The court noted that the challenged out-of-court statement was used only to impeach the trial testimony of one of the witnesses, and that the defense had the opportunity to repair the damage caused by impeachment. Id. at 1149. The court also noted that the

45

challenged trial testimony of the other witness was not shown
to be coerced.  Id.  Further, the court noted that defense
counsel had "adequate tools in hand" to challenge the
reliability of the challenged evidence before the jury:
counsel knew the nature of the interrogations; had tapes and
transcripts of them before trial; had a full opportunity to
cross-examine the allegedly coerced witnesses using the tapes
and transcripts as needed; and an adequate opportunity to put
on independent evidence challenging the testimony before the
jury.  Id.  "Considering all these factors," the court wrote,
"we conclude that Wilcox did receive a fundamentally fair
trial in spite of any government misconduct that might have
occurred."  Id.

    It is evident that the claim here raised by Petitioner is
cognizable on due process grounds, and not simply as some
attempt by petitioner to assert Davenport's Fifth Amendment
rights, as construed by the state courts.  The cases cited
above emphasize, however, that habeas relief is warranted only
if the state coercion alleged rose to such a level that it
completely undermined Petitioner's right to a fair trial.
Only in the most egregious cases would such a claim succeed.
Such claims are also less likely to succeed where, as in

46

Wilcox, there is ample opportunity to test the challenged testimony in an adversarial proceeding.

In this case, there is no evidence that Davenport was tortured or subjected to extreme psychological coercion, although he may have felt pressured or intimidated to some extent by the prosecutors during his interview. The prosecutors' conduct in interrogating Davenport did not approach the level required to constitute a violation of Petitioner's constitutional rights. None of the evidence leads the Court to equate the admission of Davenport's statement or his subsequent trial testimony with the state's knowing use of perjured testimony. Moreover, the challenged testimony was well-tested by the adversarial process, providing an adequate basis for the jurors to evaluate its credibility. Defense counsel knew about Davenport's statement on the first day of trial, and had a chance to review the tapes before he thoroughly cross-examined Davenport. The trial judge admitted Davenport's taped interview to assist the jury in evaluating whether the prosecutors had used improper methods in obtaining Davenport's testimony. The jurors thus had the opportunity to hear the interview tapes as well as the cross-examination of Davenport. Therefore, they had an

47

adequate basis upon which to evaluate the credibility of Davenport's testimony.  This claim therefore fails to warrant habeas relief.

**Claim B. The playing of the tape of the interrogation of prosecution witness Jimmy Davenport deprived Petitioner of his rights of confrontation and to due process of the law guaranteed him under the Sixth and Fourteenth Amendments and to protection from cruel and unusual punishment under the Eighth Amendment.**

Respondents assert that this claim is procedurally defaulted under Ala. R. Crim. P. 32.2(a)(3) and (5) because Petitioner did not raise it at trial and on direct appeal.[21] The Rule 20 court found that the claim had been procedurally defaulted on that basis.  (Rule 20 R. 393).  The Alabama Court of Criminal Appeals affirmed, finding this claim to be one of sixteen that were procedurally defaulted because they (1) could have been raised at trial and direct appeal and were not, (2) were raised at trial but not on direct appeal, or (3) were raised and addressed on direct appeal.  Brown, 663 So. 2d

---

[21]The court notes that, on direct appeal, Petitioner did complain about the admission of Davenport's taped statement, but only on the basis that it was not shown to have been voluntary.  He did not raise due process, confrontation, or Eighth Amendment arguments at that time.  (Brief of Appellant, Tab #37 at 17).

at 1030.  As Rules 32.2(a)(3) and (5) constitute independent
and adequate state grounds for denying relief, this claim is
procedurally barred.  Further, for the reasons addressed below
in the sections dealing with Petitioner's ineffective
assistance claims, he has failed to show "cause" for this
default due to the alleged ineffective assistance of either
his trial or appellate counsel.

**Claim C. Alabama's application of the "especially heinous,
atrocious and cruel" aggravating circumstance is
unconstitutionally vague and, as applied to
Petitioner's case, violates due process and the
prohibition of cruel and unusual punishment.**

For the reasons discussed above, this Court finds that
Petitioner's claim is procedurally defaulted under Alabama
Rules of Criminal Procedure 32.2(a)(3) & (5) because
Petitioner did not raise it at trial and on direct appeal.
See supra, Claim B at 50.

**Claim D. Petitioner was deprived of his rights under the
Eighth and Fourteenth Amendments due to a false
impression created by a prosecution witness as to
pain felt by the deceased.**

Petitioner claims that he was deprived of his
constitutional rights by the alleged false impression given to

49

the jury concerning the pain felt by McGraw when his throat
was cut.  This false impression, he argues, was created by the
testimony of Jefferson County Medical Examiner Dr. Robert
Brissie, which reflected that McGraw would have felt pain from
his neck injuries even if he were unconscious.  Petitioner
complains that the prosecutors used this testimony during the
penalty phase of his trial in order to show that the crime fit
the "especially heinous, atrocious, and cruel" aggravating
factor.  (Petitioner's Reply Brief at 23-25).

Petitioner raised this claim during the Rule 20
proceedings.  (Rule 20 R. 28-29).  The Rule 20 court did not
find the claim to be procedurally defaulted, but apparently
did not make findings specifically with respect to this claim.
Rather, the court made relevant findings with respect to
another claim:  that trial counsel was ineffective because he
allegedly inadequately prepared for and attacked Dr. Brissie's
testimony.  With respect to that ineffective assistance claim,
the Rule 20 court stated as follows:

> Brown alleged that McDonald was ineffective
> because he inadequately prepared for and
> attacked Dr. Robert Brissie's testimony in
> support of finding Brown's offense to have
> been especially heinous, atrocious or
> cruel.  McDonald's performance was not
> deficient and Brown was not prejudiced by
> McDonald's cross-examination of Dr.

Brissie.

At the punishment stage of Brown's trial, hearing was held outside the presence of the jury on the admissibility of Dr. Brissie's testimony. McDonald objected to this testimony in its entirety. Among his many questions at this hearing, McDonald asked whether an unconscious person would feel pain and received the same answer Brown's current counsel obtained at the Rule 20 hearing. Dr. Brissie's testimony was and remains that an unconscious person experiences pain. That McDonald, as well [as] Brown's current counsel, could not get Dr. Brissie to testify that an unconscious person would not feel pain, does not show that McDonald's performance was deficient. Nor can McDonald be faulted for not questioning Dr. Brissie on this point in the presence of the jury as that would have only exposed them to Dr. Brissie's unfavorable answer.

Additionally, Dr. Brissie's testimony at trial was not false or misleading. Brown failed to present any evidence to contradict Dr. Brissie's opinion at the Rule 20 hearing, and there is no reasonable probability that, but for McDonald's performance, Brown would not have been sentenced to death.

(Rule 20 R. 412). The findings of fact contained above are supported by the record and are entitled to a presumption of correctness under 28 U.S.C. § 2254(d).[22]

_____

[22]In April of 1996, after the habeas petition in this case was filed, President Clinton signed into law the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which heightens the degree of deference paid to a state

On appeal from the denial of relief under Rule 20, Petitioner again raised this claim. (Brief of Appellant, Tab #56 at 17). The court did not address the merits of the claim, however, apparently finding that it was one of the sixteen claims that had been procedurally defaulted. Respondents do not argue that the claim is procedurally defaulted, however, so the Court will address the merits.

In affirming the Rule 20 court's denial of relief on the related ineffective assistance claim, the Alabama Court of Criminal Appeals adopted the findings of fact relied upon in the Rule 20 court. See supra p. 53-54. The court ultimately held:

> We agree with the trial court's holding that at the Rule 20 hearing, Brown failed to present any evidence to contradict Dr. Brissie's opinion. Therefore, there is no reasonable probability that, but for trial counsel's performance, Brown would not have been sentenced to death.

Brown, 663 So. 2d at 1034. The findings of fact contained

---

court's findings of fact and makes other changes in habeas law. The Court proceeds under pre-AEDPA law because the outcome of this proceeding would be identical under pre- and post-AEDPA law, and because it appears that pre-AEDPA law would apply to this case under Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), since Alabama has not met the conditions for the application of the provisions in § 107 of AEDPA to capital cases. See Lindh, 117 S. Ct. at 2063.

above are supported by the record and are entitled to a presumption of correctness.

Petitioner does not present evidence showing that Dr. Brissie's testimony about McGraw's pain was false or erroneous or that it gave the jurors a false impression of McGraw's pain. He argues only that Dr. Brissie's Rule 20 testimony on this subject is inconsistent with his trial testimony. (Petitioner's Reply Brief at 24-25). He argues that two portions of Dr. Brissie's Rule 20 testimony reveal that he knew that his trial testimony about the pain felt by McGraw was misleading. At trial, he argues, Dr. Brissie said that the cutting of the neck area would be painful to a person even if he were unconscious. (Id. at 24). At the Rule 20 hearing, he argues, Dr. Brissie admitted that (1) a person can be in such a deep state of unconsciousness that he would not respond to pain, and (2) a blow to the head could render someone unconscious[23] and (3) in a deep level of unconsciousness, a person might not perceive pain. (Id. at 24-25). He complains that the prosecutors did nothing to dispel the alleged false impression created by such testimony.

---

[23]As set forth above, the evidence reveals that McGraw was struck on the head during the attack.

As Petitioner points out, a conviction obtained through the use of false evidence, known to be such by representatives of the State, violates the Fourteenth Amendment. <u>Mooney v. Holohan</u>, 294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791 (1935); <u>see also</u> <u>Miller v. Pate</u>, 386 U.S. 1, 7, 87 S. Ct. 785, 788, 17 L. Ed. 2d 690 (1967). The same result occurs when the State, although not soliciting false evidence, allows it to go uncorrected when it appears, <u>Napue v. Illinois</u>, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217 (1959), or when the prosecution knowingly uses false evidence which creates a materially false impression to the jury. <u>Alcorta v. State of Texas</u>, 355 U.S. 28, 31, 78 S. Ct. 103, 105, 2 L. Ed. 2d 9 (1957).

This claim must fail because Petitioner has not shown that Dr. Brissie's testimony was false, that it created a false impression, or that it was inconsistent with his subsequent Rule 20 testimony. Dr. Brissie testified at trial that unconscious people, if not brain-dead, will usually react to pain. (R. 984). He also testified at trial that he would expect an unconscious person without brain damage to have a perception of pain, although he admitted that it would be difficult to determine the degree of perception. (<u>Id</u>.). Dr.

Brissie's Rule 20 testimony was consistent with this
testimony. The portions of his Rule 20 testimony to which
Petitioner refers do not show otherwise. When Dr. Brissie
said that there are states of unconsciousness in which people
do not respond to pain, he was referring to people who are
brain-dead or who have suffered central nervous system
injuries. (Rule 20 Tr. 39-40). Although he said that a
severe blow to the head that disrupted brain tissue could
cause unconsciousness, and that a very deep level of
unconsciousness could prevent the perception of pain[24], (Rule
20 Tr. 40, 52-54), he never said that a blow to the head such
as one McGraw suffered would cause a state of unconsciousness
that would prevent him from perceiving pain. He stated,
rather, that "there was no epidural hematoma or subdural
hematoma or evidence of injury to the brain of the deceased,"
as he would typically expect to see in a person rendered
unconscious by a blow to the head. (Rule 20 Tr. 53, 63).
Therefore, Dr. Brissie's testimony is unrefuted and appears to
be logical and internally consistent. There was thus no
constitutional violation arising out of the presentation of

---

[24]Dr. Brissie's testimony reveals that the term
"unconscious" includes people who are brain-dead, and
therefore cannot perceive pain. (Rule 20 Tr. 39, 45).

any false or misleading testimony to the jury.

This claim must fail for another reason as well. Even assuming the Dr. Brissie's testimony was false or that it gave the jury a false impression of McGraw's pain, there is absolutely no evidence whatsoever that the prosecutors were aware of this fact. All of the cases cited by Petitioner indicates that the prosecutors must have used testimony knowing that it was false or misleading. He does not even argue that there is evidence the prosecutors knew such a thing. Thus, the prosecutors' use of Dr. Brissie's testimony was not a violation of due process, even if it had been false or misleading.

**Claim E. The trial court's instructions limiting consideration of mitigating evidence violated Petitioner's rights to a constitutional sentencing hearing.**

For the reasons discussed above, this Court finds that Petitioner's claim is procedurally defaulted under Alabama Rules of Criminal Procedure 32.2(a)(3) & (5) because Petitioner did not raise it at trial and on direct appeal. See supra, Claim B at 50.

**Claim F. The trial court's directive to the jury that it exclude from consideration during its penalty phase**

> deliberations   any   and   all   passion   violated
> Petitioner's rights under the Eighth and Fourteenth
> Amendments.

Respondents argue that Petitioner may have asserted, in conjunction with this claim, a new challenge to the trial court's jury instructions on passion or prejudice which is different from the challenge raised in the Rule 20 petition. It is perhaps for this reason that the Respondents argue that this claim is procedurally defaulted in part because it was not raised before any state court.   The Court has compared this claim as it is set forth in this proceeding to the claim as it was asserted during post-conviction proceedings, and has been unable to discern what the new challenge might be. (Compare Rule 20 R. at 600-01 to Petition for Writ of Habeas Corpus at ¶¶ 54-62).   Even assuming Respondents are correct, however, that Petitioner raises a new challenge in conjunction with this claim, one that was never raised before the state court, this claim would be procedurally barred due to Petitioner's failure to exhaust it in state court.

A petitioner is not entitled to habeas corpus relief if he has not exhausted state remedies with respect to his habeas claims.   Anderson v. Harless, 459 U.S. 4, 6-8, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982).   To exhaust a habeas claim, a

petitioner must "fairly present" it to the state courts, which means he must raise all the essential factual elements and the same legal theories that he raises in his habeas petition, so the state court has an opportunity to apply the controlling legal principles to the facts. <u>Waldrop v. Thigpen</u>, 857 F. Supp. 872, 897 (N.D. Ala. 1994)(citations omitted), <u>aff'd sub nom</u> <u>Waldrop v. Jones</u>, 77 F.3d 1308, 1315-16 (11th Cir.), <u>cert. denied sub nom</u> <u>Waldrop v. Hopper</u>, 519 U.S. 898, 117 S. Ct. 247, 136 L. Ed. 2d 175 (1996)).  This Petitioner did not do, if he asserts in this proceeding a completely new claim that was never raised in state court.  He would now be barred from presenting such a new claim in state court by the time limitation set forth in current Rule 32.2(c), which disallows a collateral attack more than two years after a conviction becomes final.  Dismissing such a claim to allow Petitioner to pursue it in state court would therefore be futile.  Because any such new claim would be procedurally barred in state court, it would be procedurally barred in this proceeding as well.  <u>Id</u>. (Citations omitted).

**Claim G. The trial court erred in its instruction to the jury on reasonable doubt and thereby violated Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments.**

Respondents argue that this claim is procedurally barred under the non-retroactivity principles established in <u>Teague v. Lane</u>, 489 U.S. 288, 100 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) because it is primarily based upon the law set forth in <u>Cage v. Louisiana</u>, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990) (per curiam), which was issued after Petitioner's conviction became final. As Petitioner points out, however, the Eleventh Circuit has determined that the <u>Cage</u> rule he invokes falls within the <u>Teague</u> exception encompassing rules that are "central to an accurate determination of innocence or guilt." <u>Nutter v. White</u>, 39 F.3d 1154, 1157-58 (11th Cir. 1994); (Petitioner's Brief on the Merits at 83). It would thus appear that the claim is not barred on non-retroactivity grounds, although it is procedurally defaulted under the "independent and adequate state ground" rule based on petitioner's failure to assert it at trial and on direct appeal.

**Claim H.  Petitioner's conviction was obtained in violation of his right to due process of law under the Fourteenth Amendment because of a jury instruction that impermissibly shifted the burden of proof.**

For the reasons discussed above, this Court finds that Petitioner's claim is procedurally defaulted under Alabama

59

Rules of Criminal Procedure 32.2(a)(3) & (5) because
Petitioner did not raise it at trial and on direct appeal.
See supra, Claim B at 50.

**Claim I.  The prosecution's misconduct and arguments during
the guilt/innocence phase of the trial were improper
and violated Petitioner's rights under the Fifth,
Sixth, Eighth and Fourteenth Amendments.**

For the reasons discussed above, this Court finds that
this claim would be procedurally barred due to the
Petitioner's failure to exhaust it in state court.  See supra
§ F at 62.

**Claim J.  The prosecution's misconduct and arguments at the
penalty phase of the trial were improper and
deprived Petitioner of a fundamentally fair hearing
and due process.**

For the reasons discussed above, this Court finds that
this claim would be procedurally barred due to the
Petitioner's failure to exhaust it in state court.  See supra
§ F at 62.

**Claim K.  The state's use of prejudicial and inflammatory
photographs and slide shows at Petitioner's trial
violated Petitioner's rights.**

With respect to Petitioner's challenge to the admission
of photographs 1, 7 and 8, the Respondents assert that this

claim is procedurally defaulted under Ala.R.Crim.P. 32.2(a)(5) because Petitioner's challenge to the admission of other photographs of the victim, Respondents asserts that this claim is procedurally defaulted under Ala.R.Crim.P. 32.2(a)(3) and (5) because Petitioner did not raise it at trial and on direct appeal.

For the reasons discussed above, this Court finds that Petitioner's claim is procedurally defaulted under Alabama Rules of Criminal Procedure 32.2(a0(3) & (5) because Petitioner did not raise it at trial and on direct appeal. See supra, Claim B at 50.

**Claim L.  Petitioner's death sentence violates the Eighth and Fourteenth Amendments because of the failure of the trial court to properly consider mitigating evidence.**

For the reasons discussed above, this Court finds that this claim would be procedurally barred due to the Petitioner's failure to exhaust it in state court.  See supra § F at 62.

**Claim M.  The trial court's denial of Petitioner's request for a continuance violated his rights under the Sixth, Eighth and Fourteenth Amendments.**

For the reasons discussed above, this Court finds that

Petitioner's claim is procedurally defaulted under Alabama Rules of Criminal Procedure 32.2(a)(3) & (5) because Petitioner did not raise it at trial and on direct appeal. See supra, Claim B at 50.

**Claim N.   Petitioner's statements to deputies of the Jefferson County Sheriff's Department were not voluntary and therefore inadmissible under the Fifth and Fourteenth Amendments.**

Petitioner gave three different statements to police about McGraw's murder. He claims that each of these statements was involuntary and therefore should not have been admitted at trial. (Petitioner's Reply Brief at 25-27). Due process considerations prohibit the use of an involuntary confession. Miller v. Fenton, 474 U.S. 104, 109, 106 S. Ct. 445, 88 L. Ed. 2d 405, 410 (1985).

Although this Court must independently make the legal decision whether a confession was voluntary, the state court's findings regarding "subsidiary factual questions" are entitled to a presumption of correctness. Miller, 474 U.S. at 112. In analyzing the voluntariness of a confession, however, the federal habeas court must make an independent examination of the totality of the circumstances surrounding the confession. Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S. Ct. 2041,

62

2047, 36 L. Ed. 2d 854 (1973). In so doing, the court must determine whether the accused made "an independent and informed choice of his own free will, possessing the capacity to do so, his will not being overborne by the pressures and circumstances swirling around him." United States v. Rouco, 765 F.2d 983, 993 (11th Cir. 1985), cert. denied, 475 U.S. 1124, 106 S. Ct. 1646, 90 L. Ed. 2d 190 (1986) (quoting Jurek v. Estelle, 623 F.2d 929 (5th Cir. 1980), cert. denied, 450 U.S. 1001, 101 S. Ct. 1709, 68 L. Ed. 2d 203, cert. denied, 450 U.S. 1014, 101 S. Ct. 1724, 68 L. Ed. 2d 203 (1981)).

The confession must be the product of the accused's free and deliberate choice rather than the product of coercion, intimidation, or deception by the police. United States v. Mendoza-Cecilia, 963 F.2d 1467, 1475 (11th Cir.), cert. denied sub nom Marin-Hernandez v. United States, 506 U.S. 964, 113 S. Ct. 436, 121 L. Ed. 2d 356 (1992). Factors relevant to the inquiry include the accused's intelligence, the length of detention, the nature of interrogation, use of physical force, and promises or inducements. See Colorado v. Connelly, 479 U.S. 157, 163 n. 1, 107 S. Ct. 515, 520 n. 1, 93 L. Ed. 2d 473, 482 n. 1 (1986); Campaneria v. Reid, 891 F.2d 1014 (2d

Cir. 1989), cert. denied, 499 U.S. 949, 111 S. Ct. 1419, 113 L. Ed. 2d 471 (1991). Each of these factors, along with other surrounding circumstances, combine to determine the crucial issue was whether there was any "overreaching" on the part of the police. Connelly, 479 U.S. at 163, 107 S. Ct. at 520.

Petitioner gave three different statements to sheriff's deputies. The first two statements were given to Sergeants White, Gaskey, and Harris at the Center Point substation on May 29, 1986, three days after the murder. Petitioner argues that, at the time of these first two statements, his capacity was diminished by his drug and alcohol addiction and by his recent ingestion of large quantities of alcohol and Valium. Furthermore, he argues that the sheriff's deputies acted improperly by: (1) taking him to the sheriff's department substation, (2) telling him it would be better if he told the truth, (3) taking him in a squad car to James Bynum's residence, (4) leaving him in the car with a deputy while Bynum was questioned, (5) making an appeal to his religious upbringing, and (6) telling him that Bynum had "told it all" and that Bynum had tried to help him. (Petitioner's Reply Brief at 26-27).

About seven weeks after the murder and after making the

64

first two statements, Petitioner asked his mother to call
Sergeant White to come see him at the jail so he could make
another statement.   (Rule 20 R. 857).   In response to this
request, White went to the jail on July 17, 1986, read
Petitioner his <u>Miranda</u> rights and took his third statement.
(R. 64-67).   Petitioner argues that the third statement is
inadmissible because it was tainted by the involuntariness of
the first two.   (Petitioner's Reply Brief at 27).

The Alabama courts made a number of findings with respect
to these claims.   On direct appeal, the Alabama Court of
Criminal Appeals found as follows:

> First, the appellant asserts that the statements
> were improperly induced and, therefore, not
> voluntary because Sgt. Harris stated to the
> appellant during the three conversations that: "Oh,
> I am sure I told him it would be a lot better for
> him if he went ahead and leveled with us, but I
> didn't make him no [sic] promises to get him out of
> anything."  (R. 119)  It is unclear from the record
> exactly when this statement by Sgt. Harris was made
> to this appellant.
>
> * * *
>
> Sgt. Harris' remarks were to convey the thought that
> he would tell the truth.  These remarks do not imply
> a promise or inducement to confess.

<u>Brown</u>, 545 So. 2d at 112.   The findings of fact set forth
above are supported by the record and are entitled to a

65

presumption of correctness.   28 U.S.C. § 2254(d).

The Rule 20 court, albeit in the context of one of Petitioner's ineffective assistance claims, made the following findings:

> At his Rule 20 hearing, Brown presented evidence of his drug and alcohol abuse, as well as evidence that he had used drugs and alcohol shortly before the murder.   Apparently, Brown believes that had this evidence been presented at his suppression hearing, it would have tended to prove that his statements to police were not given knowingly, intelligently, or voluntarily, and, that therefore, those statements should have been suppressed.   The record shows that Brown gave two of the statements in the days following the murder. His third statement was given a month after the murder, when he requested to talk to police.   We fail to see how use of drugs or alcohol days before the statements were given would have any affect [sic] upon the voluntariness of the statements.   Further, the officers who took the statements testified that Brown was coherent and sober when he gave the statements.

Brown, 663 So. 2d at 1033-34.  The findings of fact set forth above are supported by the record and are entitled to a presumption of correctness.[25]

The record reveals the following facts.  Three days after the murder, Petitioner was approached at Bankhead's house at about 4:00 p.m. by Sergeants White, Gaskey, and Harris, who

---

[25]The court notes, however, that Petitioner gave his third statement on July 17, 1988, about seven weeks after McGraw's murder, not a month thereafter.

said they needed to talk to him about the McGraw murder
investigation. They asked Petitioner to come to the Jefferson
County Sheriff's substation in Center Point, to which he
assented. (R. 29-36, 39, 80).  Petitioner was not arrested,
but went with the deputies to the Center Point substation,
arriving at about 4:15 p.m.  (R. 31, 39-40).  Sergeant White
testified that he seemed sober and coherent during this time
and during his questioning that day.  (R.
40-41).  Petitioner was advised of his Miranda rights, and his
statement denying any involvement was taken from 4:25 to 5:04
p.m., after which he was, according to the deputies, free to
leave. (R. 39-40, 59, 88).  The deputies asked him questions
after he made the initial statement.  (R. 94-98).

Petitioner then accompanied deputies, at their request,
on the thirty-minute[26] car ride from the substation to Bynum's
residence, where Bynum was questioned between 7:50 p.m. and
8:19 p.m. while Petitioner waited in the squad car with
Sergeant Harris.  (R. 21, 64, 54-57; Rule 20 Tr. 834).  When
the deputies returned to the patrol car, they arrested

---

[26]Other than the thirty-minute car ride, the record does
not otherwise reveal what occurred during the almost three
hours between the end of Petitioner's statement at 5:04 p.m.
and the commencement of Bynum's interrogation at 7:50 p.m.

Petitioner and told him that Bynum had connected him with the murder. (Rule 20 Tr. 836-37). Petitioner alleges that, at that time, the deputies told him that Bynum had named Bankhead as the instigator and ringleader and had said that Bankhead stabbed McGraw. (Rule 20 Tr. 838). Petitioner then told deputies that Bankhead had stabbed McGraw. (Rule 20 Tr. 839).

Deputies drove Petitioner back to the station, re-advised him of his <u>Miranda</u> rights, and took his second statement from 10:50 to 11:07 p.m. (R. 61-63). The evidence shows that less than seven hours transpired between Petitioner's arrival at the substation to the completion of his second statement. There is no indication that, during this time, Petitioner was denied food, water, or the use of a bathroom or that he was ever subjected to uncomfortable or intolerable physical conditions. The evidence does not show that he was abused or subjected to coercion. Indeed, it appears that he was free to leave at anytime before his arrest at Bynum's house around 8:30 p.m. For over half the time he was with deputies, he was there voluntarily.

Given the state court findings and the record evidence, it is thus apparent that Petitioner gave the first two statements as a result of an independent and informed choice

of his own free will.  There are no factors present indicating
that the police overreached in their dealings with Petitioner.
Due to his criminal past, he had considerable experience with
the police and the criminal justice system.  According to his
own Rule 20 hearing expert witness, he is of "bright normal"
intelligence, is not mentally ill, and has no brain damage,
although he does have an "antisocial personality disorder" and
a long-standing "polydrug dependency." (Rule 20 Tr. 959, 967-
70, 972, 978, 998, 1048-49).

Petitioner specifically complains that his first two
statements were involuntary because, during questioning, his
capacity was diminished by drug and alcohol addiction and
recent drug and alcohol use.  The record and the state-court
findings reveal, however, that Petitioner was not intoxicated
when he made his first and second statements on May 29, 1986.
At the Rule 20 hearing, he alleged that, in the time frame of
the murder, he was drinking between fifteen and thirty beers
a day and taking Valium,[27] although he would occasionally stay

---

[27]Petitioner told inconsistent stories about the level of
his Valium use at this time.  He alleged that he took between
fifty and sixty Valium in a two-week period, which would be
between three and five a day.  (Rule 20 Tr. 784).  He then
alleged that he took between ten and thirty a day.  (Rule 20
Tr. 784).  Later, he alleged he had between fifty and sixty
per week.  (Rule 20 Tr. 911).

off Valium for a week and "get [his] senses together." (Rule
20 Tr. 727-29). He stated that it was difficult to get
marijuana during this period. (Rule 20 Tr. 782). Petitioner
spent part of the day and the night before his arrest at his
parents' house, during which he apparently ingested no alcohol
or illicit drugs. (Rule 20 Tr. 633-34, 818-21; see also Rule
20 Tr. 907). The next day, he ran a number of errands with
Bankhead, but did not testify that he ingested alcohol or
illicit drugs during this time. As set forth above, he was
approached at 4:00 p.m. by sheriffs' deputies who testified
that he appeared to be sober.

The record and the state court findings also reveal that
Petitioner's capacity was not diminished by his drug and
alcohol addiction so as to render his statements involuntary.
Neither Petitioner nor the officers testified that Petitioner
suffered any direct effects of addiction (i.e. delirium
tremens, which Petitioner claims never to have suffered) at
the time he gave his first two statements. (Rule 20 Tr. 908).
Also, the evaluation of Petitioner's own expert revealed no
evidence of brain damage or mental illness resulting from his
extensive drug use. (Rule 20 Tr. 967-68).

Petitioner next complains that deputies took him to a

70

sheriff's substation to question him.  The fact that the
deputies took Petitioner to the sheriff's substation to
interview him does not by itself render his statements
involuntary.  The location of an interrogation is but one
circumstance to be considered by the Court in determining
whether a statement was voluntary.  Withrow v. Williams, 507
U.S. 680, 693, 113 S. Ct. 1745, 1754, 123 L. Ed. 2d 407
(1993).  As stated above, there are no circumstances
indicating that his will was overborne during the day he made
his first two statements.  The mere fact that his interview
took place at the substation will not render his statements
involuntary where other circumstances indicate that the
statements were the product of his free and voluntary choice.

Petitioner next complains that, during questioning,
sheriff's deputies told him it would be better if he told the
truth, thereby inducing him to make a statement against his
will.  The fact that the deputies may have encouraged
Petitioner to tell the truth does not make his statement
involuntary.  The former Fifth Circuit[28] held that

---

[28]This case would be binding precedent in the Eleventh
Circuit under Bonner v. City of Prichard, 661 F.2d 1206, 1209
(11th Cir. 1981) (en banc).

"[e]ncouraging a suspect to tell the truth and suggesting that
his cohorts might leave him 'holding the bag' does not, as a
matter of law, overcome a confessor's will. . . ." and that
"telling the appellant in a noncoercive manner of the
realistically expected penalties and encouraging her to tell
the truth is no more than affording her the chance to make an
informed decision with respect to her cooperation with the
government." United States v. Ballard, 586 F.2d 1060, 1063
(5th Cir. 1978)(citations omitted), quoted in Lindsey v.
Smith, 820 F.2d 1137, 1150 (11th Cir. 1987), cert. denied,
489 U.S. 1059, 109 S. Ct. 1327, 103 L. Ed. 2d 595 (1989),
Martin v. Wainwright, 770 F.2d 918, 926 (11th Cir. 1985),
opinion modified in unrelated part on denial of rehearing, 781
F.2d 185 (11th Cir. 1986), cert. denied, 479 U.S. 909, 107 S.
Ct. 307, 93 L. Ed. 2d 28 (1986). There is no evidence that
the deputies coerced petitioner. The mere statement,
therefore, that it would be better if he told the truth was
not an unconstitutional inducement or deception that
overwhelmed his ability to make a free and informed choice
whether to speak.

Petitioner also complains that deputies took him in a
squad car to James Bynum's residence and left him in the car

with a deputy while Bynum was questioned inside the residence. There is no evidence that Petitioner was left in the car for an unusually long period of time or in uncomfortable or unbearable physical conditions, or that the deputy that remained in the car with him abused him, threatened him, or treated him in such a way as to overcome his will. As already noted, at this point in time he had not been arrested and was free to leave if he had so desired. The mere fact that Petitioner rode with deputies to Bynum's house and remained in the car while Bynum was interviewed does not render his statements involuntary.

Petitioner complains that one of the deputies made an appeal to his religious upbringing. An appeal to a defendant's religious beliefs does not render a confession involuntary, however, unless the defendant's will is overborne. Miller, 984 F.2d at 1031-32. In Monteon v. Gomez, 45 F.3d 436 (table), 1994 W.L. 712305 at *3 (unpublished disposition)(1994), cert. denied, 515 U.S. 1134, 115 S. Ct. 2563, 132 L. Ed. 2d 816 (1995), the court stated that:

> [petitioner's] confession was the product of his own
> pre-existing religious beliefs, not of police
> coercion, and it was voluntary. Welch v. Butler,
> 835 F.2d 92, 95 (5th Cir. 1988) (prayer session with
> police officer where defendant confessed crime did
> not constitute police coercion when defendant's

concern for doing the religiously correct thing was a pre-existing concern), <u>reh'g denied sub nom.</u> <u>Van Welch v. Butler</u>, 842 F.2d 329 (en banc), and <u>cert. denied</u>, 487 U.S. 1221 (1988); <u>see</u> <u>Miller</u>, 984 F.2d at 1031-32 (appeal to religious beliefs is not coercion unless it overbears defendant's will).

<u>Monteon</u>, 45 F.3d at *3. In this case, there is no evidence that Petitioner's will was overborne by any religious discussion he may have had with a deputy. (Rule 20 Tr. 834-35). The evidence reveals, rather, that while Petitioner waited in the car with Sergeant Harris at Bynum's house as other deputies interviewed Bynum, Harris asked him if he knew about Jesus and told him that Jesus could help him. Petitioner responded that he did know about Jesus, but that he had not acted on that knowledge for some time. (<u>Id</u>.). This is not the sort of religious discussion that would have overborne Petitioner's free will to decide whether to speak or not.

Petitioner further complains that between his first and second statement, deputies told him that Bynum had "told it all" and that Bynum had tried to help him by identifying Bankhead as the ringleader. The state court finding that Petitioner was not a credible witness, (Rule 20 R. 408), requires this Court to regard his assertions with skepticism. Yet, even assuming that Petitioner correctly testified that

the officers mischaracterized Bynum's confession as being beneficial to him, this would not render his second statement involuntary. The Supreme Court "has refused to find that a defendant who confesses, after being falsely told that his codefendant has turned State's evidence, does so involuntarily." Oregon v. Elstad, 470 U.S. 298, 317, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985), citing Frazier v. Cupp, 394 U.S. 731, 739, 89 S. Ct. 1420, 1424, 22 L. Ed. 2d 684 (1969). See also Holland v. McGuire, 963 F.2d 1044, 1051 (7th Cir. 1992), cert. denied sub nom Holland v. McGinnis, 506 U.S. 1082, 113 S. Ct. 1053, 122 L. Ed. 2d 360 (1993)("Of all the numerous varieties of police trickery, however, a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary."). There is no apparent reason for exercising less tolerance where the defendant is deceived into believing the codefendant's statement to be exculpatory, rather than inculpatory. Common sense indicates that Petitioner would have had less incentive to speak if he believed that Bynum had exculpated him rather than implicated him in the crime. Viewed in the context of the totality of the circumstances, such a misrepresentation of Bynum's statement would not have induced petitioner to speak

nor did it render Petitioner's second statement involuntary.

Petitioner next claims that the improprieties surrounding the first two statements so tainted the third, given seven weeks later, that it was inadmissible.[29]  As set forth above, the first two statements were voluntary and admissible, so they could not have tainted the third statement.  But even if the first two statements had been involuntary, that would not necessarily render the third statement itself involuntary and inadmissible.  The Supreme Court has stated that, "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether such coercion has carried over into the second confession."  Elstad, 470 U.S. at 309 (1985)(dicta).  The Eleventh Circuit has also stated that,

> [T]he United States Supreme Court has never held that an early inadmissible statement automatically precludes the admission into evidence of later

---

[29]Petitioner claims that he would never have made the third statement if he had not made the first two, as he was merely trying to correct the lies he had previously told police.  (Rule 20 Tr. 856-58).  Petitioner's assertions are due to be viewed with doubt, in light of the state court findings that his testimony was not credible.  (Rule 20 R. 408).  Even assuming Petitioner's testimony is wholly correct, however, this claim would still fail for the reasons set forth below.

voluntary statements. <u>United States v. Bayer</u>, 331
U.S. 532, 541, 67 S. Ct. 1394, 1398, 91 L. Ed. 1654
(1947). Instead it has established that in cases
involving multiple confessions, courts may hold some
of the confessions involuntary and others not only
if such a distinction is justified by a sufficiently
isolating break in the stream of events. <u>See</u>, <u>e.g.</u>,
<u>United States v. Bayer</u>, 331 U.S. at 540, 67 S. Ct.
at 1398, 91 L. Ed. 1654 (holding valid second
confession made under notably different
circumstances six months after first confession
which violated <u>McNabb</u> rule); <u>Lyons v. Oklahoma</u>, 322
U.S. 596, 604, 64 S. Ct. 1208, 1213, 88 L. Ed. 1481
(1944) (holding valid second confession made in new,
noncoercive environment to different questioners, a
half day after first admittedly involuntary
confession).

<u>Leon v. Wainwright</u>, 734 F.2d 770, 772 (11th Cir. 1984).

In this case, seven weeks passed between the first two
statements and the third. The giving of the statement was
initiated by Petitioner. He chose the person, Sergeant White,
to whom he made the third statement and had his mother summon
White to the jail to take the statement. (Rule 20 Tr. 856-
58). White went to the jail in response to Petitioner's
stated wishes, administered <u>Miranda</u> warnings, and received the
petitioner's statement. (R. 64-68). Petitioner gave his
statement with no encouragement from White; he told White that
he knew Bankhead had been arrested and that he now wanted to
"tell it like it was." (R. 67). There was thus a
"sufficiently isolating break in the stream of events" between

the first and second statements and the third statement to
completely insulate the third statement from any problems with
the first two.   Even if the first two statements had been
involuntary, this would not taint the third statement so as to
render it involuntary as well.

The admission into evidence of the three statements made
by Petitioner did not violate his rights under the Fifth or
Fourteenth Amendments.   He voluntarily related three different
descriptions of his involvement in the McGraw murder and those
statements were properly used at trial against him.   He is not
entitled to habeas relief on this ground.

**Claim O.   Petitioner's third statement to law enforcement
officials was obtained in violation of his rights
under the Sixth and Fourteenth Amendments.**

This claim differs from the previous one in that it is
grounded on the Sixth Amendment right to counsel, not the
Fifth   Amendment   privilege   against   self-incrimination.
Petitioner complains that, although his constitutional right
to  counsel  had  already  been  invoked,  a  law  enforcement
official improperly initiated contact with him and that the
resulting discussion yielded Petitioner's third statement.   He
therefore argues that the third statement was inadmissible
because it was obtained in violation of his constitutional

right to counsel under the Sixth Amendment.

The state court made several findings with respect to this claim:

> [T]he appellant's counsel argues that the appellant's statement on July 17, 1986, should have been suppressed because the appellant's right to an attorney was violated.
>
> The appellant's counsel had been appointed on June 17, 1986, and this counsel had also been to the jail and talked with the appellant.
>
> Sgt. Harris testified, on voir dire and outside the presence of the jury, that the appellant's mother on July 17, 1986, had contacted him and stated that the appellant wanted to make another statement.  At the suppression hearing Sgt. White testified that Sgt. Brown told him that the appellant's mother had called Harris and informed Harris that the appellant wanted to make another statement.  As a result of that request, White went to the jail and read the appellant his <u>Miranda</u> rights before taking this statement statement.  The appellant indicated that he understood those rights, and the appellant signed the <u>Miranda</u> rights waiver form.  This form was admitted as evidence.  White testified that he made no threats or promises or other inducements to the appellant and no violence or coercion was applied. White acknowledged that he made no attempt to find out if the appellant had an attorney prior to taking this statement.  During cross-examination White stated that, "if he [the appellant] had requested that you be there, I would have notified you [appellant's counsel]".  (R. 835)
>
> "The fact that a defendant has an attorney does not mean, as a per se rule, that law enforcement officials cannot procure a statement of any kind from the defendant without prior notice to, if not

the consent of, the attorney."

* * *

"There being no *per se* or technical violation by not
having the retained or appointed counsel of an
accused present during an interrogation prior to
indictment, we must resolve the question of the
possibility of any constitutional violation by
looking to the facts of each particular case."
Thompson v. State, 347 So. 2d 1371, 1376 (Ala. Cr.
App. 1977), writ. denied, 434 U.S. 1018, 98 S. Ct.
740, 54 L. Ed. 2d 765 (1978).

Because there was no *per se* violation in this cause,
the issue becomes whether *vel non* the appellant
knowingly, willingly and understandingly waived his
right to counsel.  We have carefully reviewed the
record and considered the following factors:

(1) the appellant's counsel had talked with the
appellant before he gave his third statement on July
17, 1986;

(2) the taking of the statement was initiated by the
appellant, through his mother contacting Sgt.
Harris;

(3) the appellant was advised of his Miranda rights
before the statement was taken;

(4) the appellant acknowledged he understood his
Miranda rights and signed a rights waiver form;

(5) undisputed testimony that no violence or
coercion was applied to the appellant;

(6) undisputed testimony that Sgt. White made no
threats or promises or other inducement to the
appellant prior to taking the statement from the
appellant.

Upon review of these facts, we are convinced that
the appellant knowingly, willingly and
understandingly waived his right to have counsel
present during this statement on July 17, 1986.

Therefore, having reviewed the entire record, this
court holds that the trial court properly denied the
motion to suppress the statements made by this
appellant.

Brown, 545 So. 2d at 112-13.  The findings of fact set forth

above are supported by the record and are entitled to a

presumption of correctness.

### CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

**Claim P. Petitioner did not receive effective assistance of
counsel at trial in violation of his rights under
the Sixth, Eighth and Fourteenth Amendments.**

Petitioner makes eleven separate claims of ineffective

assistance with respect to his trial counsel, Russell T.

McDonald, Jr. ("McDonald"), who was assisted at trial by his

son, Russell T. McDonald, III.

1.  *Counsel failed to adequately investigate,
    develop and present evidence as to Petitioner's
    background, drug and alcohol abuse and its
    effects upon his mental state relevant to
    pretrial, guilt/innocence and life/death
    issues; counsel failed to adequately develop
    and present a viable defense strategy or
    defense at either stage of trial.*

Petitioner claims that McDonald failed to adequately

investigate, develop and present evidence as to his background

81

and drug and alcohol abuse and the effect of that abuse upon his mental state, which failure allegedly prejudiced him during the pretrial, guilt, and sentencing stages. As a result, he argues, McDonald failed to adequately develop and present a viable defense at either stage of trial. It appears in substance that Petitioner contends that his trial counsel should have presented evidence of his drug and alcohol abuse both in support of a diminished capacity defense in the guilt/innocence phase and as a mitigating circumstance in the penalty phase.

The Rule 20 court made a number of findings with respect to this claim, including the following:

> Brown alleged that McDonald rendered ineffective assistance of counsel because he failed to present evidence of Brown's history of drug and alcohol abuse. Based on the evidence presented at the Rule 20 proceeding, this claim is without merit.

> McDonald discussed Brown's drug and alcohol use with Brown on several occasions. McDonald was aware of Brown's history of drug use before representing Brown in this case. Brown told McDonald that he had used alcohol and some kind of pill the night before and the day of the murder. Brown told McDonald that he used alcohol, marijuana, and pills, perhaps Valium. Brown did not tell McDonald about his use of any other drugs. McDonald wanted this information to see if there was a guilt or punishment stage defense available based on Brown's drug and alcohol use. Despite his claim to drug and alcohol use, Brown gave McDonald the detailed account of the crime, including the false cover

story the participants developed.

In McDonald's opinion, based on his more than thirty years of experience in trying cases in Jefferson County, Alabama, jurors are prejudiced against criminal defendants who use drugs and McDonald would not want a jury to know that his client used drugs. McDonald was present and heard the testimony of Brown's sister, Donna Jordan, at the Rule 20 hearing and would never present such testimony to a Jefferson County jury. McDonald's concern about the prejudicial effect of Brown's drug use was a reason he elected to present other mitigation at Brown's trial.  He discussed this strategic decision with Brown.  When McDonald made this decision, he was aware of Brown's drug use, and had witnesses available to testify concerning it.  Brown did receive a jury charge on intoxication at the guilt stage of his trial based on the prosecution's evidence that he had been drinking on the day of the offense.

At the evidentiary hearing on this claim, Brown presented the testimony he now contends McDonald should have presented at trial in order to render effective assistance of counsel.  McDonald had called some of these witnesses at Brown's trial, in addition to other witnesses.  McDonald did not fail to present a defense at the sentencing stage of trial but rather presented witnesses in support of a unified guilt and punishment stage defense, that Brown was a non-violent follower who was dominated and pressured into his role in the crime by the older, violent Bankhead.  McDonald did not ignore Brown's drug use but selected what he considered to be a better line of defense.  McDonald knew from his vast experience with Jefferson County juries that evidence of drug use would hurt and not help his client.   Therefore, he <u>chose</u> to present other mitigation, which was consistent with his guilty stage defense.

Drugs and their users are the subject of disapproval and not sympathy in society.   This societal

prejudice is especially pertinent in Brown's case. He was not merely a user of illegal drugs but also dealt drugs during the entire period of time he used drugs, including selling drugs to his fellow students. Given this societal prejudice, evidence that Brown used and dealt drugs would have made him less sympathetic in the jury's eyes than the evidence presented by McDonald at the punishment stage of Brown's trial.

At the Rule 20 hearing, Brown presented ten witnesses, whom he contends McDonald should have called at trial. He presented testimony from his father, Leon Brown; his mother, Sarah Brown; his ex-wife, Cheryl Brown; his two older sisters, Donna Jordan and Brenda Bourquard; two childhood friends, Raymond Jay Entrekin and Richard Smith; a friend's father, Robert Burns; and a fellow drug user, Karen Evans. Brown also testified on his own behalf. Of these ten witnesses, McDonald had called Brown's parents and sisters at Brown's trial.

Brown's parents testified that his behavior changed when he was fourteen. Thereafter, they each found marijuana belonging to Brown on one occasion. Brown also told his father that he took some Darvon that belonged to his father. At the same time, Brown never drank or used drugs in front of his parents. Occasionally, however, Brown's parents did find him asleep or passed out in their doorway or outside of their home. Brown's parents did not see Brown often after he moved out of their house in his teens.

Donna Jordan did not see Brown use drugs until after he left high school. His other sister, Brenda Bourquard saw Brown drinking when he was fourteen and saw Brown and his wife drink and smoke marijuana. Both of Brown's sisters testified that they had used alcohol and drugs with Brown. Neither of them ever saw Brown inject any drugs. Both stopped using drugs with Brown long before the commission of the capital offense. Both sisters chose to stop using drugs on their own.

84

All of Brown's family members displayed a strong bias toward Brown. Each admitted that they loved and wanted to help him. Based on all of the testimony and this Court's observation of their demeanor, Brown's family members' testimony concerning Brown's drug use was exaggerated in an attempt to make him appear to have a greater drug problem than he did. The Court finds that they were not credible witnesses at the Rule 20 hearing and that the testimony of the family at Brown's trial was more credible and better mitigation evidence than their testimony concerning his drug and alcohol use.

Brown's childhood friends testified about their early drug experimentation with Brown. However, neither continued to use drugs for a very long period of time with Brown or on their own. Neither saw Brown much after Brown dropped out of high school. Despite their experimentation with drugs, Brown's childhood friends stopped using drugs by their own choice. Neither ever injected any drugs. Brown's childhood friends were able to do this even though they went to the same school and lived in the same social setting and community as Brown.

The testimony of Brown's childhood friends was not helpful to Brown. Neither were knowledgeable concerning Brown's drug and alcohol use at or near the time of the offense. One witness in particular, Entrekin, displayed a strong bias in favor of Brown and a willingness to exaggerate his testimony in a manner he perceived to benefit Brown. Entrekin initially testified that Brown only told him that he had injected drugs and that he had never seen Brown inject himself with drugs. Entrekin later changed his testimony and claimed that he had seen Brown inject himself on a couple of unspecified occasions.

Brown's ex-wife testified that, before and during their marriage, Brown used different kinds of drugs. However, they separated in 1981 and she only saw him about once a month thereafter. Brown's ex-wife has, by choice, stopped using drugs. Her son lives with

Brown's parents, who have adopted him.

Brown's ex-wife was asked to be a prosecution witness at Brown's capital murder trial but refused. She would have testified that, after the crime and before he was arrested for capital murder, Brown asked her if she wanted to buy a stereo or television. Since the prosecution knew about this testimony, if she had been called as a witness at Brown's trial, this additional incriminating evidence would have come out.[30]

Additionally, Brown's ex-wife displayed a strong bias in his favor. Brown's ex-wife is not only dependent on his parents' goodwill to see her son but also remains personally fond of him and does not want him to be executed.

The testimony of his friend's father, Burns, contradicted Brown's claim of constant, excessive drug and alcohol use. Burns testified that Brown was a frequent visitor at his home after 1982 or 1983. But Burns only saw [Brown] drunk "a couple of times." Brown was able to perform work for Burns lasting over a period of days and to stay sober during that period of time.

The testimony of Brown's friend, Evans, was not credible. She claimed that she and Brown used drugs together and that, the month before he was arrested, they were using large quantities of Valium together. However, she later testified that she had not seen Brown for at least a month before he was arrested. Given her demeanor and this glaring contradiction, Evans was not a credible witness.

Brown himself testified in detail about his drug and alcohol use, which he claimed began in the eighth

---

[30]It is not clear from Ms. Brown's Rule 20 hearing testimony that the prosecution did know about this potential trial testimony before the trial took place. (Rule 20 Tr. 487-504).

grade.  While Brown claimed to be a regular injector
of drugs, he testified that he was not injecting any
drugs during the period of time leading up to the
capital murder.  Brown claimed that, on the day of
the robbery/murder, he drank nine to twelve beers
and almost all of a liter of whiskey.[31]  According to
his testimony, he did not smoke any marijuana or
take any Valium on that day.  In fact, he was not
sure that he [had] taken any Valium as recently as
the day before the date of the robbery/murder.  The
amount  of  alcohol  that  Brown  claimed  to  have
consumed  on  the  day  of  the  robbery/murder  was
substantially less than he had claimed to consume on
a regular basis in the period of time immediately
preceding the day of the robbery/murder.  Even if
Brown's  account  of  his  alcohol  use  on  the  day  of
murder  [sic]  is  credited,  his  intake  was
substantially less than he claimed for other days.[32]

However,  Brown  consistently  overstated  and
exaggerated his drug and alcohol use.  Brown has

---

[31]The  record  reflects  that  Petitioner  actually  claimed
that he drank about half a liter of whiskey on the day of the
murder.  (Rule 20 Tr. 786-87).

[32]Petitioner  claimed  that,  during  the  relevant  time
period, he regularly drank between fifteen and thirty beers
daily, and, on occasion, some whiskey as well. (Rule 20 Tr.
729).  On the day of the murder, he claims that he drank
between nine and twelve beers and half a liter, or 16.9
ounces, of whiskey.  U.S. Dietary Guidelines define a drink as
twelve ounces of beer or one and a half ounces of whiskey.
"Eating Well," The Baltimore Sun, December 17, 1996, available
in 1996 WL 6652080.  Using this guideline to compare whiskey
and beer consumption, a half-liter of whiskey is equal to
approximately eleven beers.  If Petitioner's testimony is to
be believed, he consumed the equivalent of between twenty to
twenty-three beers on the day of the murder, which is actually
consistent with his claimed daily use, although it is clear
that  his  claimed  daily  alcohol  ingestion  was  sometimes
significantly higher than on the day of the murder.

never had delirium tremons [sic] or suffered from drug withdrawal. Brown's own expert witness testified that an absence of <u>delirium</u> <u>tremons</u> [sic] or withdrawal would not be consistent with the level of substance abuse reported by Brown. The State's expert found that Brown exaggerated his claims of drug and alcohol abuse. From both the substance of his testimony and his demeanor, Brown was not a credible witness. Even if it is assumed that evidence that Brown both used and sold drugs was mitigating, Brown certainly has exaggerated his drug and alcohol use in an attempt to diminish his responsibility for the capital murder he committed.

Further, evidence that Brown both used and sold drugs would not constitute mitigating evidence. Drugs and the people who use and sell them are the subject of widespread disapproval, and not sympathy, among members of society. This societal prejudice is especially pertinent here because Brown was not merely a user of illegal drugs but also sold drugs. Evidence that Brown both used and sold drugs would have made him less sympathetic in the jury's eyes.

Another reason Brown was not prejudiced by the absence of this evidence at his trial is that his claimed drug and alcohol use, by his own evidence, was not a factor in the commission of the murder. Brown had not been injecting drugs at any time close to the day of the offense and had not taken any Valium or smoked any marijuana on the day of the murder. Further, even Brown's claimed alcohol consumption on the day of the murder was substantially less than his claimed regular daily intake.[33] That on the day of the murder, Brown claimed to be more sober or less intoxicated than he claimed he usually was would not have benefitted him in the eyes of the jury. Thus, Brown was not prejudiced by his lawyer's decision not to present

---

[33]As set forth above, the record reflects that Petitioner's consumption on the day of the murder was consistent with his claimed regular daily intake at that time.

evidence of his drug use because his history of drug use was not connected to the offense.

Even if Brown's drug use is viewed as grounds for sympathy, it would not have affected the outcome of this trial. Brown confessed to an active role in a horribly violent attack on a harmless victim. That he was less drunk than usual and drug free for the moment would not change the result. Therefore, he has failed to show that McDonald rendered ineffective assistance of counsel.

(Rule 20 Tr. at 398-406). The Rule 20 court also made the

following findings:

Brown alleged that McDonald failed to adequately investigate and present evidence concerning his background. Brown also alleged that McDonald failed to investigate and present evidence as to Brown's mental health. McDonald's strategic decision to forego presenting Brown's drug use has already been addressed.

Brown presented testimony about his mental health at the Rule 20 hearing. Brown's witness, Dr. Karl Kirkland, testified that Brown was of above average intelligence, has no neuropsychological problems, and has a normal mental status. Kirkland thought Brown was addicted to drugs and that he met the diagnostic criteria for an anti-social personality disorder.[34]

---

[34]Kirkland described a personality disorder as a "chronic and pervasive way of relating to the world or relating to other people." (Rule 20 Tr. 965). Someone with anti-social personality disorder, he says "has problems with moral development," "problems that consistently get that person into trouble with law enforcement," and "problems learning to respect the rights of other people." (Id.). Behavioral manifestations, he stated, include "[d]isregard for rules, chronic rule violation, frequent encounter with police, an arrest record." He testified that psychological

Kirkland testified that a person with an anti-social personality disorder will lie and attempt to present himself in ways calculated to benefit himself. Brown's personality disorder did not prevent him from knowing right from wrong or from controlling his behavior.

The State's witness, Dr. Joe Dixon, agreed with Kirkland's diagnosis of an anti-social personality disorder but thought that Brown overstated or exaggerated his drug and alcohol use. Dixon based this latter opinion on several factors, including the absence of drug withdrawal or delirium tremons [sic], the absence of organic brain damage, and the absence of flashbacks after reporting LSD use.

Thus, separate from his claimed substance abuse, the only aspect of his mental condition which could have been presented at trial was Brown's anti-social personality disorder. However, this condition does not constitute mitigating evidence. See, Harris v. Pulley, 885 F.2d 1354, 1383 (9th Cir. 1989), cert. denied, 110 S. Ct. 854 (1990) ("For the ordinary citizen it would, to say the least, be paradoxical that a person who was likely not to accept social norms with respect to lawful behavior should be treated more kindly than the person who was law abiding"). There is no reasonable probability that, had the jury and court been informed of Brown's personality disorder, Brown would have [been] sentenced to life without parole. Indeed, it is far more likely that such information would lead a jury to think death was an appropriate punishment.

(Rule 20 Tr. at 414-15). Except as noted, the findings of fact set forth above are supported by the record and are

manifestations include "shallow interpersonal relationship skills, problem with object relations or development of regard for other people, problems of moral development in terms of characterological developments." (Id. at 998).

90

entitled to a presumption of correctness.

In affirming the Rule 20 court's rejection of these claims, the Alabama Court of Criminal Appeals noted:

> Brown first makes the broad argument that his trial counsel failed to adequately prepare and present an effective defense strategy at both the guilt phase and the penalty phase of his trial. Specifically, Brown argues that trial counsel should have presented evidence of his history of alcohol and drug abuse, as well as evidence that Brown suffered from an antisocial personality disorder. Following an evidentiary hearing, the trial court rejected Brown's claim.
>
> The record shows that Brown was represented at trial by Russell T. McDonald, an experienced lawyer who had once been a prosecutor and was a criminal defense attorney at the time of Brown's trial. He has either prosecuted or served as defense counsel in dozens of capital cases. The record further shows that McDonald met with Brown on several occasions and that he was aware Brown had a drug problem. McDonald studied the district attorney's file in this case, including statements from witnesses, police reports, co-defendant's statements and forensic reports, and listened to tapes of statements Brown gave to police.
>
> At the evidentiary hearing, McDonald testified that his experience in Jefferson County, where this case was tried, showed him that jurors generally are prejudiced against a defendant who uses drugs, and this was why he elected not to present Brown's history of drug and alcohol abuse to the jury. As to Brown's mental state, evidence presented at the post-conviction proceeding showed that Brown was of above-average intelligence, had no neuropsychological problems, and had a "normal mental status." The only evidence of something

abnormal regarding Brown's mental state was that he had an anti-social personality disorder, i.e., he does not accept social norms. That condition does not constitute mitigating evidence, however. <u>See</u> <u>Harris v. Pulley</u>, 885 F.2d 1354, 1383 (9th Cir. 1988), <u>cert. denied</u> 493 U.S. 1051, 110 S. Ct. 854, 107 L. Ed. 2d 848 (1990). As the trial court found, "There is no reasonable probability that, had the jury and court been informed of Brown's personality disorder, Brown would have been sentenced to life without parole. Indeed, it is far more likely that such information would lead a jury to think death was an appropriate punishment." McDonald testified that his defense strategy at trial, both at the guilt phase and at the penalty phase, was to show the jury that Brown was nonviolent, that he was a follower and not a leader, and that he had been dominated by an older codefendant, Archie Bankhead. He made a strategy decision not to present evidence of Brown's substance abuse or his mental status. "'[I]f an attorney is aware of a line of defense and makes a conscious decision to reject it, rather than failing to raise it simply because he was unaware that it existed, it is more likely that the failure to raise the defense was reasonable.'" <u>Cade v. State</u>, 629 So.2d 38, 41-42 (Ala.Crim.App.1993) (quoting <u>Gates v. Zant</u>, 863 F.2d 1492, 1498 (11th Cir. 1989), <u>cert. denied</u>, 493 U.S. 945, 110 S. Ct. 353, 107 L. Ed. 2d 340 (1989)). "An attorney may reasonably decide to avoid presenting evidence that he believes will do more harm than good." <u>Cade v. State</u>, 629 So.2d at 42.

The record shows that Brown's trial counsel developed a defense strategy and then followed that strategy. Trial counsel's testimony showed that he had sound reasons for developing the trial strategy, and trial counsel's defense strategy was within the "wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689-90, 104 S. Ct. at 2066. <u>See, also</u>, <u>King v. Lynaugh</u>, 868 F.2d 1400, 1405 (5th

Cir. 1989), <u>cert. denied</u>, 489 U.S. 1099, 109 S. Ct.
1576, 103 L. Ed. 2d 942 (1989) ("jurors are
generally unsympathetic toward drug abusers,
particularly those who commit violent crime"). The
trial court did not err in holding that Brown's
trial counsel was not ineffective as to this issue.

<u>Brown</u>, 663 So. 2d at 1032-33. The findings of fact set forth
above are supported by the record and are entitled to a
presumption of correctness.

Petitioner alleges that McDonald failed to prepare a
viable defense at either stage of trial, that he should have
more thoroughly investigated drug abuse and mental health
evidence and that he should have presented such evidence at
trial. These complaints are discussed below.


    a.   Trial Counsel's Performance

Petitioner complains that McDonald should have
investigated and presented evidence about his drug and alcohol
abuse and about his mental health. He argues that McDonald
knew he had a drug problem and that he was drunk and had been
taking pills before McGraw's murder, but that McDonald failed
to present drug abuse evidence. At the Rule 20 hearing,
Petitioner presented a profusion of substance abuse and mental
health evidence, evidently to demonstrate the abundance of
such evidence available and McDonald's errors in failing to

find and use such evidence at trial.

At the hearing, Petitioner and many of his family members, friends and acquaintances testified how, after an apparently happy, normal childhood, Petitioner became addicted to drugs and embarked on a persistent cycle of drug-seeking behavior that culminated in theft, prostitution, robbery and murder.  He complains that he had only one discussion with McDonald about his drug use, when McDonald asked him what drug he was using at the time of the murder.[35]  (Rule 20 Tr. 868-69).  Petitioner also presented Dr. Karl Kirkland, who testified that Petitioner's drug dependence had caused him to act inconsistently with his personality and prior development,

---

[35]Petitioner implies that McDonald did not have adequate meeting time with him or his family in order to properly investigate exculpatory or mitigating evidence.  Petitioner presents no authority holding that effective assistance or adequate investigation requires lengthy and extensive meetings with a defendant, his family, friends and acquaintances, especially where, as here, counsel relies on a strategy that does not require such heavy contact.  Even without such contact, McDonald was aware of the information Petitioner now asserts should have been the focus of his defense.  He had known Petitioner and his ex-wife for years, having represented them on drug charges in 1980 or 1981, and he was already representing Petitioner on robbery charges when the murder occurred.  He knew Petitioner was a long-time substance abuser.  He simply rejected that line of defense as ultimately prejudicial.  He simply chose other defenses he believed would be more effective with Jefferson County jurors.

and, in combination with his anti-social personality disorder[36], prevented him from stopping his drug use. Kirkland testified that Petitioner did not intend to attack McGraw and that he would not have done so if sober, but that substance abuse had diminished his capacity to conform his conduct to legal requirements. He also testified that drug use could have caused Petitioner to have "blacked out" during the murder. Petitioner complains that McDonald failed to use court funds to hire such a mental health professional to evaluate him, and that McDonald apparently did not respond to a request from Taylor Hardin Secure Medical Facility ("Taylor Hardin") to forward information about Petitioner and the case to assist in the competency determinations to be made there.[37]

---

[36]Both Kirkland and the state's expert testified that Petitioner has anti-social personality disorder. Kirkland acknowledged that this disorder would also cause Petitioner to try to cast himself in the best possible light. Kirkland also testified about Petitioner's spiritual development, good deeds in prison and regrets over wasted time in his life.

[37]This request was made in a December 4, 1986 letter to McDonald from Beverly B. Strong, a Taylor Hardin staff person. (Rule 20 Supp. R. 60). She requested information on (a) Petitioner's alcohol and drug abuse history, (b) his psychiatric history, (c) evidence presented to the Court which resulted in the evaluation order, (d) McDonald's observations of Petitioner and (e) any other information that could assist the evaluators. Id. Petitioner does not specifically allege how McDonald's failure to respond to this request may have prejudiced him. Petitioner acknowledges that the Taylor

Petitioner complains about McDonald's failure to investigate and present this type of mitigating evidence. With respect to such claims, the Eleventh Circuit has stated as follows:

> Failure to conduct a reasonable investigation into possible mitigating circumstances and to present certain mitigating evidence may render counsel's assistance ineffective. See Lightbourne v. Dugger, 829 F.2d 1012, 1025 (11th Cir. 1987) (per curiam), cert. denied, 488 U.S. 934, 109 S. Ct. 329, 102 L. Ed. 2d 346 (1988). Nevertheless, counsel is not required indiscriminately to present evidence.

> In order to determine what evidence might be appropriate, defense counsel has the duty to conduct a reasonable investigation. The failure to conduct any investigation of a defendant's background may fall outside the scope of reasonable professional assistance. After a sufficient investigation, however, "counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation." A lawyer's election not to present mitigating evidence is a tactical choice accorded a strong presumption of correctness which is "virtually unchallengeable." Id. (citations

---

Hardin examination was limited to the issues of whether he was insane at the time of the offense or competent to stand trial. He does not show what information McDonald had that would have favorably affected such determinations. In fact, Petitioner's own expert did not testify that Petitioner was incompetent to stand trial, or that he was insane at the time of the offense, but only that drugs had caused him to act inconsistently with his prior development and diminished his capacity to conform his conduct to legal requirements. Moreover, Petitioner himself was more than capable of relating certain of the requested information, and the Lunacy Commission Report does, in fact, reflect that the evaluators were aware of his substance abuse. (Id. at 64-66).

omitted) (quoting <u>Mitchell</u>, 762 F.2d at 889; <u>Sinclair v. Wainwright</u>, 814 F.2d 1516, 1519 (11th Cir. 1987)). In addition, "[U]nder some circumstances, an attorney may make a strategic decision not to pursue a particular line of investigation, or to pursue a particular inquiry only so far." <u>Bolender v. Singletary</u>, 16 F.3d 1547, 1557 n. 11 (11th Cir.),<u>cert. denied</u>, 513 U.S. 1022, 115 S. Ct. 589, 130 L. Ed. 2d 502 (1994). The question is whether failing to present certain mitigating evidence to the jury, or ending an investigation short of exhaustion, was a reasonable tactical decision. "If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end." <u>Porter v. Singletary</u>, 14 F.3d 554, 557 (11th Cir.1994), <u>cert. denied</u>, 513 U.S. 1009, 115 S. Ct. 532, 130 L. Ed. 2d 435 (1994).

<u>Mills v. Singletary</u>, 63 F.3d 999, 1024 (11th Cir. 1995), <u>cert. denied</u>, 517 U.S. 1214, 116 S. Ct. 1837, 134 L. Ed. 2d 940 (1996).

As Petitioner argues, there was plenty of drug abuse evidence McDonald could have presented at the penalty phase of the trial. McDonald specifically stated, however, that he rejected this line of defense in favor of one he believed would be more effective: that Petitioner was a follower who was led into an act inconsistent with his character by his older co-defendant, Archie Bankhead.

McDonald's decision to rely on this strategy instead of the one now advocated by Petitioner does not constitute ineffective assistance. McDonald stated that it was his

97

experience that Jefferson County, Alabama juries do not readily accept drug-related mitigation arguments. He avoided presenting evidence of Petitioner's drug abuse because he thought that would make Petitioner less sympathetic to the jury. He thought that his chosen strategy would be more effective and likely to win juror sympathy, as Petitioner had a boyish appearance and Bankhead had a much more hardened look at the time of trial. This is precisely the type of strategic decision Strickland holds to be "virtually unchallengeable." Lightbourne, 829 F.2d at 1025. Similarly, insofar as Petitioner complains that McDonald failed to fully investigate his substance abuse, this claim must fail because any such failure was reasonable in view of McDonald's chosen strategy.[38]

Case law indicates that McDonald's choice of strategy was reasonable. Courts have noted that drug abuse arguments often fail to inspire jury sympathy. As the Eleventh Circuit stated, "[p]recedents show that many lawyers justifiably fear introducing evidence of alcohol and drug use." Clisby v. State, 26 F.3d 1054, 1056 (11th Cir. 1994), cert. denied 513

_____

[38]As is explained in the prejudice discussion below, McDonald's strategic choice to avoid substance abuse and mental health evidence and to instead depict Petitioner as a follower was eminently reasonable. McDonald therefore did not render deficient performance in making this strategic choice.

U.S. 1162, 115 S. Ct. 1127, 130 L. Ed. 2d 1089 (1995) (citing Rogers, 13 F.3d at 386-88; White v. Singletary, 972 F.2d 1218, 1225-26 (11th Cir. 1992). See also King v. Lynaugh, 868 F.2d 1400, 1405 (5th Cir.) (in finding counsel to have been effective, court noted the state court finding that "jurors are generally unsympathetic toward drug abusers, particularly those who commit violent crime"), cert. denied, 489 U.S. 1099 (1989); Woomer v. Aiken, 856 F.2d 677, 684 (4th Cir. 1988) (decision to omit drug use evidence found reasonable in part due to "the common knowledge that many find it difficult to view the illegal use of narcotics under any circumstances as a mitigating factor"), cert. denied, 489 U.S. 1091, 109 S. Ct. 1560, 103 L. Ed. 2d 862 (1989).

McDonald's strategy was also to argue that Davenport's testimony was unreliable due to the strong-arm tactics of the prosecutors, who conducted a two-hour interrogation of Davenport just before Petitioner's trial, and to thereby shift the focus to the prosecutors. (Rule 20 R. 361-63). These are the types of strategic decisions to which the court must defer under Strickland.

This Court therefore cannot conclude that McDonald's performance was deficient under Strickland.

99

## b. Prejudice

Petitioner complains that McDonald's failure to present substance abuse and mental health evidence prejudiced him at the pretrial stage.  He apparently refers to the suppression hearing, in which McDonald sought to have Petitioner's three statements excluded from evidence.  Because Petitioner states a separate ineffective assistance claim regarding the suppression of Petitioner's statements, however, which is analyzed and rejected below, the Court will not discuss it in this section.[39]

Petitioner also complains that McDonald's failure to present substance abuse and mental health evidence prejudiced him at the guilt/innocence and penalty stages of trial.  He argues that evidence of his drug abuse was necessary to his defense after Davenport changed his testimony, thereby providing the evidence of  intent needed to prove the capital

_____

[39]   The Court notes, however, that this claim would fail simply because there is not a reasonable probability that the outcome of the trial or sentencing would have been different even if the statements had been suppressed.  There was ample evidence, without Petitioner's statements, to show that Petitioner murdered McGraw and that aggravating circumstances existed so as to permit imposition of the death penalty.

charges against him.[40]

From a practical standpoint, the arguments that
Petitioner was bullied or domineered by a hardened, violent
co-defendant into committing a crime inconsistent with his
character and that a key prosecution witness was pressured
into giving dubious testimony against Petitioner would seem
more likely to win mercy than the argument that Petitioner was
so dazed by or desperate for drugs that he viciously and
repeatedly stabbed a man to death.   Moreover, the evidence
simply did not portray that depth and quality of drug abuse
usually associated with successful use of that defense.   The
jury simply would not have viewed this defendants drug use
either as an excuse for the crime or as mitigation of it.

The Eleventh Circuit has noted that while substance abuse
may often precede or accompany criminal behavior, and may

---

[40]Petitioner also complains that the admission of
Davenport's taped testimony allowed the jury to hear "numerous
hearsay statements incriminating [Petitioner] and numerous
self serving assertions by the prosecutor's [sic] about how
they were only interested in truth and justice."
(Petitioner's Reply Brief at 54).   The Court notes, however,
that the trial court instructed jurors that they were to
consider the taped material only to help them evaluate the
circumstances of the interview and that the prosecutors
acknowledged this in their closing argument.   (R. 861-63, 902-
03, 921).

worsen anti-social tendencies, sentencers rarely view it as highly mitigating in nature.  The Court stated that

> [W]e think that most judges view drug and alcohol abuse as highly predictive of a propensity for criminal activity.  Cf. U.S. Sentencing Guideline S 5H1.4 ("Substance abuse is highly correlated to an increased propensity to commit crime.").  But, we doubt that many sentencers view substance abuse as a strong mitigating factor.  Cf., Rogers, 13 F.3d at 388 (noting reasonableness of lawyers' fear that defendant's voluntary drug and alcohol use could be "perceived by the jury as aggravating instead of mitigating") (emphasis in original).

Clisby v. State, 26 F.3d 1054, 1056 n.2 (11th Cir. 1994), cert. denied 513 U.S. 1162, 115 S. Ct. 1127, 130 L. Ed. 2d 1089 (1995).  There is thus no reasonable probability that substance abuse evidence would have changed the result of the penalty phase of trial.

There was similarly no mental health evidence presented by Petitioner that would have benefitted him during either phase of the trial.  There was no evidence offered at any time to suggest that petitioner was not capable of understanding the nature of his acts and their wrongfulness such that a defense could be based on his mental state.  As for the penalty phase, evidence that a defendant has an antisocial personality disorder has been found not to constitute

mitigation evidence[41], and would not adequately explain why the petitioner was motivated to attack McGraw, stab him dozens of times, and steal his property. Neither would the presentation of drug addiction evidence in the mental health context have changed the result of trial, since, as stated above, most jurors and sentencers would be less sympathetic in the face of such information. The expert testimony that Petitioner suffered from diminished capacity at the time of the murder

---

[41]The Eleventh Circuit noted that:
[a]ntisocial personality disorder has been held not to be mitigating as a matter of law. Harris v. Pulley, 885 F.2d 1354, 1383 (9th Cir. 1988), cert. denied, 493 U.S. 1051, 110 S. Ct. 854, 107 L. Ed. 2d 848 (1990):

> [I]t is difficult to suppose that there are any persons who commit the kind of vicious crime for which the death penalty is now imposed in this country who do not possess one or more of the personality disorders or one or more of the neuroses recognized as mental disorders by the American Psychiatric Association. To hold that each of these conditions must be a mitigating factor when the death penalty is considered would be to undermine the death penalty under the guise of acknowledging that what the American Psychiatric Association finds to be a mental disorder must be treated as a factor that calls for less severe punishment than death.

Id; Weeks v. Jones, 26 F.3d 1030, 1035, n. 4 (11th Cir. 1994), cert. denied, 513 U.S. 1193, 115 S. Ct. 1258, 131 L. Ed. 2d 137 (1995).

due to intoxication and, possibly, drug use would not have outweighed the aggravating factors. The jury was instructed on the intoxication defense during the guilt/innocence phase and rejected it. Also, the state would have been able, as it did at the Rule 20 hearing, to offer expert testimony disputing that petitioner's capacity was so diminished as to constitute a mitigating circumstance.

Because Petitioner's crime was vicious and because the evidence, including his own statements, clearly showed that he stabbed McGraw dozens of times, it is unlikely that the result of the penalty phase would have been different absent the challenged omission of evidence. For the reasons stated above, Petitioner cannot meet the second prong of <u>Strickland</u> as to this claim.

> 2. *Counsel failed to ask during voir dire whether venire members would automatically vote to impose the death penalty if Petitioner were convicted of capital murder.*

Petitioner claims that McDonald performed ineffectively by failing to ask potential jurors during voir dire whether they would automatically impose the death penalty if they found Petitioner guilty. The Rule 20 court made the following findings of fact with respect to this claim:

In support of this claim, Brown presented the
testimony of two Birmingham lawyers, Dan Turberville
and Roger Appell, each of whom testified that he
always did such reverse-<u>Witherspoon</u> voir dire.  The
testimony of these two lawyers does not establish
that McDonald's performance was outside the wide
range of professional assistance.  McDonald is just
as experienced, if not more experienced, in capital
murder cases as either of Brown's witnesses.  That
they do things a certain way does not show that
their way is right or that McDonald's way is wrong.

Further, Brown has not shown that he was prejudiced
by the absence of such questioning.  Both
Turberville and Appell admitted that they did [not]
know what would have happened in Brown's case if
such questioning had occurred.  Appell has had a
client sentenced to death after undertaking such
questioning.  Thus, Brown has not proved that a
single juror would have responded to, or been
excused because of, such voir dire questioning.  He
has not even attempted to prove that a jury selected
after such questioning would not have convicted
Brown and recommended a death sentence.  Therefore,
Brown has not shown a reasonable probability that,
had such questioning occurred, he would not have
been sentenced to death.

(Rule 20 R. 415-16).  These findings of fact are supported by

the record and are entitled to a presumption of correctness.

Defendants have the right to inquire whether potential

jurors would automatically impose the death penalty upon

conviction and to challenge for cause those that would.

<u>Morgan v. Illinois</u>, 504 U.S. 719, 729, 112 S. Ct. 2222, 119 L.

Ed. 2d 492 (1992).  But defense counsel is not, in all cases,

obliged to make such an inquiry, the failure to do so is not,

ipso facto ineffective assistance.

The Court is unwilling to label McDonald's failure to conduct a Morgan inquiry as deficient performance under the first prong of Strickland. First, Morgan was not announced until after Petitioner's conviction became final in 1990. The trial occurred in February 1987. The courts have often repeated that counsel will not be held to be ineffective for failing to make some objection or raise some argument later recognized by the Supreme Court. The Sixth Amendment requires only competent counsel, familiar with the law as it then exists, not clairvoyant counsel. That some attorneys may anticipate a claim or defense later recognized by the Supreme Court does not mean that those who fail to do so are ineffective.

Second, the trial record reflects that McDonald conducted a thorough and searching voir dire of the prospective jurors. (R. 234-266). While it is true that he did not ask whether any juror would automatically impose the death penalty, he emphasized the presumption of innocence and the importance of following the law as instructed by the court.

In any event, Petitioner suffered no prejudice from the failure to pursue the Morgan inquiry.

In the Eleventh Circuit, prejudice is presumed to arise from deficient attorney performance when "the circumstances would offend basic concepts of due process," and when "the adversary process itself is [rendered] presumptively unreliable [by the circumstances]." <u>Blanco</u>, 943 F.2d at 1496. Due process was certainly not offended and the integrity of the adversary process was not compromised by the failure to pursue this line of questioning.

> 3. *Counsel failed to adequately present a defense strategy at the hearing to suppress statements Petitioner made to Jefferson County law enforcement officers, or to otherwise effectively seek suppression of evidence.*

Petitioner alleges that McDonald rendered ineffective assistance in his attempt to suppress the three statements given by Petitioner to sheriff's officers. Specifically, he complains, McDonald did not prepare or encourage him to testify at the suppression hearing and did not present adequate evidence of involuntariness to convince the court to suppress the statements.

The Rule 20 court made the following findings with respect to this claim:

> Brown alleged that McDonald rendered ineffective assistance of counsel in his attempt to suppress Brown's three statements to Jefferson County

107

Sheriff's Deputies.   Brown raised three specific
claims, that McDonald did not prepare Brown to
testify at the suppression hearing, that McDonald
did not present any evidence or defense warranting
the suppression of Brown's statements, and that
McDonald did not adequately challenge the legality
of his arrest.  McDonald's performance in connection
with the suppression of the confessions was not
deficient and Brown was not prejudiced by McDonald's
performance because Brown's confessions were
properly obtained and there was no valid challenge
to their admission to be raised.

As to this claim, Brown presented his own testimony
and that of Sergeants White, Harris, and Gaskey.
Based on the testimony presented both at trial and
at the Rule 20 hearing, the Court finds that Brown's
testimony concerning the taking of his confession
was not credible and that the testimony of the
officers who took the confession was credible.

Brown was given his <u>Miranda</u> rights before each of
his three statements and on each occasion showed
that he understood those rights both verbally and by
signing a form.   Brown told the officers on each
occasion that he wanted to make a statement.   Brown
was never threatened or promised anything or told
that it would be better for him to make a statement
by any of the three officers.

Brown was picked up for questioning at Archie
Bankhead's house.  He was not arrested or handcuffed
and voluntarily went with the investigators for
questioning.   Brown was coherent when he was first
contacted and at all later times.

After Brown was questioned initially, he and the
investigators went to James Bynum's house.   After
Bynum was interviewed at that location and
implicated Brown, Brown was arrested.

After Brown was arrested at Bynum's house, he was
returned to a sheriff's department sub-station and
was questioned further.    Brown made a second

statement at this time.  As noted above, Brown was given and waived his <u>Miranda</u> rights on this occasion as well.

Over a month after the occasion of giving his first and second statements, Brown made a third statement, to White.  Brown sent word that he wanted to make another statement to White and that request was the reason White went to see Brown.  At the jail, Brown told White that he knew Bankhead had been caught and that he now wanted to tell the truth.

Based on the evidence presented, Brown was never told by any officer that he would help Brown on any pending charges if Brown would level with him and help solve the robbery/murder  case.  Brown was never told that Bynum was trying to help Brown out.  At Bynum's house, Brown was told that Bynum's statement had implicated Brown in the murder of McGraw.

The testimony of Sergeants White, Harris, and Gaskey, both at trial and the rule 20 hearing, established that they did not arrest Brown at Bankhead's house but rather asked if they could speak to him and obtained his consent.  Brown's own testimony did not contradict the testimony of these officers.  Thus, the evidence shows without dispute that Brown was not arrested until after Bynum confessed and implicated Brown.

The testimony of credible witnesses, Gaskey and Harris, established that Brown was not induced into testifying by being informed that Bynum was trying to help him or that Brown could help himself by putting the murder on Bankhead.  Brown is an admitted liar and is not a credible witness.  His testimony is unworthy of belief and false.  Having Brown tell the same lies at the suppression hearing would not have affected the outcome.  Brown only gave his third confession after he learned that Bankhead had been arrested. Brown was not induced to give this statement by the fact that he had given prior statements but rather because he knew that his

>prior statements were false and would be discovered
>to be false or rendered unbelievable if Bankhead
>confessed.

(Rule 20 R. 406-09).  These findings of fact are supported by

the record and are entitled to a presumption of correctness.

Petitioner claims that McDonald should have prepared and

encouraged him to testify at the suppression hearing.  He also

claims that McDonald should have used the testimony of lay and

expert witnesses to argue that his status as a long-time

substance abuser and his alleged diminished capacity at the

time of McGraw's murder rendered his statements involuntary.[42]

McDonald's failure to do so was not ineffective assistance.

---

[42]  Insofar as Petitioner claims McDonald should have
argued that his statements were involuntary due to his
intoxication at the time of the murder, he would not prevail.
In deciding whether a statement is voluntary, a court must
ascertain the circumstances surrounding the giving of the
statement, not the circumstances surrounding the acts
discussed in the statement.  See Schneckloth v. Bustamonte,
412 U.S. 218, 226, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854
(1973)(voluntariness analysis requires federal habeas court to
make independent examination of the totality of the
circumstances surrounding the confession).  See also Clemons
v. State, 1996 WL 731996 at *19 (Ala. Crim. App. 1996)(test
of voluntariness is whether defendant's will was overborne at
the time he confessed) (citations omitted).   In this case,
Petitioner gave his first statement several days after the
murder, so his intoxication during the murder would have been
irrelevant to the determination of whether the statements were
voluntary.   Moreover, the evidence does not indicate that
Petitioner was under the influence of alcohol or drugs at the
time of his statements.

Even if he had presented all the evidence Petitioner presented at the Rule 20 hearing, there is still no reasonable probability that the statements would have been suppressed. Petitioner has not cited, and the court has been unable to find, any cases in which a statement has been found involuntary merely because the defendant was a long-time substance abuser. There is no evidence that Petitioner was under the debilitating influence of drugs or alcohol when he gave his statements, so as to render them involuntary. Also, Petitioner has presented no evidence that he suffered any diminished capacity that would have rendered his statements involuntary. Petitioner's expert testified about his diminished capacity only at the time of the murder, not at the time of the statements (Rule 20 Tr. 989-90).[43]  There is thus no reasonable probability, under the second prong of Strickland, that the statements would have been suppressed even if McDonald had presented the substance abuse and

---

[43]Furthermore, the expert's opinions were based in part on Petitioner's report of taking Valium on the day of the murder; when informed that Petitioner had also reported not taking Valium that day, the expert acknowledged that this would change his opinion as to Petitioner's level of diminished capacity. (Rule 20 Tr. 1038-40). Also, the expert testified that his evaluation revealed that Petitioner suffered no brain damage as a result of his extensive substance abuse.

addiction evidence that was presented at the Rule 20 hearing.

Petitioner also complains that in his attempt to have the statements suppressed, McDonald should have presented his testimony that the deputy sheriffs improperly "buttered him up [and] discussed religion with him." There is no merit to this claim.[44]

Petitioner maintains that McDonald should have used his testimony to establish that the deputies first talked to him without reading him the warnings required under <u>Miranda</u>, 384 U.S. at 476-77, and to argue that the statements should therefore be suppressed. The deputy sheriffs' testimony reflects that Petitioner was given his <u>Miranda</u> warnings before they spoke to him about the murder of Jack McGraw, however. (R. 6, 8, 41-44). Even if McDonald had put Petitioner on the stand to testify otherwise during the suppression hearing,

_____

[44] The Rule 20 court, which also decided the Motion to Suppress, expressly found that Petitioner is an admitted liar and that his testimony regarding the statements is not credible. Insofar as Petitioner's Rule 20 testimony differed from that of the deputy sheriffs who took his statements, the court chose to believe the testimony of the deputy sheriffs, which indicated that the statements were voluntary and admissible. There is thus no reasonable probability that the statements would have been suppressed even if Petitioner had testified as to the above-listed examples of alleged misconduct of the deputy sheriffs.

there is no reasonable probability that the court would have credited Petitioner's version and suppressed the statements.

Finally, assuming _arguendo_ a deficiency in counsel's performance on the Motion to Suppress, the ineffective assistance claim would nonetheless fail. Had the statements been suppressed, there is no reasonable probability that Petitioner would not have been convicted or sentenced to death. Ignoring the statements, there was ample evidence to convict the defendant and to impose the death penalty.

> 4.   _Counsel failed to object to certain prosecution jury arguments at the trial._

Petitioner claims that McDonald rendered ineffective assistance by failing to object to certain arguments made by the prosecution to the jury at both phases of trial. In denying this claim, the Rule 20 court made the following factual findings:

> McDonald, who is a lawyer with vast experience in trying criminal cases before a jury, especially in Jefferson County, Alabama, as a matter of tactics does not object to argument unless he considers it to be truly harmful to his client. He has arrived at this strategy because he does not want a jury to think he is hiding anything from them. This strategy as to objections to argument has been recognized as being reasonable. _Julius_ v. _Johnson_, 840 F.2d 1533, 1538-1539 (11th Cir.1988), _modified on unrelated ground_, 854 F.2d 400 (11th Cir.1988), _cert_. _denied_, 109 S. Ct. 404 (1988).   McDonald's

113

non-objection to argument pursuant to a reasonable
strategy did not remove his performance from the
"wide range of professionally competent assistance."

Strickland v. Washington, 466 U.S. 690 (1984). (Rule 20 R.

409). These findings of fact are supported by the record and

are entitled to a presumption of correctness.

a.   Guilt/innocence phase arguments

In his summation at the guilt/innocence phase of the

trial, the prosecutor argued:

> I have been a lawyer for only five years. I didn't
> enter law school until I was thirty years old. I
> had been a school teacher. I had been a swimming
> coach, both a high school coach and a club coach,
> and I was Assistant Coach at the University of
> Alabama. And then I finally started law school at
> the University of Alabama after I had been coaching
> there. Because years before that, that is what I
> had wanted to be. I had wanted to be a lawyer. I
> had wanted to stand before juries and do what I'm
> doing right now. Well, I'm one and I have been one
> for five years. And I have been a prosecutor for
> all five of those years. I prosecuted for two years
> in Shelby County, and then for a year and a half in
> Mobile County and since January of 1985, here in
> Jefferson County.

(R. 893-894).

> And I have seen many lawyers and I have watched
> trials and I have tried cases against many people.
> Of course, I have gotten to know more about the
> legal profession. And there are occasions when I'm
> ashamed of my profession. Not many, but occasions.
> And there are occasions when I'm ashamed of some of
> my brother or sister colleagues in the legal
> profession. I have tried cases against lawyers who
> I literally, on occasion, wanted to reach over and

114

slap their face.   And perhaps not for reasons that
you might think.

I can remember trials where I was trying my best to
present the evidence, to convince the jury of the
guilt of a person, and I sat next to a lawyer who
did nothing.   I have sat next to lawyers who were
supposed to be representing people charged with
crimes.   And some of those people I had a very
strong personal dislike for.   But I developed an
even   stronger   personal   dislike   for   those   few
attorneys who merely went through the motion and did
not   do   their   duty,   their   sworn   duty   to   their
profession, their client.

I graduated from law school in 1981.   My dad asked
me what present I would like upon my graduation.
And I told him that the only thing that I wanted was
a book.   It was a book that I had read about.   I had
read about this book in one of F. Lee Bailey's
books.   Of course, F. Lee Bailey being a famous
criminal attorney in Boston.   And he mentioned this
book and said that it had inspired him when he was
in law school.   And I felt that if it had inspired
a man such as F. Lee Bailey, I wanted to read it.
And I asked my dad to get me that book, and he did.

He had to order it specially from Washington, D.C.
It was out of print.   And the name of that book was
the "Art of Advocacy" [sic] by a lawyer now dead, a
man named Lloyd Paul Striker.   He was an old trial
attorney   from   New   York   City.      And   if   I'm   not
mistaken,   this   book   was   first   published   in   1951.
And I read that book five years ago.   And I learned
from that book.

I learned from that man's insights and what the law
is all about and what people are all about and what
trying cases is all about.   And even in 1951, Lloyd
Paul Striker was saying, Where are the great voices
in the legal profession?   Where have they gone?   And
he   cited   great   lawyers   from   years   past.      Great
lawyers, great barristers in England, and cases that
they had tried from prior centuries, even.   And he

115

cited great lawyers in this century. I have been rereading Striker's book, "The Art of Advocacy" [sic].

I get up pretty early every morning. Sometimes I read the paper, sometimes I read a novel. I like to be alone, I like to be with my wife and child, and I like a little time by myself in the morning. So out of habit from my days as a swimming coach, I used to get up very early, put on a pot of coffee, I read and I think. And I have been rereading this book.

And the particular chapter that I was reading today, which is the chapter on closing argument. And as I sat and watched Rusty McDonald, I remembered what Striker said about closing argument: The great lawyer does not persuade merely with logic. If you go to a jury merely with logic, that may be sufficient. But the great lawyer wins, wins that jury. He makes that jury want to follow him. He makes them want to believe.

And I have known Rusty for several years now; knew him when I was in Shelby County. And I knew Rusty by reputation, both as a prosecutor and as a defense attorney. Rusty has been both and he has done both equally well.

And I watched him today, and I said "I'm proud of that man." And this is one of those times in my profession when I'm proud. He is being paid for his time by the State of Alabama, and he is losing money. He was appointed to represent Gary Leon Brown. But he accepted that appointment as a duty to the legal profession and as a duty to Gary Brown. I don't think anyone can deny that Rusty McDonald has not tried with every fiber of his being to defend and to represent Gary Leon Brown.

Rusty McDonald doesn't lay down for anybody. And I am proud to be in the same profession with Rusty McDonald. He took this case knowing full well, knowing full well that Gary Brown had made

116

statements; one, denying any involvement in this
crime; the second, admitting being there, admitting
taking some of the items that were taken from Mr.
McGraw's trailer, but denying committing any of the
savagery that was inflicted upon Mr. McGraw.  And he
knew that Gary Brown had made a third statement,
which Mr. Brown admitted yes, I took that knife and
I stabbed and I stabbed, and I stabbed, and I
stabbed.

How can a man defend against evidence like that?
Rusty McDonald did in this case the only thing that
he could do.  The only thing that he could do, I
suggest to you, which was to stand before you from
day one and say, This man is guilty.  He is guilty
of a crime, he was there, but he is not guilty of
capital murder and the State will not prove it.

And he mentioned to you that the Judge would charge
you on lesser included offenses of manslaughter and
of felony murder.  And the judge will charge you on
all three of those offenses: capital murder, felony
murder, manslaughter.

And you as jurors have a duty notwithstanding Mr.
McDonald's statements that his client is guilty of
felony murder, to consider whether he is guilty of
anything.  And if you reject a not guilty verdict,
to consider whether he is guilty of manslaughter and
if you reject a guilty verdict of manslaughter, to
consider a guilty verdict of felony murder.

Mr. McDonald, I suggest to you, has chosen that
point to draw the line in the dust.  He is saying to
you, This is where I stand.  This is where I fight.
This is the Alamo.  I know I'm surrounded.  I know
what the other side has.  I cannot let that jury
convict a many I represent of capital murder.
Because that jury is not going to believe that Gary
Brown was not there.  That jury is not going to
believe that Gary Brown did not stab Jack McGraw.

What might that jury believe?  Felony murder.  That
is where I draw the line.  And he did his dead-level

117

best to convince you of that. That there was no
intent to kill on Gary Brown's part.

(R. 894-899).

The only way to attack this case was to attack Jimmy
Davenport and Blanche Bankhead. Mr. McDonald
attacked, attacked, and attacked. And he
characterized Jimmy Davenport himself as a scared
young boy, and every one of you saw him. And I
don't think a single one of you would disagree with
that proposition. Jimmy Davenport was and is a
scared young boy, which is not to excuse him for his
participating in those horrible events that night.

(R. 902-03).

. . . I want to address the statement that Jimmy
Davenport made to Mr. Anderton and to me in our
office on Sunday.

The Judge has already instructed you on at least two
occasions that none of what was said, the actual
words themselves, is evidence in this case. That's
not evidence. What is evidence in this case was
what happened during that interview, was how I and
how Mike Anderton treated Jimmy Davenport, because
that is relevant evidence. That is for you to
consider.

It would not have been relevant had not Mr. McDonald
done such a superb job of cross-examining Jimmy.

(R. 903).

It would not have been relevant had not Mr. McDonald
done such a superb job of cross-examining Jimmy.
And that's what cross examination is all about. You
can lead witnesses in cross-examination, you cannot
do that in direct. The witness for an opposing
party, you can say, now, isn't it true, Jimmy, that
this occurred? And isn't it true, Jimmy, that that
occurred? Yes. Yes. Yes.

(R. 903).

> Remember listening to that tape?  Do you remember a
> portion on the tape right toward the end of the
> portion that you listened to where you heard my
> voice say, "And Jimmy, you know this is being taped
> and you know this is going to be turned over to the
> defense attorney?"  And it was.  And Mr. McDonald
> was made aware of that on Monday morning, or he
> would not have known what questions to ask Jimmy.
>
> And that is why we wanted you to hear that tape.
> And you are to judge for yourself whether Jimmy
> Davenport was so intimidated, was so frightened that
> he consciously made up lies to satisfy what we
> wanted.   I'm not a witness in this case, I can't
> testify; neither can Mike.   That is for you to
> decide.
>
> I would suggest this to you:  If somebody had taken
> Jimmy Davenport ten years ago, five years ago, and
> given him a tongue-lashing like we gave him -- and
> what we gave, I suggest to you, wasn't particularly
> bad -- if somebody had straightened that boy out
> five or ten years ago, then he might not have been
> driving that car that night.

(R. 903-04).

> Now, put yourselves in the position of the
> prosecutors.   Everyone in this case, all the
> attorneys, had all the statements of all the
> witnesses.    We read the statements, including
> Jimmy's.   There is a conflict here.   Gary says
> "discussion in the car."  Jimmy says "no discussion
> in the car."  What is logical to think?
>
> What is logical to think is that Jimmy is trying to
> cover his fanny, and that is exactly what he was
> doing.  All right.  But don't take our word for it.
> Gary Brown.  More about what happened in the first
> statement.

(R. 907).

I was a little derelict in my preparation of this
case, and I admit it.  It didn't hit me until right
at the end.  Archie Bankhead when he was arrested,
you heard Eddie White testify after lunch, when I
showed him the documents.  July 12th in Mobile,
Alabama.  Where was he transported to?  The
Jefferson County Jail.  And who was staying at the
Jefferson County Jail at that time, Sergeant White?
Mr. Brown was over there.  Cooperative Mr. Brown.
When did Archie Bankhead make his statement?  July
15th.  There is no evidence that Gary Brown talked
to Archie Bankhead or knew about it.

I find it somewhat curious that two days after
Archie Bankhead makes his statement in the jail to
Sergeant White, Gary Brown, out of the blue, wants
to make another statement.

You see a pattern developing here?  He is going to
give up a little more, because he is going to try to
cut himself some more slack.  He has got to cover
that fanny.

He is in it deep now.  But maybe, maybe he could put
it off on Archie by saying, Archie made me do it.

(R. 911-12).

. . . that scheming, lying little weasel, Gary Brown
was in on it right from the start.

                        *  *  *

Probably never would have happened, that gutless
little wonder never would have done it on his own.
Bankhead, the big man, the karate expert, he set it
off. . . .

                        *  *  *

And Bynum, and that little character right there in
his new suit, on him like a pack of dogs; . . .

(R. 917).

120

Petitioner enumerates as improper the prosecutor's (1) expression of personal opinions, (2) reference to matters outside the record (including evidence the prosecution has been unable to use due to legal rules or strategy), (3) disparaging characterizations of the defendant which were not based upon evidence in the record and (4) "improperly spotlighting the defendant's exercise of his Sixth Amendment right to counsel and defense strategy" and implying that defendants wrongly possess more procedural safeguards than their victims.    (Petitioner's Reply Brief at 94-97). Petitioner argues that the combined effect of all the allegedly improper arguments and comments deprived him of a fair trial under the Fifth, Sixth and Fourteenth Amendments to the Constitution.    He also contends that the arguments injected factors other than "the character and record of the individual offender and the circumstances of the particular offense" into the case, raising Eighth Amendment concerns with respect to capital punishment under Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978).    Petitioner therefore claims that McDonald's failure to object the prosecutor's comments was ineffective assistance.

As found earlier, the complaint is without merit.    See

121

Julius v. Johnson, 840 F.2d 1533, 1538-39 (11th Cir.1988), modified on unrelated ground, 854 F.2d 400 (11th Cir.1988), cert. denied, 488 U.S. 960 (1988); Kelly v. United States, 820 F.2d 1173, 1176 (11th Cir.1987), cert. denied, 484 U.S. 966, 108 S. Ct. 458, 98 L. Ed. 2d 398 (1987), citing Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983), cert. denied, 464 U.S. 1063, 104 S. Ct. 745, 79 L. Ed. 2d 203 (1984).

The claim does not meet the second prong of Strickland because there is no reasonable likelihood that, but for McDonald's failure to object to improper summation, the result of the proceedings would have been different. Brooks v. Kemp, 762 F.2d 1383, 1401 (11th Cir. 1985), cert granted and judgment vacated on unrelated grounds, 478 U.S. 1016, 106 S. Ct. 3325, 92 L.Ed. 2d 732 (1987).

b.  Penalty phase arguments

Petitioner argues that McDonald rendered ineffective assistance during the penalty stage of the trial by failing to object to several of the prosecution's closing arguments that were allegedly improper and prejudicial.

The Rule 20 court found that McDonald did not render ineffective assistance and that Petitioner was not prejudiced

122

by the allegedly improper arguments.   (Rule 20 R. 409-11).

The prosecutor argued:

Mr. McGraw didn't have a lot of relatives.   He
didn't have his mommy or daddy out there at the
trailer on the night of the 26th talking to Archie
and Gary and James, saying, "please, spare my son's
life."   He didn't have that opportunity.   He didn't
have the opportunity to try to convince somebody not
to do something.

(R. 1038).

You have got to think about [the fact that the
combination of fifty-nine stab wounds to McGraw's
back would have caused him to bleed to death if left
unattended].   Because I'll tell you, ladies and
gentlemen, I would submit to you that there is no
hope for that fellow. He has committed the ultimate
crime.   For that, he should be punished accordingly.

(R. 1042).

I don't think it is fair to you twelve people for me
to stand here and ask you to return a verdict
without knowing something more about me than merely
the fact that I represent the State of Alabama, just
that I represent the State of Alabama.   I don't care
about the State of Alabama.

I did not believe in the death penalty years ago.
In high school, I did not believe in the death
penalty.   When I was in college, I did not believe
in the death penalty.   When I was in law school, I
was not sure.   I did change.

I had a professor, his name was Charlie Trosh, and
I became good friends.   He is no longer a professor
at the University, he works for a law firm in

Nashville.  Charlie had been a prosecutor and he had been a defense attorney.  And we talked, had many talks about a number of things.

We talked about the death penalty.  And we both had pretty much the same view, founded by going back and forth to formulate my view.  And we would pose different situations to each other.  And I finally came to the view through discussions with him and other people, and just going through life, that there are some crimes, there are some crimes for which the ultimate penalty may be imposed, should be imposed.

And the reason, strangely enough, it may sound contradictory, but  this is the reason I believe it is an affirmation of life.  I believe the death penalty is a statement.

It is a statement that is made by those people who live as civilized human beings; who treat each other as civilized human beings treat each other; who do not prey on each other; who do not believe that you may go in and kill and loot without being called to answer.

I don't think the death penalty deters people from committing horrible crimes.  It certainly didn't deter Gary Leon Brown.  I suppose in certain isolated instances, it might.  Maybe a kidnapper who was holding a child for ransom, maybe, maybe if he knew that he would die if he killed that child, maybe be would spare that child.  And I suppose there are a few other isolated instances where the death penalty might deter someone.

But it certainly doesn't stop the Gary Leon Browns of the world.  It doesn't stop the James Bynums of the world.  And it doesn't stop the Archie Bankheads of the word [sic].

So, I say to you, the death penalty is nothing more than a statement from good people in society to the rest of society:  This crime, this act deserves the

ultimate punishment.  Not banishment to some island
in the city; not imprisonment for the rest of your
life; but death.

(R. 1053-55).

Mr. McDonald said "vengeance is mine, sayeth the
Lord."  This is not vengeance.  This is a punishment
imposed by man against another man for a crime
committed against a man.  Is there no forgiveness?
Certainly there is forgiveness.

Mr. Joe James, the brother, -- excuse me, the cousin
-- there are no brothers of Jack McGraw.  Mr. Joe
James and his brother, they could forgive Gary
Brown.  I do not know if they have, but they could,
for the loss that they have suffered.  They lost a
cousin, and they could forgive him for that loss. If
any of this realatives [sic] were still alive, they
could forgive him for the loss that they have
suffered.  Jack McGraw cannot forgive him for the
loss that he had suffered.  He is not here to
forgive him.

Even if Jack McGraw could be resurrected for one day
and say, "I forgive you Gary," Jack McGraw could not
forgive Gary for the intent that Gary Brown has
committed against God Almighty.  Because only God
Almighty can forgive him of that offense.  And only
God Almighty knows whether Gary Brown has contrition
in his soul and truly seeks forgiveness.

There is not a human being on this earth who will
ever be able to tell you truly that, "Yes, Gary
Brown has remorse and is contrite and is truly
sorry."  God Almighty can do that.

(R. 1055-56).

And you have got to understand that the only
evidence we have of what went on in that trailer are
the statements of those men and the blood and the
pictures that were there.  You couldn't hear the
statement of James Bynum, that's hearsay.  You

125

> couldn't hear that the statement of Archie Bankhead,
> that's hearsay.  You could just hear Gary Brown.
> And you hear him lie and lie and give a little more
> and give a little more until he was cornered and
> trapped and couldn't give anymore.

(R. 1058).

> You know, I only learned one poem in my entire life.
> The way I learned it was from a book that my mother
> gave me, one of Hemingway's novels she gave me years
> ago.  It was a copy that was typed, came from that
> poem, the English poet, John Donne.

> And John Donne wrote that: "No man is an island,
> every man is a piece of the continent, a part of the
> main; if clod be washed away by the sea, Europe is
> the lesse [sic], as well as if a promontory were, as
> well as if a manner of thy friends or of thy own
> were; any man's death diminishes me, because I am
> involved in mankind; and therefore never send to
> know for whom the bell tolls.  It tolls for thee."

(R. 1060-61).

Petitioner argues that the combined effect of all these allegedly improper arguments and comments deprived him of a fair trial under the Fifth, Sixth and Fourteenth Amendments to the Constitution.  He also argues that the arguments injected factors other than "the character and record of the individual offender and the circumstances of the particular offense" into the case, raising Eighth Amendment concerns with respect to capital punishment under <u>Lockett</u>, 438 U.S. 586 (1978). assistance.

For the reasons set forth in the discussion of the claim related to the penalty phase argument, the Court finds and concludes that Petitioner has not carried his burden of proving the ineffective assistance of counsel.

     5.   *Counsel failed to object to the trial court's directive that the jury exclude from its consideration in its penalty phase deliberations any and all passion.*

Petitioner argues that McDonald rendered ineffective assistance by failing to object to the following jury instructions made by the trial court during the penalty phase of trial:

> Please understand that in reaching your findings concerning the aggravating and mitigating circumstances in the case, and in determining what the punishment in the case should be, you must avoid any influence of passion, prejudice, or any other arbitrary factor.

> Your deliberations and verdict should be based upon the evidence you have seen and heard and upon the law about which you have been instructed. There is no room, ladies and gentlemen, for the influence of passion, prejudice, or other arbitrary factors.

(R.1061-62).

Petitioner argues impropriety based on the observation that "[j]ust as the sentencer is justified, after consideration of the aggravating circumstances, to weigh feelings of retribution flowing from that evidence as he

127

ponders his penalty decision, he is equally free to consider genuinely felt compassion and sympathy, natural byproducts of the evidence in mitigation." Petitioner's Reply Brief at 88, citing <u>California v. Brown</u>, 479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987); <u>Drake v. Kemp</u>, 762 F.2d 1449 (11th Cir. 1985), <u>cert. denied</u>, 478 U.S. 1020, 106 S. Ct. 3333, 92 L. Ed. 2d 738 (1986); <u>Wilson v. Kemp</u>, 77 F.2d 621 (11th Cir. 1985); <u>Buttram v. Black</u>, 721 F. Supp. 1268 (N.D. Ga. 1989), <u>aff'd</u>, 908 F.2d 965 (11th Cir. 1990). He argues that McDonald's failure to object on this basis was ineffective assistance.

Again, Petitioner does not satisfy either prong of <u>Strickland</u> as to this claim. First, the instruction wasnot erroneous. <u>See California v. Brown</u>, 479 U.S. at 542-43.

There is also no reasonable probability that the outcome of the proceedings would have been different had McDonald objected. Since the instruction was proper, Petitioner would have received no relief in response to an objection. Even if the court had omitted the instruction, there is no reasonable probability that the jury would have recommended life without parole instead of death.

      6.    *Counsel failed to object to a jury instruction that shifted the burden of proof on reasonable doubt.*

Petitioner claims that McDonald rendered ineffective assistance by failing to object to a "burden-shifting" instruction on reasonable doubt. The challenged instruction, as quoted by Petitioner, reads: "If there does not remain in your collective minds that abiding conviction that he is guilty, then what you are saying in effect is, 'I am not convinced beyond a reasonable doubt or to that moral certainty . . . and I must acquit.'" (R. 854). Petitioner argues that this instruction is "susceptible to an interpretation which removed from the prosecution the burden of proving Brown's guilt beyond a reasonable doubt," and thereby violates due process under the principles set forth in <u>Sandstrom v. Montana</u>, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). (Brief of Petitioner at 90)[45].

The Rule 20 court rejected this claim, finding that the instruction was not improper and that, taken as a whole, it informed the jury that "only the State had the burden of proof." (Rule 20 R. 411).

_____

[45]The holding in <u>Sandstrom</u> addressed a trial court's charge as to the element of intent which stated that "the law presumes that a person intends the ordinary consequences of his voluntary acts." 442 U.S. at 513. The Supreme Court held that this language unconstitutionally shifted the burden of proof away from the State to the defendant.

In construing the instruction, the court focuses initially on the specific language challenged; if it does not pass constitutional muster, then the court reviews the instructions to consider how reasonable jurors could have understood the charge as a whole. Francis v. Franklin, 471 U.S. 307, 315-16, 105 S. Ct. 1965, 1971-72, 85 L. Ed. 2d 344 (1985).

The challenged language has been expressly upheld against a Sandstrom challenge by the Alabama courts. Jackson v. State, 674 So. 2d 1318, 1339 (Ala. Cr. App. 1993), judgment aff'd in part, rev'd in part on other grounds, sub nom Ex parte Jackson, 674 So.2d 1365 (Ala. 1994).[46] On the other

---

[46]The instruction that was challenged in Jackson reads as follows:

> I would say to you that if after a full and fair consideration of all the evidence in the case, if there should remain in your collective minds an abiding conviction that Mr. Jackson here is guilty of an offense charged, then you would be convinced beyond a reasonable doubt and you should convict.

> On the other hand, if after the same and full and fair consideration of all the evidence in the case, if there does not remain in your minds an abiding conviction that he is guilty, then you would not be convinced by that full measure of proof required in the law and he should be acquitted.

Jackson, 674 So. 2d at 1339.

hand, the First Circuit invalidated, on burden-shifting grounds, a similar instruction in a pre-Sandstrom case, Dunn v. Perrin, 570 F.2d 21 (1st Cir.), cert. denied, 437 U.S. 910, 98 S. Ct. 3102, 57 L. Ed. 2d 1141 (1978), in which the trial court described reasonable doubt as a "strong and abiding conviction [of doubt] as still remains after careful consideration."[47]   The Dunn court complained that this

-----

[47] The Court notes that in Harvell v. Nagle, 58 F.3d 1541 (11th Cir. 1995), cert. denied, 517 U.S. 1225, 116 S. Ct. 1859, 134 L. Ed. 2d 958 (1996), similar instructions withstood an attack under Cage v. Louisiana, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990). Although a burden-shifting claim was not raised in Harvell, the court quoted the instruction and thoroughly examined it, and even emphasized the "if there remains" portion in its quotation without any criticism or comment regarding burden-shifting. That instruction, as quoted by the Harvell court, reads as follows:

I would say this:  If after a full and fair consideration of all the evidence in the case, if there should remain in your collective minds--I will remind you in a little while that your verdict has to be unanimous.  But, if there should remain in your collective minds an abiding conviction that Mr. Harvell is guilty of the unlawful homicide, a killing without justification or excuse, intentional killing without justification or excuse, then you must convict.

On the other hand, if after that same full and fair consideration of all the evidence in the case, if there does not remain in your collective minds that abiding conviction that he is guilty, then that's kind of like saying that you are not convinced by the full measure of proof required by the law and he

instruction required Petitioner to establish doubt in the juror's minds, rather than requiring the government to prove guilt. <u>Dunn</u>, however, is very different from the instruction in this case.

In <u>Dunn</u>, the court essentially defined "reasonable doubt" as an abiding conviction. Here the instruction tells the jury that to find <u>guilt</u>, it must possess an abiding conviction that the defendant is guilty. The focus of the instruction is entirely different. In <u>Dunn</u> the focus was the concept of reasonable doubt itself, which was equated with having a strong and abiding doubt. In petitioner's case, the focus of the instruction was on the idea of guilt and the jury was told they could not find guilt unless they possessed an abiding conviction of it.

Here, the jury was clearly informed where the burdens properly rested[48]:

---

should be acquitted.

You should know that <u>a reasonable doubt may spring from the evidence, from a lack of evidence or from any part of the evidence</u>.

<u>Harvell</u>, 58 F.3d at 1546 (emphasis in original).

[48]In determining the effect of an instruction on the validity of a conviction, the Supreme Court follows the established rule that "a single instruction to a jury may not

132

Mr. Brown, the defendant, is presumed to be not guilty. That is a legal presumption and it is factual evidence in his behalf. It is evidence in and of itself. Lawyers sometimes, and I think very appropriately, try to give this presumption of innocence a physical manifestation or tangibility by referring to it as a cloak of innocence. Perhaps you have heard that; coat of innocence or hood of innocence, whatever. And that is a very wise endeavor, because the presumption of innocence is real, it's not just a fanciful notion. It is real and it is evidence. Mr. Brown starts the litigation with a clean slate, so to speak, presumed to be not guilty.

Who has the burden of persuasion? Who has the burden of proof? You know full well that the State of Alabama does, the prosecuting governmental entity.

What is the measure of proof or the quantum of proof that the government is held to in the prosecution of a criminal case? The State must prove their case beyond a reasonable doubt or a moral certainty to the satisfaction of all the jurors in order to overcome or hurdle that presumption of innocence.

Now, use your common sense in giving these legal words working definitions. . . .

Reasonable doubt. It is self-defining. Again, this is the measure of proof that the State is held to in the prosecution of a criminal case. The State doesn't have to prove guilt beyond all possible doubt, folks, nor does the State have to prove guilt to a mathematical certainty.

---

be judged in artificial isolation, but must be viewed in the context of the overall charge. [Citation omitted]." Boyde v. California, 494 U.S. 370, 378, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990), citing Cupp v. Naughten, 414 U.S. 141, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973).

A reasonable doubt, a doubt for which a good, sound, sensible reason could be give; not a mere possible doubt or some fanciful doubt. One way to put it, I think, is this: If after a full and fair consideration of all the evidence in the case, if there should remain in your collective minds an abiding conviction that Defendant Gary Leon Brown is guilty of whichever offense you are looking at, the that is another way of saying "I am convinced beyond a reasonable doubt of the State's proposition that he is guilty, and I must convict."

In the alternative, if after that same full and fair consideration of all the evidence in the case, a reasonable doubt can spring from the evidence, from a lack of evidence, or from any part of the evidence; but if there does not remain in your collective minds that abiding conviction that he is guilty, then what you are saying in effect is, "I am not convinced beyond a reasonable doubt or to that moral certainty that the Judge is talking about, and I must acquit."

R. 852-854).

In the context of the entire instruction, there is no reasonable likelihood that the jury applied the instruction in a way that shifted the burden of proof. Estelle v. McGuire, 502 U.S. 62, 73, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991), citing Boyde, 494 U.S. at 380. This instruction therefore failed to afford McDonald a sufficient basis upon which to raise a Sandstrom objection. His failure to object therefore does not constitute deficient performance for the purposes of Strickland.

Again, assuming arguendo that McDonald's failure to

object constituted deficient performance, Petitioner would in any event be unable to meet the prejudice prong of <u>Strickland</u> because there is no reasonable probability that Petitioner would not have been convicted absent the instruction.

> 7. *Counsel failed to adequately investigate the State's penalty phase forensic evidence presented through Dr. Robert Brissie on the issue of the victim's degree of suffering, or to adequately cross-examine Dr. Brissie in this regard, for the purpose of dispelling a false impression regarding the victim's pain.*

Petitioner claims that McDonald provided ineffective assistance by failing to adequately prepare and conduct the cross-examination of medical examiner Dr. Robert Brissie with respect to the pain suffered by the victim. Petitioner argues that Dr. Brissie created a false impression about the pain McGraw perceived before he died, and that this affected the outcome of his penalty trial, as it was relevant to the determination of whether the crime was committed in a "heinous, atrocious and cruel manner." He argues also that McDonald rendered ineffective assistance by failing to dispel this impression during cross-examination.

In rejecting this claim, the Rule 20 court noted that McDonald's performance was not deficient and Brown was not

prejudiced by McDonald's cross-examination of Dr. Brissie.
See supra, Sec. D at 53-54.

(Rule 20 R. 412).[49]  The Court's finding of fact are supported
by the record and are entitled to a presumption of
correctness.

In affirming the Rule 20 court's denial of relief on this
claim, the Alabama Court of Criminal Appeals found that Brown
failed to present any evidence to contradict Dr. Brissie's
opinion.  Therefore, there is no reasonable probability that,
but for trial counsel's performance, Brown would not have been
sentenced to death.  Brown, 663 So. 2d at 1034.  These
findings of fact are supported by the record and are entitled
to a presumption of correctness.

   8.   *Counsel failed to object to the trial court's*
        *instruction improperly limiting the jury's*
        *consideration of mitigating evidence in the*
        *case.*

Petitioner claims that McDonald rendered ineffective
assistance by failing to object to the trial court's jury

_____

   [49]Despite the implication left by the Rule 20 court's
finding that Dr. Brissie's testimony occurred outside the
presence of the jury, the penalty phase transcript makes plain
that he also gave similar testimony to the jury.  (R. 983-985,
998-999).

instruction limiting consideration of mitigating evidence:

> The burden of proof is on the State to convince each
> of you beyond a reasonable doubt of the existence of
> an aggravating circumstance considered by you in
> determining what punishment is to be in this case.
> This means that before you can even consider finding
> the defendant's punishment be death, each and every
> one of you must be convinced beyond a reasonable
> doubt based on the evidence that at least one or
> more of the aggravating circumstances exist.
>
> A mitigating circumstance, folks, considered by you
> should be based on the evidence you have heard, of
> course.  When the factual existence of an offered
> mitigating circumstance is in dispute, the State
> shall have the burden of disproving the factual
> existence of that circumstance by a preponderance of
> the evidence.
>
> The burden of disproving it by a preponderance of
> evidence means that you are to consider that the
> mitigating circumstance does exist unless taking the
> evidence as a whole, it is more likely than not that
> the mitigating circumstance does not exist.
>
> So, if there is a factual dispute over the existence
> of a mitigating circumstance, you should find and
> consider that that mitigating circumstance exists
> unless you find the evidence is such that it is more
> likely than not that the mitigating circumstance did
> not exist.

(R. 1035-36).

Petitioner complains that the trial court, by failing to instruct the jury that it did not have to unanimously agree as to mitigating circumstances, gave the jury the impression that it must unanimously agree on mitigating circumstances and thereby erected an impermissible barrier to the jury's

137

consideration of mitigating evidence.   In support of his position, Petitioner cites <u>McKoy v. North Carolina</u>, 494 U.S. 433, 110 S. Ct. 1227, 108 L. Ed. 2d 369 (1990) and  <u>Mills v. Maryland</u>, 486 U.S. 367, 108 S. Ct 1860, 100 L. Ed. 2d 384 (1988).

Both <u>Mills</u> and <u>McKoy</u> were decided after Petitioner's 1987 trial.

As the Eleventh Circuit has stated,

> [w]e have held many times that "[r]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop." <u>Elledge v. Dugger</u>, 823 F.2d 1439, 1443, <u>modified in unrelated part</u>, 833 F.2d 250 (11th Cir. 1987), <u>cert. denied</u>, 485 U.S. 1014, 108 S. Ct. 1487, 99 L. Ed. 2d 715 (1988); <u>accord</u>, <u>Thompson v. Wainwright</u>, 787 F.2d 1447, 1459 n.8 (11th Cir. 1986), <u>cert. denied</u>, 481 U.S. 1042, 107 S. Ct. 1986, 95 L. Ed. 2d 825 (1987); <u>Funchess v. Wainwright</u>, 772 F.2d 683, 691 (11th Cir. 1985), <u>cert. denied</u>, 475 U.S. 1031, 106 S. Ct. 1242, 89 L. Ed. 2d 349 (1986).   In <u>Funchess</u>, for example, we rejected a claim that counsel's performance was deficient for failure to anticipate a Florida Supreme Court decision that came one year after trial.  <u>See</u> <u>id</u>.

<u>Spaziano</u>, 36 F.3d at 1039 (petitioner claimed, in effect, that counsel rendered ineffective assistance by failing to anticipate a state court decision issued almost a decade after trial).

Therefore, McDonald's failure to anticipate <u>Mills</u> and

138

McKoy does not meet the first prong of Strickland.

Even if McDonald reasonably should have anticipated Mills and McKoy, the law of those cases would not have changed the result in this case. In Mills, the Supreme Court reversed a death sentence because there was

> "a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance."

Mills, 486 U.S. at 384. Although the verdict form instruction on finding mitigating factors did not mention unanimity, the instruction immediately preceding it required unanimity as to the existence of aggravating circumstances; the instruction immediately following it required unanimity as to whether the mitigating circumstances found to exist outweighed the aggravating circumstances found to exist. Id. at 384-89. Also, the judge repeatedly stressed to the jury that their findings had to be unanimous. Id. at 378, n.11. The Mills court concluded that "there was 'a substantial probability' that reasonable jurors, upon receiving the judge's instructions in this case and in attempting to complete the verdict form as instructed, well may have thought they were

139

precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." Id. at 384.

In McKoy[50], the Court found that North Carolina's capital sentencing scheme impermissibly limited jurors' consideration of mitigating circumstances because it allowed them to consider only those mitigating circumstances found unanimously. The instructions specifically required jury unanimity on the existence of mitigating circumstances. McKoy, 494 U.S. at 436. Thus, the court reasoned, one holdout juror could prevent others from giving effect to evidence calling for a lesser sentence than death, and those jurors who all agreed that there were some mitigating circumstances could not give effect to mitigating evidence unless they agreed unanimously that the same circumstance existed.

---

[50]The application of McKoy would arguably violate the non-retroactivity principles enunciated in Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989)(plurality opinion), since Petitioner's conviction became final in 1989, before McKoy was issued. For the purposes of this analysis, however, the court will apply McKoy, since the result would be the same as if it were not applied and since at least one court has found that the rules announced in Mills and McKoy "are bedrock procedural rules falling within the second exception to the Teague rule" Williams v. Dixon, 961 F.2d 448, 459 (4th Cir.), cert. denied, 506 U.S. 991, 113 S. Ct. 510, 121 L. Ed. 2d 445 (1992).

Broadly stated, <u>Mills</u> and <u>McKoy</u> invalidated death
sentences "based on jury instructions that, reasonably
construed, prevented the respective juries from considering
any mitigating factors they did not unanimously find to
exist." <u>Rodriquez v. Colorado</u>, 498 U.S. 1055, 111 S. Ct. 770,
112 L. Ed. 2d 789 (1991)(Marshall, J., dissenting).

In this case, even if McDonald arguably should have
anticipated <u>Mills</u> and <u>McKoy</u>, it does not appear that the
challenged instructions are contrary to those cases.   No
reasonable construction would have led jurors to believe that
they were prohibited from considering any mitigating factor
not unanimously agreed to exist by all jurors.   Although the
court told jurors that "each and every one of you must be
convinced beyond a reasonable doubt based on the evidence that
at least one or more of the aggravating circumstances exist,"
this does not reasonably translate into an instruction that
they had to unanimously agree that a particular mitigating
circumstance existed.   There was no specific language, as in
<u>Mills</u> and <u>McKoy</u>, requiring a unanimous finding that any
particular mitigating circumstance existed.   The context of
the instruction as a whole does not lead to a conclusion that
there was any reasonable likelihood that the jury applied the

141

instruction in such a way as to violate Petitioner's constitutional rights. See Boyde, 494 U.S. at 380.

McDonald therefore would have had no reasonable basis to object to the challenged instructions, even if he should have anticipated Mills and McKoy. Hence, this claim does not meet the first prong of Strickland.

The claim likewise fails Strickland's second prong. There is no reasonable probability that Petitioner would have avoided the death penalty if McDonald had objected to the instruction and had obtained an explicit instruction that the jurors did not have to unanimously agree as to the existence of mitigating circumstances. The instruction did not imply that such unanimity was required, so such an instruction would not have changed the jury's recommendation. Even if the instruction were capable of being interpreted to require such unanimity, there is no reasonable probability, in view of the heavy weight of the aggravating circumstances and the flimsy mitigating evidence, that the jury's recommendation would have changed if McDonald had persuaded the court to give an explicit instruction that no unanimity was required as to the existence of mitigating circumstances.

> 9.   *Counsel failed to challenge the application of*
> *the Ala. Code (1975) § 13A-5-49(8) aggravating*
> *circumstance ("heinous, atrocious and cruel")*
> *to his case.*

Petitioner claims that McDonald rendered ineffective assistance by failing to challenge the trial court's application of the aggravating circumstance set forth in Ala. Code § 13A-5-49(8) (1975), which states that "[t]he capital offense was especially heinous, atrocious or cruel compared to other capital offenses." He argues that this circumstance is unconstitutionally vague, that it was applied in an overly broad and arbitrary manner, and that his Sixth, Fourteenth and Eighth Amendment rights were thereby violated.

The Rule 20 court rejected this claim stating that McDonald's failure to object to the trial court's proper, narrow definition of the aggravating circumstance did not constitute deficient performance, and because Petitioner was not prejudiced, as the facts of the case warranted a finding of the circumstance. (Rule 20 R. 418-19).

In discussing this claim, Petitioner points to the following jury instructions:

> The aggravating circumstances which you may consider
> in this case, if you find from the evidence that
> they have been proven beyond a reasonable doubt, are
> . . . the capital offense was especially heinous,
> atrocious or cruel compared to other offenses.

The term "heinous" means extremely wicked or shockingly evil. The term "atrocious" means outrageously wicked and violent. The term "cruel" means designed to inflict a high degree of pain or with utter indifference to or even enjoyment of the suffering of others. What is tended [sic] to be included in this aggravating circumstance are those cases where the actual commission of the capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.

For a capital offense to be especially heinous or atrocious, any brutality which is in involved in it must exceed that which is normally present in any capital offense. For a capital offense to be especially cruel, it must be a . . . consciousless [sic] or pitiless crime which is unnecessarily tortious [sic] to the victim.

All capital cases are heinous, atrocious, and cruel to some extent. What is intended to be covered by this aggravating circumstance is only that case in which the degree of heinousness, atrociousness, or cruelty exceeds that which will always exist when a capital case is committed.

(R. 1030-31).

Of the aggravating circumstances provided by law, there are two, as you know, that the State has professed to argue to you. I told you that the fact that I instruct you on these circumstances or define that for you does not mean that the circumstances have been proven beyond a reasonable doubt in the case.

* * *

144

Petitioner has not stated an objection to a specific statement in these instructions.  He asserts generally that "the arbitrary application of this aggravating circumstance was exacerbated by the [instruction] that 'all capital cases are heinous, atrocious and cruel to some extent'." (Petitioner's Reply Brief at 72).

State capital sentencing schemes must "genuinely narrow the class of persons eligible for the death penalty." Zant v. Stephens, 462 U.S. 862, 877, 103 S. Ct. 2733, 2742, 77 L. Ed. 2d 235 (1983).

> "When the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. [Citations omitted].  If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm."

Avare v. Creech, 507 U.S. 463, 474, 113 S. Ct. 1534, 1542, 123 L. Ed. 2d 188 (1993)(citations omitted).

In Proffitt v. Florida, 428 U.S. 242, 255-56, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Supreme Court found that Florida courts had sufficiently narrowed the heinous, atrocious or cruel aggravating circumstance by limiting its application only to "the conscienceless or pitiless crime

145

which is unnecessarily torturous to the victim." The
challenged instructions use language substantially similar to
that found to be sufficiently narrowing in <u>Proffit</u>.[51]  In that
case, the circumstance was directed only at "the
conscienceless or pitiless crime which is unnecessarily
torturous to the victim."   <u>Proffitt</u>, 428 U.S. at 255-56.

The Eleventh Circuit has held that the Alabama courts'
construction of the "heinous, atrocious or cruel" aggravating
circumstance sufficiently narrows that circumstance because it
limits the application of the circumstance to "those
conscienceless or pitiless homicides which are unnecessarily
torturous to the victim."   <u>Lindsey v. Thigpen</u>, 875 F.2d 1509,
1514 (11th Cir. 1989) [citations omitted].

In this case, however, there is at least some question as
to whether the challenged instruction sufficiently narrowed

---

[51]The challenged instructions also narrow application of
the circumstance to cases where the offense is "accompanied by
such additional acts as to set the offense apart from the norm
of capital offenses," and where the "degree of heinousness,
atrociousness or cruelty [as defined in prior instructions]
exceeds that which will always exist when a capital offense is
committed."   (R. 1066-67).   It is not likely that these
limitations sufficiently narrow the circumstance so as to
withstand constitutional scrutiny, since they do not give the
jury any standard by which to determine what is within the
"norm of capital offenses" or when "the degree of heinousness,
atrociousness or cruelty exceeds that which will always exist
when a capital offense is committed."

the application of this aggravating circumstance because the narrowing language approved by the <u>Proffitt</u> court was apparently used only to narrow the meaning of the word "cruel," even though the jury could have applied the circumstance to a murder that was "heinous, atrocious <u>or</u> cruel." <u>See</u> <u>Shell v. Mississippi</u>, 498 U.S. 1, 2-3, 111 S. Ct. 313, 112 L. Ed. 2d 1 (1990) (instruction that "the word heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others" is insufficient)(Marshall, J., concurring), citing <u>Maynard v. Cartwright</u>, 486 U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988).[52]   In <u>Shell</u>, Justice Marshall noted that while the

---

[52]<u>See, contra</u> <u>Haney v. State</u>, 603 So. 2d 368, 387 (Ala. Crim. App. 1991), <u>aff'd</u>, 603 So. 2d 412 (Ala.1992), <u>cert. denied</u>, 507 U.S. 925, 113 S. Ct. 1297, 122 L. Ed. 2d 687 (1993), in which the court stated as follows:

[T]he instant case is distinguishable from <u>Maynard</u> [<u>v. Cartwright</u>, 486 U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988)]. Unlike <u>Maynard</u>, the jury here was instructed on the meaning of the words of the aggravating circumstance in the context of capital sentencing. These instructions correctly followed the previously recognized limiting construction of the aggravating circumstance established by the Alabama Supreme Court in <u>Ex parte</u>

word "cruel" may have been constitutionally defined, the instruction "left the jury with two constitutionally infirm, alternative bases on which to find that petitioner committed the charged murder in an 'especially heinous, atrocious or cruel' fashion." Shell, 498 U.S. at 3-4.[53]

Once again though, Shell was announced by the Supreme Court after Petitioner's trial and after Petitioner's counsel was required to make his decisions. Counsel cannot be faulted for failing to anticipate future developments in the law. In light of Profitt, it was not unreasonable for an attorney in 1987 to believe that the instruction given sufficiently narrowed the "especially heinous, atrocious, or cruel" factor

---

Kyzer, 399 So. 2d 330, 334 (Ala. 1981), wherein the court stated: "The aggravating circumstance listed in § 13-1-6(8) [now § 13A-5-49(8)] was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."

Id. at 387.

[53]Petitioner specifically complains about the following instruction: "[a]ll capital offenses, of course, are heinous and atrocious and cruel to some extent." This complaint is meritless. This phrase, as used in context, merely assists in explaining to the jury that not all capital crimes are so "heinous, atrocious or cruel" as to fall within the definition of the aggravating circumstance for the purpose of sentencing. It is difficult to discern how this language could have been harmful to Petitioner's case.

148

to pass constitutional muster.

Because Petitioner so clearly fails to meet the second prong of <u>Strickland</u> as to this claim, it is unnecessary for the Court to pass judgment on whether the challenged instruction was unconstitutionally vague or whether McDonald rendered deficient performance for failing to object to it. Even if McDonald had objected to the instruction and had persuaded the court to give an instruction more sharply narrowing the definition of "heinous, atrocious or cruel," there is no reasonable probability that the result of the proceeding would have been different. McGraw's murder would likely be encompassed by almost any reasonable definition of "heinous, atrocious or cruel." Also, the jury would likely have recommended execution even without specifically finding the heinous, atrocious or cruel circumstance. The mitigating evidence available to Petitioner would not have outweighed the evidence of another aggravating circumstance: that Petitioner helped two other men overpower and murder another human being in order to rob him of a few bits of electronic equipment and some petty cash.[54]

_____

[54]The court notes that the Alabama Court of Criminal Appeals reviewed the evidence in the case and found that the offense was "especially heinous, atrocious and cruel." <u>Brown</u>,

Because the result of the proceeding would have been the same even if McDonald had strongly, even successfully, objected to this instruction, Petitioner cannot meet the second prong of <u>Strickland</u>. This claim must therefore fail.

> 10. *Counsel failed to object to the trial court's jury instructions on reasonable doubt.*

Petitioner claims that McDonald rendered ineffective assistance by failing to object to the instructions set forth on p. 171 of this Opinion,[55] the basis that they violated his Sixth, Eighth and Fourteenth Amendment rights:

In the penalty phase, the court stated that "[t]he same definitions apply to reasonable doubt that I gave you [in the guilt/innocence phase]. (R. 1029).

Petitioner argues that these instructions are

---

545 So. 2d at 116.

[55]   Petitioner points to the following language in the instruction:

One other way to put this in a shorter fashion: A reasonable doubt is a doubt based upon reason and common sense, the kind of doubt that would make a reasonable person hesitate to act. So, proof beyond a reasonable doubt must therefore be proof of such a convincing character that a reasonable person such as yourself would not hesitate to rely and act upon it in the most important of your own personal affairs.

unconstitutional under <u>Cage v. Louisiana</u>, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990) and <u>Victor v. Nebraska</u>, 511 U.S. 1, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994), both issued after Petitioner's 1987 trial.

This claim, like others previously discussed in this Opinion, is based upon McDonald's failure to anticipate the future development of the law.    Because "[r]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop."    <u>Spaziano</u>, 36 F.3d at 1039(citations omitted), the claim has no merit.[56]

Even assuming that McDonald should have, for some reason, anticipated the issuance of <u>Cage</u> and <u>Victor</u>, the claim would still be meritless because the challenged instructions are not constitutionally infirm.[57]

---

[56]The Rule 20 court used this reasoning to reject the claim.    (Rule 20 R. 421).

[57]<u>Teague v. Lane</u>, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) normally prohibits, on collateral review of a case, the application of a new rule of law announced before conviction was final.    Even so, <u>Cage</u> falls within <u>Teague</u>'s second exception, allowing the retroactive application of new rules involving procedures that are "implicit in the concept of ordered liberty."    <u>Nutter v. White</u>, 39 F.3d 1154, 1157-58 (11th Cir. 1994), citing <u>Teague</u>, 489 U.S. at 307.    Insofar as it modifies or clarifies <u>Cage</u>, <u>Victor</u> would also apply.    <u>See</u> <u>Gaston v. Whitley</u>, 67 F.3d 121, 122 (5th Cir. 1995), <u>cert.</u>

151

Petitioner challenges the trial court's statement that "[t]he State must prove their case beyond a reasonable doubt or a moral certainty," and its use of the phrase "moral certainty" at other points in the instructions. The use of this term does not, however, render the instructions unconstitutional under <u>Cage</u> and <u>Victor</u>.

In <u>Cage</u>, the challenged instructions equated "reasonable doubt" with the terms "actual substantial doubt" and "grave uncertainty." 498 U.S. at 41. They also required a "moral certainty" that the defendant was guilty. <u>Id</u>. The Supreme Court held that the combination of the words "substantial" and "grave" with the term "moral uncertainty," rather than "evidentiary uncertainty" improperly suggested a higher degree of doubt than reasonable doubt. <u>Id</u>. The Court stated that in construing the instruction, it considered "how reasonable jurors could have understood the charge as a whole." <u>Id</u>. The Supreme Court has since eschewed such a standard in favor of the standard announced in <u>Boyde</u>, 494 U.S. at 380 and restated in <u>Estelle</u>, 502 U.S. at 73, n.4 and accompanying text:

---

denied, 518 U.S. 1023, 116 S. Ct. 2561, 135 L. Ed. 2d 1078 (1996)(<u>Victor</u> modifies <u>Cage</u> and adopts a different standard, so "if <u>Sullivan</u> v. <u>Louisiana</u>, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993)] and <u>Teague</u> command retroactivity here, it is now <u>Victor</u>, not <u>Cage</u>, which should be applied retroactively").

whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way [that violates the Constitution].

The <u>Victor</u> court modified <u>Cage</u>, holding that courts are not required to use any particular language in burden of proof instructions if "taken as a whole, the instructions correctly conve[y] the concept of reasonable doubt." <u>Victor</u>, 511 U.S. at 5. The Court upheld use of the term "moral certainty" in reasonable doubt instructions where jurors were told that they must have "an abiding conviction, to a moral certainty, of the truth of the charge." 511 U.S. at 14-15.

In this case, the instructions include substantially the same language used in <u>Victor</u>. The <u>Victor</u> court noted that the instructions required the jury to base their conclusions on the evidence, as do the instructions in this case. <u>Id</u>. at 16. The <u>Victor</u> court also noted that the problem with the use of "moral certainty" in the <u>Cage</u> instructions was that "the rest of the instruction provided insufficient context to lend meaning to the phrase." <u>Id</u>. at 21. The instructions in this case do not suffer such a defect.

Here, the instructions correctly communicated to the jury the State's burden of proof, leaving no reasonable likelihood

153

under <u>Boyde</u> that jurors applied the instructions in such a way as to violate the Constitution.

Because the instructions are constitutionally sound, McDonald had no basis for objecting to them. His failure to do so was therefore not deficient performance under the first prong of <u>Strickland</u>, even assuming he should have anticipated the issuance of <u>Cage</u> and <u>Victor</u>.

The claim also fails under <u>Strickland</u>'s second prong, because even if McDonald had objected to the instructions, and even if the court had omitted the "moral certainty" language from them, there is no reasonable probability that the result of the proceeding would have been different. The evidence pointing to Petitioner's guilt, including his own statements, was overwhelming. It is unlikely that omitting the "moral certainty" language would have led the jury to reach a different decision regarding Petitioner's guilt.

> 11. *Counsel failed to specify all the possible constitutional grounds for objecting to Davenport's testimony and the playing of his recorded statement.*

Petitioner claims that McDonald rendered ineffective assistance by failing to specify all the possible constitutional grounds for objecting to Davenport's testimony and to the playing of his recorded statement at trial.

154

Petitioner does not identify other grounds he claims should
have been stated by counsel.

In rejecting this claim, the Rule 20 court made the
following findings:

> Brown alleged that McDonald was ineffective because
> he did not specify all possible constitutional
> objections to Davenport's testimony and to playing
> the tape of the prosecutors' interview with
> Davenport at trial. However, McDonald's performance
> was not deficient. While McDonald objected to
> playing the tape at trial, he viewed the
> prosecutor's interview with Davenport and the tapes
> of that interview as providing a new, additional
> chance to discredit the case against Brown.
> McDonald wanted the jury to hear the prosecutor's
> interview with Davenport because he thought it
> showed them in a bad light, as trying to change
> Davenport's testimony. Thus, McDonald made a
> strategic decision to attack Davenport's credibility
> based on an eleventh-hour change in that testimony
> and to use the tape of that interview to support his
> attack. This was reasonable strategy and McDonald's
> performance was not deficient.
>
> Further, Brown was not prejudiced by the playing of
> the tape of the Davenport interview. This Court
> instructed the jury that the statements made on tape
> were not substantive evidence and that the tape was
> only being played to allow the jury to evaluate the
> circumstances of the interview. (TR. 861-863, 921)
> In closing argument, the prosecution also told the
> jury that what was said on the tape was not evidence
> but was only being offered to show how Davenport was
> treated in the interview. (TR. 902-903) Thus, the
> jury was not only instructed to consider this tape
> only in deciding Davenport's credibility but the
> prosecution also did not make any improper use of or
> reference to the tape's content. Therefore, there
> is no reasonable probability that, had McDonald made

further objections to the tapes being played, then
Brown would not have been convicted.

(Rule 20 R. 419-21).

These factual findings are supported by the record and
are entitled to a presumption of correctness.

**Q.   Petitioner's conviction and sentence of death violate the
Sixth and Fourteenth Amendments because he did not
receive effective assistance of counsel on appeal.**

Petitioner claims that his conviction and sentence
violate his rights under the Sixth and Fourteenth Amendments
because he received ineffective assistance of counsel on
appeal.  Petitioner represented on direct appeal by William
Wynn, who was assisted by another attorney, William DelGrosso.

The Court must analyze Petitioner's ineffective
assistance of appellate counsel claims under the same
Strickland v. Washington standard applicable to ineffective
assistance of trial counsel claims.  Matire v. Wainwright, 811
F.2d 1430, 1435 (11th Cir. 1987).  To determine whether
appellate counsel's failure to raise a particular issue or
claim on appeal caused prejudice, the court must assess
whether the unraised claim was of such merit that counsel can
be faulted for not having asserted it.  Alvord v. Wainwright,
725 F.2d 1282 (11th Cir. 1984); Hooks v. Roberts, 480 F.2d

156

1196, 1197-98 (5th Cir.1973), <u>cert. denied</u>, 414 U.S. 1163, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974).

The Eleven Circuit has observed: "[T]he best way to evaluate 'this question ... is to examine the alleged trial errors to see if they contain sufficient merit ... that his appellate counsel can be faulted for not having raised them.'" <u>Alvord v. Wainwright</u>, 725 F.2d 1282, 1291 (11th Cir. 1984) (quoting <u>Hooks v. Roberts</u>, 480 F.2d 1196, 1197-98 (5th Cir.1973), <u>cert. denied</u>, 414 U.S. 1163, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974)). Counsel is not required to present on appeal every conceivable appellate issue, but may use his professional judgment to winnow out weaker claims and focus on more meritorious arguments. <u>Smith v. Murray</u>, 477 U.S. 527, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986); <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983); <u>Julius v. Johnson</u>, 840 F.2d 1533 (11th Cir. 1988). Appellate counsel is ineffective only when his failure to assert an appellate issue is so professionally unreasonable that he is no longer acting as "counsel" required by the Sixth Amendment.

Petitioner claims that his appellate counsel were

ineffective for failing to address the following issues on appeal:

(1) The prosecutions' improper arguments during the guilt/innocence trial and during the penalty trial.

(2) The trial court's directive that the jury exclude from its consideration in its penalty phase deliberations any and all passion.

(3) The jury instruction which impermissibly shifted the burden of proof.

(4) The trial court's instruction improperly limiting the jury's consideration of mitigating evidence in the case.

(5) The unconstitutional application of Alabama's especially heinous, atrocious and cruel aggravating circumstance.

(6) All constitutional grounds for objection to Jimmy Davenport's testimony as a whole and his specifically tainted testimony.

(7) The trial court's failure to properly consider mitigating evidence and failure to consider whether death was an appropriate sentence.

(8) The trial court's denial of Brown's motion for a continuance.

(9) The introduction of inflammatory photographs and the slide show during the penalty phase.

(10) The trial court's instruction to the jury on reasonable doubt.

(11) The playing of the tape of the interrogation of Jimmy Davenport.

(Petition for Writ of Habeas Corpus at ¶ 165).

Claims (1)-(6) and (10)-(11) set forth above (the "duplicate claims"), were addressed above in the discussion of Petitioner's ineffective assistance of trial counsel claims. The court has concluded that trial counsel was not constitutionally ineffective because he failed to address these issues during trial. Each of the duplicate claims failed to meet at least one prong of <u>Strickland</u>. While the fact that trial counsel's failure to object to the matters set forth in the duplicate claims did not constitute deficient performance does not alone answer whether appellate counsel's failure to raise them on appeal was unreasonable, the fact that they were <u>not</u> preserved at trial did limit appellate counsel's ability to argue them on appeal.

In death penalty cases, Rule 45A of the Alabama Rules of Appellate Procedure authorizes the appellate court to search the record for "plain error." Although "plain error" may preserve issues in capital cases that would not have been preserved in other cases due to the lack of a trial objection, still the absence of a trial objection weighs against a finding of prejudice on appeal. <u>Stewart v. State</u>, 601 So.2d 491, 493 (Ala.Crim.App. 1992); <u>Ex parte Kennedy</u>, 472 So.2d 1106 (Ala) <u>cert</u>. <u>denied</u> 474 U.S. 975, 106 S.Ct. 340, 88

L.Ed.2d 325 (1985); <u>Stewart v. State</u>, 601 So.2d, 491, 501
(Ala.Crim.App. 1992).

On Claims (1)-(5) and (10), there clearly was no
objection made at trial; and there is no "plain error."
Similarly, insofar as petitioner argues that appellate counsel
failed to assert on appeal all <u>grounds</u> of objection to
Davenport's testimony (Claim Q(6)), it is clear that those
grounds for objection were <u>not</u> made at trial, and there is no
showing of "plain error."   Finally, as to Claim Q(9), only
some of the photographs were objected to by trial counsel.
The admission of the photographs not objected to was not plain
error.

It is clear that Petitioner's appellate counsel exercised
his professional judgment to winnow the claims down to those
he believed were most likely to succeed.   His decision to do
so was not professionally unreasonable because none of these
claims rose to the level of "plain error" to overcome the lack
of an objection at trial.

Turning to Claims (7), (8), and (11), the Rule 20 court
made the following findings with respect to Petitioner's
ineffective assistance of appellate counsel claims:

> William Wynn, assisted by William DelGrosso,
> represented Brown on appeal.   At the Rule 20

hearing, Wynn testified that before accepting the appointment to represent Brown, he talked with trial counsel about the case. Then both Wynn and DelGrosso reviewed the record and identified what they believed were substantial issues. Wynn said he thought the most effective way of presenting Brown's case on appeal was to focus on the best issues available. Wynn and DelGrosso researched the issues, then Wynn hired a legal research service to perform additional research. After extensive research, Wynn wrote the appellate brief.

Brown, 663 So. 2d at 1035.

These findings of fact are supported by the record and are entitled to a presumption of correctness.

>    1.    *Ineffective assistance claim regarding the trial court's consideration of mitigating evidence.*

In Claim (7), Petitioner complains that his appellate counsel rendered ineffective assistance by failing to challenge the trial court's alleged failure to properly consider mitigating evidence and to consider whether death was an appropriate sentence.[58] Because the trial court properly considered mitigating evidence, and because the failure to

_____

[58]The claim that the court did not consider whether death was an appropriate sentence appears to be a restatement of the other claim set forth in this section: that the court did not properly consider mitigating evidence. Insofar as Petitioner intends it to be a separate claim, it is baseless. The trial court performed the weighing of aggravating and mitigating circumstances necessary to make its sentencing determination.

161

raise a meritless claim does not constitute deficient performance, this ineffective assistance claim fails to meet the first prong of <u>Strickland</u>.

Petitioner argues that, in making its sentencing determination, the court "rejected, failed to consider, or failed to accord proper status to mitigating evidence in violation of Petitioner's rights under the Eighth and Fourteenth Amendments." (Petitioner's Reply Brief at 80). He complains that, in its sentencing order, the court either did not mention the following non-statutory mitigating circumstances, or compartmentalized them under its discussion of the statutory mitigating circumstances:

> a) A change in Brown's life after he was arrested and before trial;  b) Brown's religious conversion while in jail after his arrest and before trial; c) Brown's good behavior and absence of disciplinaries while incarcerated in the Jefferson County Jail; d) Brown's cooperative and polite nature while in the Jefferson County Jail; e) Brown's expression of a personal interest in math and English while incarcerated in the Jefferson County Jail; f) Brown's assistance in connection with a G.E.D. program at the Jefferson County Jail; g) Brown's ability to teach; h) Brown's being directly responsible for two men in the Jefferson County Jail obtaining their G.E.D. certificates; I) Brown's witnessing to other prisoners; j) Brown's having been a positive influence on the life of another prisoner; k) Brown's having a six year old son; l) The love of Brown's six year old son for him; m) Brown's expression of remorse; n) Brown's pleasant and cooperative nature during his childhood and

early adolescent years; o) Brown's good disposition as a youngster; p) Brown's having participated in various church activities in his youth; q) Brown's having "done things brothers do" with his younger brother; r) Brown's assistance of his mother in running a day care in her home; s) Brown's not having been involved in fights; t) Brown's trustworthiness as a baby sitter; u) Brown's not having been a leader but a follower; v) Brown's having given his best at basketball even though he lacked the necessary physical attributes; w) Brown's behavior changes around age 14 when he started using drugs and alcohol; x) Brown was under the influence of alcohol at the time of the crime; y) Brown's long history of drug and alcohol abuse; z) indications that Archie Bankhead acted as the director in connection with the killing of Jack McGraw; aa) the absence of any prior convictions of violent crimes; bb) Brown's having come from a fine family; cc) sympathy for Brown's family and friends; dd) sympathy for Brown; ee) Family members and others' love for Brown and desire to see Brown live.

(Petitioner's Reply Brief at 80-81).

Petitioner argues that the trial court improperly elevated statutory mitigating circumstances over non-statutory mitigating circumstances, and relegated non-statutory mitigating circumstances to an inferior status. Id. at 82-83.

The Supreme Court has held that, "in capital cases, the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence." Hitchcock v. Dugger, 481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987)(citing Skipper v. North Carolina, 476 U.S. 1, 106 S.

163

Ct.1669, 90 L. Ed. 2d 1 (1986)).[59]   See also  Lockett v. Ohio,
438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978).   The
defendant in a capital case generally must be allowed to
present any relevant mitigating evidence regarding the
defendant's character or record and any of the circumstances
of the offense, and consideration of that evidence is a
constitutionally indispensable part of the process of
inflicting the penalty of death.   California v. Brown, 479
U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987).

During the sentencing hearing, the trial court heard the
petitioner's mitigating evidence, including evidence and
testimony regarding the factors set forth above (the "non-
statutory factors").   Petitioner's trial counsel submitted
medical records and invited Petitioner's supporters in the
courtroom to testify.   (R. 1127).   The court noted that
twenty-seven people attended the sentencing in support of
Petitioner.   (R. 1128).   He asked Petitioner's trial counsel
if he had any corrections to the pre-sentence report.   (R.

---

[59]Hitchcock was decided in April, 1987, after Petitioner's
March, 1987 sentencing.   As noted consistently in this
Opinion,  courts do not sustain ineffective assistance claims
based upon counsel's failure to anticipate the development of
the law.

1129).[60]

The Court considered <u>all</u> of the mitigating evidence presented by Petitioner.  But it concluded that the presence of aggravating circumstances, weighed against the absence of mitigating circumstances, compelled it to uphold the jury's advisory verdict imposing the death penalty.  (<u>Id</u>.)   It thus appears that the court considered themitigating evidence presented by Petitioner, although it ultimately concluded that no mitigating circumstances existed so as to outweigh the aggravating circumstances.[61]  (R. 1160).

_____

[60]The trial court's jury instructions at the penalty phase show that it understood the necessity of considering non-statutory mitigating circumstances.  The court instructed that the list of mitigating circumstances provided in Alabama law "is not a complete list of the mitigating circumstances you may consider," (R. 1033), and that "mitigating circumstances shall include any aspect of the defendant's character or record, or any of the circumstances of the offense that the defendant offers as a basis for a sentence of life without parole instead of death."  (R. 1033-35).

[61]In Alabama, "the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer." <u>Haney v. State</u>, 603 So. 2d 368, 389 (Ala. Crim. App. 1991)(citations omitted), <u>aff'd</u> 603 So. 2d 412 (Ala. 1992), <u>cert. denied</u>, 507 U.S. 925, 113 S. Ct. 1297, 122 L. Ed. 2d 687 (1993).
See also <u>Walton v. Arizona</u>,  497 U.S. 639, 649, 110 S. Ct. 3047, 3054, 111 L. Ed. 2d 511 (1990)(although "the [<u>Lockett</u>] Court has refused to countenance state-imposed restrictions on what mitigating circumstances may be considered in deciding whether to impose the death penalty . . . it does not follow from <u>Lockett</u> and its progeny that a State is precluded from

The trial court's discussion of non-statutory mitigating evidence complied with the state law requirement that sentencing courts "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51 [statutory mitigating circumstances], and any additional mitigating circumstances offered pursuant to § 13A-5-52 [nonstatutory mitigating circumstances]." Ala. Code § 13A-5-47(d)(1975). Although the trial court did not use the thirty narrowly-drawn non-statutory mitigating "circumstances" now advanced by Petitioner, its more general classification of the evidence and its consideration of certain evidence under the category of statutory mitigating circumstances does not indicate that the trial court failed to properly consider the evidence.[62]

---

specifying how mitigating circumstances are to be proved.").

[62]The Supreme Court has recognized that "[n]onstatutory evidence, precisely because it does not fall into any predefined category, is considerably more difficult to organize into a coherent discussion. Even though a more complete explanation is obviously helpful to a reviewing

To be sure the trial court may have classified the mitigating evidence differently. But this Court is convinced that it properly considered all the evidence. There was thus no constitutional basis for appellate counsel to have challenged the court's consideration of mitigating circumstances. Appellate counsel's failure to do so therefore did not constitute deficient performance.

Even if the court arguably erred in its alleged failure to consider the non-statutory mitigating evidence, appellate counsel's failure to raise such error on appeal would not meet the first prong of Strickland. The Supreme Court has recognized that appellate counsel need not advance every possible argument but should instead work toward "winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Jones v. Barnes, 463 U.S. 745, 751-52, 103 S. Ct. 3308, 3312, 77 L. Ed. 2d 987 (1983). "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the

---

court, from the trial judge's perspective it is simpler merely to conclude, in those cases where it is true, that such evidence taken together does not outweigh the aggravating circumstances. Parker v. Dugger, 498 U.S. 308, 318, 111 S. Ct. 731, 737-38, 112 L. Ed. 2d 812 (1991).

hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536, 106 S. Ct. 2661, 2667, 91 L. Ed. 2d 434 (1986), citing Jones, 463 U.S. at 751-752.  As Petitioner's primary counsel testified at the Rule 20 hearing, he could have raised far more issues than he ultimately did on appeal, but that he wanted to focus attention on the most important issues and avoid a "shotgun" approach that would lessen the impact of Petitioner's strongest arguments.  (Rule 20 R. 415).

Furthermore, this ineffective assistance claim fails to meet the second prong of Strickland.  Petitioner was not prejudiced by appellate counsel's failure to challenge the trial court's alleged improper consideration of non-statutory mitigating circumstances.  If the omitted claim had no reasonable probability of success on appeal, Petitioner did not suffer prejudice as a result of counsel's performance. See Joiner v. United States, 103 F.3d 961, 963 (11th Cir. 1997), cert. denied, 520 U.S. 1246, 117 S. Ct. 1857, 137 L. Ed. 2d 1058, citing Heath v. Jones, 941 F.2d 1126, 1132 (11th Cir. 1991), cert. denied, 502 U.S. 1077, 112 S. Ct. 981, 117 L. Ed. 2d 144 (1992).

If appellate counsel had made this claim, it is unlikely that the state appellate courts would have granted relief.  In fact, the Alabama Court of Criminal Appeals conducted its own independent weighing of the aggravating and mitigating circumstances, and agreed with the trial court's conclusion.  Brown, 545 So.2d at 116.  There is no reasonable probability that the appellate courts would have found that the aggravating factors were outweighed by Petitioner's mitigating evidence, especially since many of the non-statutory mitigating "circumstances" advanced by Petitioner either could not or could barely be characterized as mitigating.  Even those "circumstances" that could credibly be called mitigating in nature were not significant enough to have outweighed the aggravating circumstances and to have thus changed the result of the sentencing.  This claim therefore fails because Petitioner cannot meet either prong of Strickland.

   2.  *Ineffective assistance for failure to raise a claim regarding the trial court's denial of a continuance.*

In Claim (8), Petitioner complains that appellate counsel failed to raise a claim regarding the trial court's denial of

Brown's motion for a continuance on the morning of trial.[63]
Petitioner argues that the trial court abused its broad
discretion to deny a continuance because the law limits such
discretion where the defendant's constitutional rights are in
danger of being violated and where a reasonable continuance
has been requested "for the purpose of obtaining defense
witnesses where it has been shown that the desired testimony
would be relevant and material to the defense." (Petitioner's
Reply Brief at 67, quoting Tolbert v. State, 552 So. 2d 164
(Ala. Crim. App. 1989)(citations omitted)).

Petitioner cites Ake v. Oklahoma, 470 U.S. 68, 105 S.
Ct. 1087, 84 L. Ed. 2d 53 (1985), in which the Supreme Court
held that due process required that the "state, at a minimum,
assure the [indigent] defendant access to a competent
psychiatrist who will conduct an appropriate examination and
assist in the evaluation, preparation, and presentation of the
defense" whenever he "demonstrates to the trial judge that his

---

[63]Petitioner's appellate counsel did raise a claim
pertaining to the court's refusal to grant a continuance, but
the claim was based upon the fact that the defense was not
informed of Jimmy Davenport's change in testimony until just
before trial, not upon the basis of Petitioner's need for time
to review the Taylor Hardin records and to be examined by his
own expert.

sanity at the time of the offense is to be a significant factor at trial." <u>Ake</u>, 470 U.S. at 83.  He argues that the trial court, by denying his motion for continuance, violated his rights under <u>Ake</u>, and that appellate counsel erred in failing to raise such a claim.

Appellate counsel's failure to challenge, under <u>Ake</u> or under more general abuse of discretion principles, does not meet either prong of <u>Strickland</u> so as to constitute ineffective assistance.

Petitioner points out that, on the first day of trial, he moved for a continuance because the defense needed time to prepare psychological status evidence and to have a psychologist evaluate him.  He complains that the Taylor Hardin Secure Medical Facility ("Taylor Hardin") examined and evaluated him, but submitted its report to the court only a week before his trial, and its documentation "some time later."  He complains that his trial counsel acquired the documentation the first day of trial.  He argues that, as a result of this late receipt of information from Taylor Hardin and the denial of a continuance, Petitioner asserts that his trial counsel "was unable to make an adequate assessment of trial strategy and to obtain expert psychological assistance

for his defense," which he contends would have been of "immense value" to him.   (Petitioner's Reply Brief at 68).

As set forth above, focusing on the strongest appellate claims instead of raising every possible issue is "the hallmark of effective appellate advocacy." Smith, 477 U.S. at 536.   Therefore, the omission of even a non-frivolous appellate claim will not necessarily constitute deficient performance, particularly where, as here, appellate counsel testified that he omitted numerous possible claims in order to concentrate his efforts on Petitioner's strongest claims.   It is only where the omitted issue is of such substantial merit that counsel's failure to raise it can be faulted as professionally unreasonable.

In Alabama, "a continuance in a criminal trial is addressed to the sound discretion of the court and will not be disturbed unless clearly abused." Young v. State, 469 So. 2d 683, 687 (Ala. Cr. App. 1985).   A review of the transcript reveals several facts pertinent to the trial court's denial of a continuance.   On November 24, 1986, eleven weeks before trial, McDonald told the trial court that Petitioner would be asserting an insanity defense.   (R. 167-68).   The court granted funds for a private psychiatrist without requiring

172

Petitioner to file a motion. (R. 168). On December 17, 1986, about eight weeks before trial, the court reaffirmed to McDonald that funds were available for him to hire a psychiatric or psychological expert.[64] (Supp. Tr. 36). On January 30, 1987, ten days before trial, the trial court informed McDonald of the substance of Petitioner's report from Taylor Hardin. (R. 174). McDonald moved for a continuance on February 2, 1987, a week before trial began, when he received a copy of the Taylor Hardin report. (R. 171-72). On that same date, McDonald requested that the court obtain for the defense the Taylor Hardin records and notes concerning Petitioner. (R. 171). The court then reaffirmed to McDonald that Petitioner was entitled to funds to hire a psychiatric expert. (R. 173-74). McDonald waited for two days to contact a Dr. Brooks, who said he wanted to review the doctors' notes from the Taylor Hardin examination. (R. 172). Dr. Brooks, who was, in any event, unavailable the week of trial, did not see Petitioner, and McDonald apparently never contacted another expert. (R. 172-73). The court provided McDonald

---

[64]At that time, the court indicated that Petitioner apparently had not "passed muster" to be examined at Taylor Hardin, but that the court would attempt to have Petitioner examined because this was a capital case. (Supp. Tr. 35).

with the Taylor Hardin records and notes as trial proceedings began on February 9, 1987, and stated that he would be allowed to take them overnight, if he wished.   (R. 175, 184, 187). The funds for expert assistance were still available to Petitioner as trial began.  (R. 174).

Given these facts, the denial of the motion to continue did not constitute an abuse of discretion.  Petitioner had sufficient funds and time to obtain an expert, and to make arrangements for the expert to be prepared to review the Taylor Hardin report and records in an expedited fashion when they became available.  Also, McDonald had access to the substance of the Taylor Hardin report ten days before trial, which was enough time to evaluate its impact on his trial strategy.  On the first day of trial, McDonald merely stated that he needed to look over the records before confirming that Petitioner would not be using the insanity defense.  (R. 175).

Neither do these facts indicate that Petitioner's rights under Ake were violated.  The court made it clear, eleven weeks before trial, that Petitioner could have funds to hire a psychiatrist.  The court thus never denied Petitioner access to psychiatric assistance.  McDonald apparently chose not to attempt to engage a psychiatrist until receiving the results

174

of the Taylor Hardin report ten days before trial.   The unavailability, until just before trial, of the actual notes and records from the Taylor Hardin examination does not render the trial court's denial of a continuance a violation of Petitioner's <u>Ake</u> rights.

Appellate counsel's failure to raise a meritless challenge to the denial of a continuance was not deficient performance.   It is clear that the continuance issue was hardly even marginal in merit, and it cannot be said that appellate counsel's decision to forego this issue was professionally unreasonable.

Furthermore, if Petitioner's Rule 20 expert testimony is an example of the sort of evidence he could have presented if given a continuance, he probably would have still been convicted and sentenced to death.   <u>See</u> discussion of claim P.1. set forth above.   As made clear by petitioner's own Rule 20 expert, petitioner's mental health did not affect his decision to murder or assist in the murder of McGraw. Although there was some testimony about petitioner's diminished capacity due to drug and alcohol abuse, the expert admitted that petitioner was not mentally ill but had only an "antisocial personality disorder."

The omitted claim was not of such merit or significance that its omission on appeal constituted deficient performance or prejudice to Petitioner, since it had no reasonable probability of success on appeal. See Joiner, supra. This claim fails to meet the second prong of Strickland.

> 3. *Ineffective assistance for failing to raise a claim regarding admission of certain photographs and slides at trial.*

In Claim (9), Petitioner complains that appellate counsel failed to raise a claim regarding the introduction at trial of certain photographs and of a slide show which was shown to jurors during the penalty phase. Petitioner claims that certain photographs and slides of McGraw's body used at trial were inflammatory, highly prejudicial and of little evidentiary value, since other evidence was available to illustrate the matters depicted in the photographs. (Petitioner's Reply Brief at 117-18).

For instance, Petitioner argues that deputy sheriffs fully described the crime scene and that Dr. Brissie could have used a diagram in explaining McGraw's injuries. (Id.). He argues that many of the photographs were prejudicial in that they were cumulative, duplicates or close-ups, and that many of the slides were prejudicial because they were

cumulative, duplicative, or showed McGraw's body after having been subjected to autopsy procedures.   (Id. at 118).   He argues that these photographs and slides "served only to arouse the passions and prejudices of the jury," thereby violating his constitutional rights.   (Id. at 118-119).   He argues that appellate counsel rendered ineffective assistance in failing to raise this issue on appeal.

Appellate counsel's failure to raise this claim was not deficient performance.   The photographs and slides at issue were admissible under Alabama law, so appellate counsel did not have an adequate basis upon which to assert such a claim.[65] In Alabama, it has long been the law that

> [a]s a general rule, photographs are admissible in evidence if they tend to prove or disprove some disputed or material issue, to illustrate or

---

[65]The Court notes that, in reviewing the case of another defendant in McGraw's murder, the Alabama Court of Criminal Appeals examined a claim that the trial court should not have admitted 17 slides of the McGraw's body, which were also shown in this case.   The court rejected appellant's argument that the slides were "irrelevant, inaccurate, misleading, and cumulative, and that the trial court should not have allowed the medical examiner to use them as an aid to his testimony." Bankhead v. State, 585 So. 97 (Ala. Crim. App. 1989), remanded on other grounds on rehearing, 585 So. 2d 112 (Ala. 1991), on remand, 585 So. 2d 133 (Ala.Cr.App. 1991), aff'd. on return to remand, 625 So. 2d 1141 (Ala.Cr.App. 1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993), on remand, 625 So. 2d 1149 (Ala. Crim. App. 1993).

elucidate some other relevant fact or evidence, or
to corroborate or disprove some other evidence
offered or to be offered, and their admission is
within the sound discretion of the trial judge.
Fletcher v. State, 291 Ala. 67, 277 So. 2d 882
(1973); Hopkins v. State, 429 So. 2d 1146
(Ala.Crim.App.), cert. denied, 429 So. 2d 1146
(Ala.1983); Godbolt v. State, 429 So. 2d 1131
(Ala.Crim.App.1983); Carpenter v. State, 400 So. 2d
417 (Ala.Crim.App.), cert. denied, 400 So. 2d 427
(Ala.1981). Photographs which depict the character
and location of external wounds on the body of a
deceased are admissible even though they are
cumulative and based upon undisputed matters.

Wicker v. State, 433 So. 2d 1190 (Ala.Crim.App.1983);
Hopkins v. State; Hines v. State, 365 So. 2d 320
(Ala.Crim.App.), cert. denied, 365 So.2d 322 (Ala.1978).
The fact that a photograph is gruesome and ghastly is no
reason to exclude its admission into evidence, if it has
some relevancy to the proceedings, even if the
photographs may tend to inflame the jury. Warrick v.
State, 460 So. 2d 320 (Ala.Crim.App.1984); Carpenter v.
State; Richards v. State, 337 So. 2d 171
(Ala.Crim.App.), cert. denied, 337 So. 2d 173
(Ala.1976).

Magwood v. State, 494 So. 2d 124, 141 (Ala. Crim. App. 1985),

aff'd 494 So. 2d 154 (Ala. 1986), cert. denied, 479 U.S. 995,

107 S. Ct. 599, 93 L. Ed. 2d 599 (1986). In Magwood, the

court found that trial court did not err in admitting

extremely gruesome photographs of the crime scene, even though

prosecution witnesses could adequately describe the scene

without using the photographs.

Under this authority, the photographs, as generally

described by Petitioner, were clearly admissible, even if they

178

were gruesome and cumulative of other evidence, because they showed the character and location of external wounds on McGraw's body.

There are, however, Alabama cases implying that duplicative gruesome photographs may be objectionable[66]   In this case, the court has not been able to locate the photographs and slides in the record, so it has reviewed trial testimony describing them.   Of the photographs and slides particularly described by witnesses, none are duplicative or repetitive, as they are all described as showing different injuries, or different angles or views thereof.  Of those for which the court could not locate particular descriptions, including State exhibits 9-13, 18, 20-22 and 25-33, it appears that Petitioner did not object to them during trial.   The State offered exhibits 2, 3, 7-13, and 17-33, and of these,

---

[66]See Updyke v. State, 501 So. 2d 566, 567 (Ala. Crim. App. 1986)("There is no evidence within the record which suggests that the State illegally prejudiced the appellant by the use of the photographs.   Each photograph depicts the different injuries sustained and does not appear to be duplicative in nature.").   See also Smith v. State, 581 So. 2d 497 (Ala. Crim. App. 1990), rev'd on other grounds, 581 So. 2d 531 (Ala. 1991)(in affirming admission of photographs of deceased, the court stated that "each photograph depicts something different, whether it be a different angle or a different piece of evidence in support of the State's case.")

petitioner's trial counsel objected only to 7, 8, and 17.  (R. 438).  State exhibits 7 and 8 were properly admitted by the trial court following a hearing.  (R. 588-90).  State exhibit 17 was introduced by Petitioner's counsel during his cross-examination of a witness.  (R. 453).  Thus, the described photographs and slides were not duplicative and the undescribed ones were admitted without objection from Petitioner, so that claims based upon the their admission were not preserved for review.[67]

It is thus apparent that appellate counsel did not render deficient performance in failing to challenge admission of the photographs and slides at trial, as there was no basis for such a challenge.  Even if there had been a tenuous basis for such a claim, appellate counsel may choose to focus on the strongest arguments, as counsel here claims he did.  (Rule 20 Tr. 415).  This claim thus fails under the first prong of Strickland.

---

[67]Under Alabama law, "[o]bjections to evidence cannot be raised for the first time on appeal, and "[r]eview on appeal is limited to matters on which rulings are invoked in the trial court." Wood v. State, 416 So. 2d 794, 799 (Ala. Crim. App. 1982), citing Brown v. State, 392 So. 2d 1248 (Ala. Cr. App. 1980), cert. denied, 392 So. 2d 1266 (Ala. 1981), McGee v. State, 383 So. 2d 881 (Ala. Cr. App.), cert. denied, 383 So. 2d 884 (Ala. 1980).

Also, the result of the proceedings would not have been different but for appellate counsel's failure to raise such meritless or unpreserved claims. This claim thus also fails under the second prong of <u>Strickland</u>.

### 4. *The playing of the tape of the interrogation of Jimmy Davenport.*

Finally, at Claim (11), petitioner argues that appellate counsel was ineffective because he failed to argue all grounds for objection to playing of the Davenport-interrogation tape. On direct appeal, counsel did challenge the admission of the playing of the tape for the jury, but the Alabama Court of Criminal Appeals found that petitioner had no standing to object to the Fifth Amendment voluntariness of Davenport's taped statement. He now contends that appellate counsel should have argued that the playing of the tape denied him due process.

At trial, the court allowed the playing of the taped interrogation of Davenport by prosecutors, twice instructing the jury, however, that they could not consider the content of the conversations on the tape in assessing Petitioner's guilt. The tape was admitted for the express limited purpose only of showing the circumstances and manner of Davenport's interview

181

the day before trial began as an aid to the jury's assessment of the credibility of his in-court testimony. Although trial counsel initially objected to the playing of the tape, he later viewed it has having tactical benefits for the defense because it could show that Davenport might have been intimidated and coerced into giving the trial testimony he did, thereby undermining the prosecution. On appeal, counsel argued only that the taped statement was admitted into evidence without a sufficient showing of its voluntariness.

Petitioner contends now that counsel should have attacked the taped statement not on Fifth Amendment voluntariness grounds, but on due process, confrontation, and Eighth Amendment grounds. None of these issues have sufficient merit to blame counsel for not addressing them on appeal.

Insofar as petitioner claims counsel should have argued that the playing of the tape denied him due process and confrontation grounds, appellate counsel could have reasonably concluded that the arguments had little chance of prevailing on appeal. Petitioner was not deprived of a fundamentally fair trial by the admission of the taped interview because the trial court twice instructed the jury on the proper, limited use of the evidence. As evidence bearing on the credibility

of Davenport, it certainly was relevant. Petitioner was given the opportunity to cross-examine Davenport about the circumstances of the interview and to argue to the jury that the tape proved that Davenport was pressured and intimidated into giving the testimony he did and, therefore, that it was not credible.

Petitioner's right to confront and cross-examine the witnesses against him was not violated. Davenport testified in person at trial and was subject to cross-examination, including cross-examination about the circumstances of the taped interview. Certainly, petitioner could not cross-examine the tape itself, but it was offered only as physical evidence of the circumstances of the interview. The inability to cross-examine the tape is no different from a defendant's inability to cross-examine any other piece of physical evidence, be it a gun, photograph, or fingerprint.

Nor did the playing of the tape violate petitioner's right to individualized sentencing under the Eighth Amendment. Again, Davenport testified in person, supplying the jury and the court with the information necessary to assess the appropriate sentence. Since it is conceded that Davenport's trial testimony is consistent with what he said during the

184 of 185

taped interview, the playing of the tape added nothing to the jury's or the court's consideration of sentencing insofar as the circumstances of the offense and petitioner's role in it.

Because none of these theories for attacking the admissibility of the taped interview had merit, appellate counsel's failure to assert them not only was not deficient, but caused no prejudice to the defense. There is no reasonable probability that, if raised on appeal, any of these arguments would have resulted in reversal either of petitioner's conviction or sentence. Thus, this claim of ineffective assistance of appellate counsel is meritless.

### CONCLUSION

Having carefully addressed each of the claims for habeas corpus relief asserted by Petitioner in this action, the court finds each one of them either meritless or barred from consideration on one or more grounds. None of the claims entitles Petitioner to relief.

Therefore, the petition for writ of habeas corpus is due to be denied. A separate final judgment embodying this conclusion will be entered.

DONE this the _30th_ day of _September_ , 1999

_____
UNITED STATES DISTRICT JUDGE
U. W. CLEMON